Page 1

1              UNITED STATES DISTRICT COURT

2                DISTRICT OF CONNECTICUT

3

  MARGARET MARY KELLEY,

4

        Plaintiff,

5

  -vs-                      Civil Action No. 03-CV-57(GLG)

6

  SUN MICROSYSTEMS, INC.,

7

        Defendants.

8  _____/

9

10

11              DEPOSITION OF:

12              ANJALI JHANGIANI

13           Monday, June 7, 2004

14

15

16

17

18

19

20

21

22  Reported by:        DEPOBOOK REPORTING SERVICES
                      Certified Shorthand Reporters
23  LOWELL E. TORNO          713 10th Street
    CSR NO. 2131       Modesto, California 95354
24                     _____
25                      (800) 830-8885

Anjali Jhangiani  /  June 7, 2004

---

Page 2

1
    I N D E X   O F   E X A M I N A T I O N S
2
3    Examination by:              Page:
4    MR. LUCAS               5
5
6
7            -o0o-
8
9    I N D E X   O F   E X H I B I T S
10

11  Exhibits:   Description:        Page:
12  JJJ - Copy of a document entitled, "Sun    34
      Microsystems Inc., Systems Sales
13    Division, Sales Representative and
      Account Executive Plan Agreement,
14    (Re-goaling form)"
15  KKK - Copy of a document entitled,    37
      "Netscape YTD Detail"
16
    LLL - Commission Summary Report, William   95
17    Kozak
18  MMM - Commission Summary Report, Kristen   97
      Powers
19
20           -o0o-
21
22
23
24
25

---

Page 3

1           -o0o-
2        BE IT REMEMBERED that, pursuant to Notice of
3  Taking Deposition, and on Monday, June 7, 2004,
4  commencing at the hour of 10:05 a.m. thereof, at the Sun
5  Microsystems, Inc., 7777 Gateway Boulevard, Building 14,
6  Newark, California, before me, LOWELL E. TORNO, a Notary
7  Public in and for the State of California, personally
8  appeared
9        ANJALI JHANGIANI,
10  called as a witness herein; and the said witness, being
11  by me first duly sworn, was thereupon examined and
12  testified as is hereinafter set forth:
13           -o0o-
14  A P P E A R A N C E S :
15        MARTIN, LUCAS AND CHIOFEI, LLP, represented by
16  SCOTT LUCAS and MICHEL BAYOME, Attorneys at Law,
17  177 Broad Street, Stamford, Connecticut 06901, appeared
18  telephonically as counsel on behalf of the Plaintiff.
19        EDWARDS AND ANGELL, LLC, represented by
20  JOHN G. STRETTON, Attorney at Law, 301 Tresser
21  Boulevard, 13th Floor, Stamford, Connecticut 06901,
22  appeared telephonically as counsel on behalf of the
23  Defendant.
24        SUN MICROSYSTEMS, represented by PAUL BRIONES,
25  Counsel, Employment Law, 4120 Network Circle, Santa

---

Page 4

1  Clara, California 94054, appeared personally on behalf
2  of the Defendant.
3           -o0o-
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

Page 5

1           -o0o-
2        ANJALI JHANGIANI,
3  called as a witness herein; having been first duly sworn
4  was examined and testified as follows:
5        EXAMINATION BY MR. LUCAS
6        MR. LUCAS:  Q.  Good morning, Ms. Jhangiani.
7    A.  Hi.
8    Q.  My name is Scott Lucas, and I represent Mary
9  Kelley in a federal lawsuit she brought against Sun.
10    A.  Uh-huh.
11    Q.  Are you familiar with the lawsuit?
12    A.  Yes, I am.
13    Q.  Have you read the complaint in this matter?
14    A.  Yes, I have.
15    Q.  What have you done in preparation for this
16  deposition?
17    A.  I validated to insure that the compensation
18  that she was eligible to earn was correctly calculated.
19    Q.  Okay.
20    A.  And paid out.  Additionally, in her -- from
21  the date of notification to the termination date, to
22  validate that OTE calculation was accurately calculated
23  and paid out.  And also the entire OTE for new fiscal
24  year, which was effective July 1st, to make sure that
25  was accurately called and paid out.  And I did a

Anjali Jhangiani  /  June 7, 2004

Page 6

1  reconciliation for that.
2       I reviewed the goal sheets, as well as the
3  comp plan for '01.  And that's about it.
4       Q.  Did you meet with counsel?
5       A.  Oh, yes, I did.
6       Q.  Which counsel?
7       A.  Both Paul and John.
8       Q.  So you met with Mr. Stretton?
9       A.  I didn't actually meet with him, but we had
10  phone conversations, yes.
11      Q.  And what documents did you look at to do these
12  reconciliations that you are referring to?
13      A.  John had provided us with the -- originally, I
14  believe it was just an E-mail when we started the legal
15  review to say can you go back and take a look at how
16  much we paid her, was it accurate.  And what we did is,
17  we put together a validation against what her earned
18  commissions or target incentive should have been.
19      Q.  Okay.
20      A.  So we looked at the offer letter, the goal
21  sheets that were submitted to us, and we validated it
22  against that compared to what we had entered into the
23  system for calculation to make sure it was accurate.
24      Q.  Is this a written validation?
25      A.  Yes, some of it -- it was very similar to what

Page 7

1  the counsel also provided to us.  Was just a spread
2  sheet that we put out and very similar to what the
3  counsel put out, so it was just really a matter of just
4  revalidating what they did.
5       Q.  Okay.
6       A.  And that was document 737.
7       Q.  That is the validation, or you are saying the
8  validation is similar to that?
9       A.  The validation is similar to that.  This was a
10  similar process that we used.
11      MR. LUCAS:  John, are you willing to produce
12  the validation?
13      MR. STRETTON:  I mean, you can make a request
14  for the document.  All I can tell you at this time is we
15  will take it under consideration and get back to you.
16      MR. LUCAS:  Q.  Ms. Jhangiani, did the
17  validation turn up any payments that were not on the
18  document Bates Number Sun 737?
19      A.  No, there was no discrepancy from what we did
20  to what was presented to us.
21      Q.  On 737?
22      A.  That is correct, on 737.
23      Q.  Let me back up a minute.
24      What is your title, Ms. Jhangiani?
25      A.  I am the -- I am Legal Title Financial Manager

Page 8

1  but, you know, aka Commission Accounting Manager.
2       Q.  How long have you held that position?
3       A.  A little over five years.
4       Q.  How long have you been an employee of Sun?
5       A.  A little over ten years.
6       Q.  What was the first position you held with Sun?
7       A.  It was a order operations group in order
8  entry.
9       Q.  So what did you do in order operations?
10      A.  I was the supervisor.
11      Q.  How many people did you supervise?
12      A.  Well, I held a couple of different positions,
13  so one time I would have said maybe about twelve, and
14  later to about, maybe, 16, but that is the best of my
15  knowledge right now.
16      Q.  How long were you a supervisor for order
17  operations?
18      A.  Maybe about three and a half, four years.
19      Q.  Was that a financial position?
20      A.  Yes, it's under the finance organization.
21      Q.  Did you supervise people taking orders; is
22  that correct?
23      A.  What it was is, when a sales rep procures a
24  purchase order and they send it to the order entry
25  department to enter into our order entry system, so that

Page 9

1  it's documented and an invoice or purchase order then --
2  or sales order, excuse me, gets generated, and that is
3  what tells the manufacturing group that we got a system
4  that we either got to build or schedule to get shipped
5  out from shipping.
6       Q.  Okay.  It gets scheduled to be built or
7  shipped?
8       A.  That's correct.
9       Q.  Is that considered being booked when a sales
10  order is generated?
11      A.  Yes.
12      Q.  Is that the term, an order being booked under
13  Sun's terminology, that is when a sales order is
14  generated?
15      A.  That's correct.  Well, there are two different
16  terminologies since when I first started at Sun compared
17  to when -- when I started at Sun, I had a different ERP,
18  which was the order entry system, that we called and now
19  we have Oracle ERP, but at the time for CAD, if you get
20  a order into the systems and you hit a complete status,
21  the order got booked.
22      Q.  Okay.
23      A.  Now I believe in the ERP system, you can have
24  it booked but it is not completed.  You cover pending
25  documentation.

Anjali Jhangiani / June 7, 2004

Page 10

1    Q.    When did that change take place in the systems
2    that you used between Oracle and the prior one?
3    A.    I would say about maybe seven years ago,
4    approximately.  Seven, yeah, maybe about six or seven
5    years ago.
6    Q.    The late '90s?
7    A.    Approximately, yes.
8    Q.    So at least in the year 2001, when an order
9    was booked, it did not necessarily mean all the
10   paperwork was complete; is that accurate?
11   A.    Correct.
12   Q.    What is the next position you held?
13   A.    That was it.  Oh, when I originally started at
14   Sun?
15   Q.    No, I am saying after being supervisor at
16   order operations, where did you go after that within the
17   organization?
18   A.    Right here within commission accounting.
19   Q.    What was your title?  Financial Manager?
20   A.    Financial Manager.
21   Q.    To whom do you report?
22   A.    Mike Garling.
23   Q.    What is his title?
24   A.    I think, again, legally, it's financial
25   manager.

Page 11

1    Q.    Who does he report to?
2    A.    George Thomasson.
3    Q.    What is his title?
4    A.    Vice-president.
5    Q.    Of finance?
6    A.    That's correct.
7    Q.    Does he report to a Senior Vice-president or
8    is that Executive Vice-president?
9    A.    Yes, he does.
10   Q.    Which one?
11   A.    Is Brett Shaffer.
12   Q.    Senior or Executive Vice-president?
13   A.    I think it's Senior Vice-president.
14   Q.    Are there Executive Vice-presidents above the
15   Senior Vice-presidents?
16   A.    You know, I am not sure.  I don't really look
17   at the senior and titles and so forth.
18   Q.    Do you supervise anybody at the current time?
19   A.    Yes, I do.
20   Q.    How many people?
21   A.    Ten.
22   Q.    Ten?
23   A.    That's correct.
24   Q.    What are your duties as financial manager?
25   A.    How detailed do you want me to go?

Page 12

1    Q.    Why don't we start, generally, and if I want
2    more information, I will let you know.
3    A.    In general, in a nutshell, our mission
4    statement is to insure that we accurately and timely pay
5    out compensation to sales -- to our sales
6    representatives here in the U.S.  What I do is I manage
7    the commission accountings to administer to insure that
8    compensation is accurately and timely paid out.
9         I also manage the system that calculates
10   compensation which is Sun Com, which is a home-grown
11   application, and work with our IT manager to insure that
12   our monthly calcs or modifications on enhancements we
13   need get processed to adhere to the comp architecture.
14   Q.    How many financial managers are there?
15   A.    That manage what?
16   Q.    Sales compensation.
17   A.    From end to end of compensation here in our
18   finance organization, we got quite a few people who
19   actually touch comp, so we have a manager who goes to
20   the comp committees, which is an organization that helps
21   architect the new fiscal year comp architecture.  At the
22   same time, they also work with the sales organizations
23   for any escalations that are not in adherence to the
24   comp architecture.  So there's some sort of escalation
25   path.

Page 13

1         Then we also have components of the
2    compensation that are managed by other financial
3    managers such is as for validation of indirect revenue.
4    That's our PSR process.
5         Then we have another financial manager that
6    manages sales programs.  Again, this is where revenue
7    that is earned compensation that we pay out to our sales
8    representatives through a special program, such as
9    passports, would fall under sales programs.
10        And I think that would be it.  But at the area
11   level, there's like a controller who also manages at an
12   area level.
13   Q.    Is there a controller for the Stamford,
14   Connecticut sales office?
15   A.    Yeah.
16   Q.    For the area that includes the Stamford,
17   Connecticut sales office?
18   A.    Yes, there would be.
19   Q.    What territory is that?
20   A.    I believe that would be under financial
21   services.
22   Q.    Do you know who occupied that position in
23   2001?
24   A.    No.  I can't recall.
25   Q.    Is that person the direct contact for the

Anjali Jhangiani  /  June 7, 2004

Page 14

1 sales representatives at the Stamford office?
2     A.    That is correct.  That is their area of
3 finance organization.  That would be their first
4 stop/shop to go to.
5     Q.    And then if that doesn't get resolved at that
6 level, they can come to your department?
7     A.    Yes.
8     Q.    In 2001, were you responsible for
9 compensation -- for overseeing compensations -- excuse
10 me, let me rephrase that.
11     In 2001, were you responsible for overseeing
12 compensation payments to the sales forces at Stamford,
13 Connecticut office?
14     A.    Yes.
15     Q.    Yes?
16     A.    Yes.
17     Q.    You don't know who the area representative
18 was?
19     A.    No.  I can tell you who it is today, who held
20 that title for a few years.  I can't under oath tell you
21 for sure if it was still David Berthiume or not.
22     Q.    The person that holds it now is David?
23     A.    Berthiume.
24     Q.    Can you spell that for me?
25     A.    I don't think I could do that.

Page 15

1     Q.    Okay, Berthiume, is that it?
2     A.    Yeah, B-E-R-T-H-I-U-M-E.
3     Q.    Okay.  He had it for a few years, but you
4 don't know if he had it back in 2001; is that it?
5     A.    That's correct.
6     Q.    Do you know who might have preceded him?
7     A.    No, I can't recollect.
8     Q.    Can you give me your educational background?
9     A.    I earned a Bachelor's degree from the
10 University of California, California State University.
11 And prior to that I completed my first two years of my
12 undergraduate at University of Illinois.
13     Q.    Okay.  What was your Bachelor's degree in?
14     A.    Liberal Arts.
15     Q.    Any postgraduate degrees?
16     A.    No, sir.
17     Q.    Any postgraduate training?
18     A.    Other than management training, no.
19     Q.    Any finance training?
20     A.    Yes, finance training here in commission
21 accounting, yeah.  But nothing that, you know -- it's
22 in-house training here at Sun.
23     Q.    Can you pull out Exhibit C, the premarked, the
24 offer letter to Kelley.
25     A.    Okay.

Page 16

1     Q.    Do you have that in front of you?
2     A.    Yes, I do.
3     Q.    Now, this is something you looked at in
4 preparation for your deposition?
5     A.    Yes, I have.
6     Q.    Have you ever seen it before you looked at it
7 in preparation for your deposition?
8     A.    No.
9     Q.    Is this a standard form for a sale
10 representative?
11     A.    As an offer letter?
12     Q.    Yes.
13     A.    Yeah.  Yes.
14     Q.    It indicates on the second full paragraph that
15 Ms. Kelley had been compensated at a salary of 52,000;
16 do you see that?
17     A.    That's correct.
18     Q.    Did you verify that, in fact, she was paid
19 $52,000 during the entire time she was employed at Sun?
20     A.    I validated her earned compensation against
21 the target incentive of 52,000, yes.
22     MR. STRETTON:  I want to make sure that --
23 John Stretton here -- I tried to place an objection
24 prior to that response, and I am not sure because of the
25 conference call I was heard.

Page 17

1     MR. LUCAS:  I didn't hear that.
2     THE REPORTER:  I didn't hear it.
3     MR. LUCAS:  Let me try again.
4     Q.    Did you verify that Ms. Kelley was paid a
5 salary at a rate of $52,000 annually during the entire
6 time she was employed at Sun?
7     A.    $52,000 is not her salary.  52,000 is plus --
8 it is not just the base salary.  It would be her salary
9 plus benefits.
10     Q.    Okay.
11     A.    So can you repeat the question so I understand
12 it clearly?
13     Q.    Let me rephrase it.
14     Did you verify that she was paid at a base
15 salary rate of $52,000 annually during the entire time
16 she was employed at Sun?
17     A.    Yes.  Excuse me, yes.
18     Q.    In addition to that, she received benefits; is
19 that correct?
20     A.    That's correct.
21     Q.    And what was included in those benefits?
22     A.    That would be her 401K, Sun Flex, health
23 benefits, car allowance.  I think that's all I can
24 recall.
25     Q.    If you look at the bottom of the first page of

5 (Pages 14 to 17)

Anjali Jhangiani  /  June 7, 2004

Page 18

1  Exhibit C, right above where it says, "What you need to
2  do," she was going to get a monthly car allowance of
3  $450 a month; correct?
4      A.   That is correct.
5      Q.   Was that a single monthly payment or is that
6  paid twice a month?
7      A.   You know, I'm not sure because that portion of
8  her compensation is administered by the payroll
9  department.
10     Q.   Now, is Sun -- does Sun, or did it, use in
11  2001 for its sales force in Stamford a 24 period annual
12  pay schedule or 26?
13     A.   Again, those are things that are administered
14  by the payroll.
15     Q.   So you don't know?
16     A.   No, I would not know.
17     Q.   Then going back to the second full paragraph,
18  it says, "Annual target incentive potential is 78,000";
19  do you see that?
20     A.   That's correct, I see that.
21     Q.   What do you understand that term to mean?
22  What is a target incentive potential?
23     A.   Target incentive would be if the sales rep
24  attained their annual goals, then they can earn up to
25  $78,000 in commissions.

Page 19

1      Q.   And if they exceed their goal, they can earn
2  more than that; is that correct?
3      A.   That is correct.
4      Q.   The next line says, "On target annual earnings
5  at plan will be 130,000," I understand that to be the
6  base salary rate plus the target incentives, the sum of
7  78,000 added together; is that correct?
8      A.   That's correct.
9      Q.   So in other words, if you sell your quota and
10  no more or no less, you can expect to earn $130,000 plus
11  benefits; correct?
12          MR. STRETTON:  Objection.
13          MR. LUCAS:  Q.  You can answer.
14     A.   What do I do at this point, Paul?
15          MR. BRIONES:  If you know the answer, then you
16  can answer.  If you don't know.  Do not speculate.
17          THE WITNESS:  Okay, from my understanding of
18  OTE, which we call it, which is on target earnings, is
19  on target earnings equals your salary, your target
20  incentives, your car allowance, some additional
21  benefits, plus a calculation or a percentage of, let's
22  say, any additional bonuses that the employee can
23  attain.
24          MR. LUCAS:  Q.  Now, look at the next full
25  paragraph, it says, "During your first six months"; do

Page 20

1  you see that?
2      A.   That's correct, I see it.
3      Q.   It refers to a monthly draw in the amount of
4  $5,525.  Do you see that?
5      A.   Yes.
6      Q.   Is that a monthly payment of on target
7  earnings?  In other words, if you got paid on target
8  earnings, would that be the monthly amount?
9      A.   No, that would not be the amount.
10     Q.   That is just the 78 plus the 52 divided by
11  twelve?
12     A.   No.  That would be -- do you want me to tell
13  you what it is?
14     Q.   Yes, how did you get that?
15     A.   It's 85 percent of your target incentives
16  divided by twelve.
17     Q.   85 percent of 78,000 divided by twelve?
18     A.   That's correct.
19     Q.   Do you know, under the formula here that
20  Ms. Kelley was getting compensated under, what her on
21  target earning payment would be on a monthly basis?
22     A.   What?  I think I'm not understanding the
23  question.  Can you please repeat the question?
24     Q.   Okay.  You are familiar with the term "on
25  target earnings"?

Page 21

1      A.   Yes.
2      Q.   What I am asking you for, for Ms. Kelley, what
3  would the monthly payments be if she was only being paid
4  the on target earnings?
5      A.   Her on target earnings would be, if you take
6  her target incentive --
7      Q.   The 78,000?
8      A.   Yes, and again when -- let me make a
9  disclaimer here first.  There are two organizations that
10  would be involved in paying out on target earnings.  The
11  portion that commission accounting is involved for is
12  just the target incentive portion, and payroll would be
13  involved in paying out the salary portion.
14          So payroll would pay out their salary based on
15  their calculation of -- on the bi -- I think it's a
16  biweekly or bimonthly basis, and for us in commission
17  accounting, how we calculate the target what we would
18  owe for OTE for that month would be exactly a simple
19  formulation, 78,000 divided by twelve.
20     Q.   Do you know what that figure is?  I don't have
21  a calculator in front of me.
22     A.   No, sir, I do not.
23     Q.   Hang on one second.
24          65 sound right to you?
25          MR. STRETTON:  Objection, calls for

Anjali Jhangiani  /  June 7, 2004

Page 22

1  speculation.
2      MR. LUCAS:  Q.  Do you have a calculator
3  handy?
4      A.    No, sir, I do not.
5      Q.    If I told you 78,000 divided by 12 would be
6  6500, would that be the figure for the on track
7  earnings?
8      MR. STRETTON:  Objection.
9      MR. LUCAS:  Q.  Target earnings.  I know you
10 can't do the math.  I'm saying whatever that figure,
11 78,000 divided by 12 is the on target earnings from a
12 commission prospective; is that correct?
13     MR. STRETTON:  I think if you want to proceed
14 with by hypothetical, you can do that, but I don't think
15 she can testify to a number that she can't calculate in
16 her head.
17     MR. LUCAS:  I didn't give her a number.  I
18 gave her a formula.
19     Q.    $78,000 divided by 12, and that's the on
20 target earnings for the commission portion of her
21 compensation?
22     A.    Yes.
23     Q.    Do you have Exhibit B there in front of you?
24 "B" as in boy.
25     A.    Yes, I do.

Page 23

1      Q.    Are you aware that Ms. Kelley was a Sales
2  Representative B, as in boy?
3      A.    Yes, I am.
4      Q.    Do you recognize what Exhibit B is?
5      A.    Yes.  I do.
6      Q.    What is it?
7      A.    It is the compensation architecture plan on a
8  page.
9      Q.    And there's two plan designs that comprise
10 Exhibit B, one for a Sales Rep B with MBO's and one
11 without MBO's; do you see that?
12     A.    Yes, I do.
13     Q.    Do you know what an MBO is?
14     A.    It's management by objectives.
15     Q.    Do you know if Ms. Kelley was with or without
16 MBO's?
17     A.    She was without.
18     Q.    So if you turn to the third page of Exhibit B,
19 is that the architecture for Ms. Kelley's compensation?
20     A.    I'm looking at document Sun 445, just to make
21 sure that's page 3.
22     Q.    I am looking at 444.
23     A.    Hang on, because that would be -- page 3, then
24 would be page 444.
25     Q.    Right.

Page 24

1      A.    And then, yes, that would be without the MBO
2  comp plan.
3      Q.    Just so I am sure, we are looking at this the
4  same way, the upper left-hand portion of that box there
5  sets forth her -- it says, "On target earnings 130,000";
6  do you see that?
7      A.    Yes.
8      Q.    Now, that is not the term that you were using
9  because it doesn't include benefits; correct?
10     A.    That's correct.
11     Q.    And if someone is being paid on target
12 earnings, is it your understanding that it would include
13 benefits or not include benefits?
14     A.    Again, I want to make sure we understand we
15 are on the same page about benefits.
16     Q.    Okay.
17     A.    Well, you indicated when we were looking at
18 Exhibit C that 130,000 was not the total commission --
19 excuse me, the total compensation for on target
20 earnings.  There was in addition to that a sum for
21 benefit and for including a car allowance.  Do you
22 recall that testimony?
23     A.    Yes.
24     Q.    Here it looks like Sun is using the term on
25 target earnings to be just the salary plus the target

Page 25

1  incentives?
2      A.    Yes.
3      Q.    Which way does Sun use it -- use the
4  definition of on target earnings when it is paying an
5  employee on target earnings?
6      A.    Exactly how it is stated here, which is base
7  salary, plus the commissions, which would equal 130 K.
8      Q.    It doesn't include the benefits?
9      A.    Yeah, and my apology.  When I'm thinking of
10 OET, I'm also thinking of the total compensation plan so
11 I overstated what I really meant to say is total --
12 total compensation plan.
13     But you are correct, it is the way it's
14 defined here, OTE equals base salary plus commissions,
15 and it would not include the car allowance or any
16 additional bonuses that could be paid out on this plan.
17     Q.    If I wanted to determine what Ms. Kelley's
18 monthly on target earning payments would be under the
19 architecture applicable to her position, I would divide
20 $130,000 by twelve?
21     A.    That would be true.  You could do it that way,
22 yes.
23     Q.    Then on the right-hand side, which is "goal
24 achievement" in the box; do you see that?
25     A.    Uh-huh.

Anjali Jhangiani  /  June 7, 2004

Page 26

1    Q.    It has, if you earn -- it looks to me, tell me
2  if I am misinterpreting this, if you achieve a goal
3  between zero and 100 percent of your target, you get
4  your PCR, broadcast PCR; correct?
5    A.    Correct.
6    Q.    Does that mean personal commission rate?
7    A.    That is correct.
8    Q.    And if you are over 100 percent but less than
9  110 percent, your personal commission rate times two; is
10  that correct?
11    A.    That is correct.
12    Q.    Is that for everything that is sold or just
13  for the amount above 100 percent; do you know?
14    A.    It's any -- the PCR times two, we will call
15  it, is a two X PCR, and that is for anything less than
16  110 percent and greater than 100 percent of your annual
17  goal.
18    Q.    So if I had a goal of a hundred and I sold
19  110, I would get my PCR for the first 100 and my PCR
20  times two applies to the 10,000 that is left over or the
21  ten that is left over?  Do you follow me on that?
22    A.    Yes.
23    Q.    Is that accurate?
24    A.    Yes, that is.  It is for every dollars greater
25  than 100 percent.

Page 27

1    Q.    And that is the same, if we go over
2  110 percent, every dollars that you sell over
3  110 percent, you earn a commission of your commission
4  rate, your PCR, times three; is that accurate?
5    A.    That is correct.
6    Q.    On the bottom of the box, there are four rows.
7  First is car allowance, 5400 paid biweekly; do you see
8  that?
9    A.    Yes.
10    Q.    Does that refresh your recollection whether
11  Ms. Kelley was to get a car payment or car allowance two
12  times a month?
13        MR. STRETTON:  Objection.
14        THE WITNESS:  In the example, again, it states
15  that it's biweekly, but I can't tell you if Ms. Kelley
16  received her car allowance biweekly.  Again, that is
17  administered by payroll.
18        MR. LUCAS:  Q.  What is that SPIF?
19    A.    That is a space that -- "Sales Program
20  Incentive Funds."
21    Q.    How is that applied to someone in Ms. Kelley's
22  position?
23    A.    In this example, if there was a special
24  program that the comp architecture team in conjunction
25  with the VP of sales have approved, hypothetically, they

Page 28

1  are targeting a very specific market to sell a very
2  specific product, then they may launch a SPIF, as we
3  call it, and what that means, I can give you in a simple
4  example, if we are trying to attain a revenue quota for
5  our software product line, then if you sell
6  the software product from this day to that day within a
7  specific quarter and you are still employed, then we can
8  pay you extra commissions and that does not retire your
9  revenue goal, so you will receive commissions on the
10  revenue, but you will receive an extra compensation for
11  selling that specific product.
12    Q.    Do you know whether any SPIFS were in force --
13  for lack of a better term -- during fiscal year '01 for
14  Ms. Kelley?
15    A.    I really didn't go through her detail
16  commissions to see if this was any SPIF payment, so no.
17    Q.    You don't know?
18    A.    No.  I don't recall.  I didn't see them.  I am
19  sorry.
20    Q.    The next row, "linearity bonus," can you tell
21  me what that is?
22    A.    Again, this is what I was trying to refer to
23  earlier where it is above and beyond your OTE payments
24  that can be made.  It is just an additional bonus that
25  they can attain.

Page 29

1    Q.    It seems to me to be descriptive, it's
2  "15 percent of target commission, 25 percent of bonus
3  available per quarter."  Do you know what that means and
4  how to apply to Ms. Kelley?
5    A.    To be quite frank with you, we haven't had a
6  linearity bonus in the last few years, we took it out of
7  the architecture comp plan, so I am not down to the
8  detail level of calculating compensation.  One of my
9  accountants can probably better answer that for you.
10        But from my recollection what that means is --
11        MR. BRIONES:  No, you don't know.
12        THE WITNESS:  Okay.  I have never done a
13  calculation of it, so I can't tell you.
14        MR. LUCAS:  Q.  Do you know whether Ms. Kelley
15  was credited with a linearity bonus for fiscal year
16  2001?
17    A.    I did not look at the details of her
18  commission statements to see.
19    Q.    I thought you said you reconciled her
20  commission statement with the payment as to what she
21  should have been paid?
22    A.    Well, when I did the reconciliation, it was
23  for the revenue that was assigned to her and the PCR
24  multiplied to the revenue to see if the commission that
25  she earned was paid out on the OTE, the target

DEPOBOOK REPORTING SERVICES (800) 830-8885

Anjali Jhangiani  /  June 7, 2004

Page 30

1   incentive.  Anything above and beyond bonuses, I did not
2   go through a monthly statement to look at that.
3      Q.   The last item in the box is something called a
4   "Leasing Bonus."  Do you know what that is?
5      A.   Yeah, I do.
6      Q.   What is that?
7      A.   The leasing bonus is where if the sales rep
8   procures a purchase order and has that order go through
9   a specified lease company, and in this example it could
10  be GE or General Electric or SMF leasing, then they can
11  receive an additional bonus.
12     Q.   And again, you didn't look to see if
13  Ms. Kelley was eligible for or did receive such a bonus?
14     MR. STRETTON:  Objection.
15     MR. BRIONES:  You can answer if you know.
16     THE WITNESS:  Again no, I did not go through
17  the details to see whether bonuses or SPIFS were paid
18  out.
19     MR. LUCAS:  Q.  Okay.
20     A.   Actually, I take that back.  I did see one.  I
21  think that was the October commission statement where I
22  did see there was a bonus paid to her for the leasing
23  add-on bonus, yes.
24     Q.   Do you know what the amount of that was?
25     A.   I believe it was $99.

Page 31

1      Q.   Look at the notes on the bottom.  It says in
2   number two, second sentence, "In general, Sun's intent
3   is to make only perspective changes."
4         Do you know what that is a reference to?
5      A.   Yeah.
6      Q.   What is that?
7      A.   Generally, Sun is not in -- when they do
8   re-goaling, they never do retrogoaling, so we don't go
9   back to the beginning of the fiscal year.  Any
10  re-goaling we do would be prospective.
11     Q.   Is that the same with any changes in the
12  architecture, that generally would be prospective, not
13  retroactive?
14     MR. STRETTON:  Objection.
15     THE WITNESS:  Comp architecture?
16     MR. BRIONES:  Was that an objection, John?
17     MR. STRETTON:  Yes.  Yes.
18     MR. BRIONES:  Go ahead.
19     THE WITNESS:  I am sorry, was your question --
20  can you repeat your question again?
21     MR. LUCAS:  Q.  Well, the first sentence of
22  number two, note number two, says, "Sun Microsystems
23  reserves the right to correct any goaling or management
24  error."
25         Then it goes on to "In general, we only intend

Page 32

1   to make only prospective changes."
2         I assume that's a reference to not only
3   goaling but any changes attributable to what they call
4   management errors; is that accurate?
5      MR. BRIONES:  Answer only if you understand
6   the question.
7      THE WITNESS:  Yeah, you can't see my face
8   because I am a bit perplexed in understanding, because I
9   thought originally we were talking about just the
10  goaling.
11     MR. LUCAS:  Q.  Okay.  What I was asking you,
12  how you understood the second sentence in note two.  You
13  referred to goaling, and I am just trying to see whether
14  you in your understanding of this referred to more than
15  just goaling changes.
16     MR. BRIONES:  And, again, answer only if you
17  know the answer.  Don't speculate.
18     THE WITNESS:  No, because I've had five years
19  of experience, and we have had, you know, various
20  different situations, and it is not just to goaling,
21  but, you know, even system problems, but if we find out
22  that there is an error, we try to fix it right there and
23  then and hopefully going forward the errors causing it
24  is only prospective.  I cannot go back retro and change
25  what I reported in my GL, you know, anything like that.

Page 33

1         So it is difficult to answer.  You know, I am
2   not sure how to respond other than saying that it's more
3   than just goaling or management errors that we change
4   prospectively.
5      Q.   It is?
6      A.   Yes.
7      Q.   Okay.  Generally, you don't want to change
8   things retroactively; right?
9      MR. STRETTON:  Objection.
10     THE WITNESS:  Again if we find that we have
11  made a calculation error, I am illegally bound to make
12  sure, what I stated earlier is that we accurately and
13  timely pay a sales rep and according to the comp
14  architecture.  So if I find out at some point in time
15  after the fact that there was an error that was made, I
16  would correct that error, and in this example, it would
17  be for something that was retro.
18     MR. LUCAS:  Q.  So in your opinion Sun is
19  allowed to go back and retroactively take money away
20  from an employee if it thinks it has made an error in
21  payment?
22     MR. STRETTON:  Objection.
23     THE WITNESS:  Yes.
24     MR. LUCAS:  Q.  Have you done that in the
25  past?

9 (Pages 30 to 33)

Anjali Jhangiani  /  June 7, 2004

Page 34

1    MR. STRETTON:  Objection, are we referring to
2  Meg Kelley here or just anyone in general?
3    MR. LUCAS:  Q.  Anyone in general.
4    MR. STRETTON:  A little beyond the deposition
5  notice here.
6    MR. LUCAS:  Yes or no question.  Has to do
7  with the way commissions and compensation are done.
8    THE WITNESS:  Yes, we will do that.
9    MR. LUCAS:  Q.  Did you do that in the
10  situation with Ms. Kelley?
11    A.  No.  Not to my recollection from what I
12  reviewed.
13    MR. LUCAS:  The next thing I want to show you,
14  has not been marked yet.
15    It should be, Lowell, in the pile marked
16  exhibits to be marked.  And Bates Number Sun 1717
17  through 184.  It's a re-goaling form.
18    (Whereupon, marked for identification,
19    Exhibit JJJ - Copy of a document
20    entitled, "Sun Microsystems Inc.,
21    Systems Sales Division, Sales
22    Representative and Account Executive
23    Plan Agreement, (Re-goaling form)."
24  THE WITNESS:  I have it in front of me.
25  MR. LUCAS:  Q.  Do you recognize these

Page 35

1  documents?
2    A.  Yes, I do.
3    Q.  What are they?
4    A.  They are goal sheets.
5    Q.  These sheets are executed when there is a
6  change in a salesperson's goal; is that correct?
7    A.  That is correct.
8    Q.  And in this packet, there appears to be three
9  executed goal changes; is that correct?
10    A.  One moment.  I am just going through them to
11  see.
12    Q.  One is dated October 2000; one is January of
13  2001; and the other one is May of 2001.
14    A.  Where are you looking at the dates?  Is it
15  just --
16    Q.  Let's take them one at a time.  If you look at
17  the last page, 184 --
18    A.  Yes.
19    Q.  -- there is a date of October 17th, 2000; do
20  you see that?
21    A.  Yes, the one where the sales rep signed, yes.
22    Q.  If you look at the prior page, that is 183; do
23  you see that?
24    A.  Yes.
25    Q.  Let me ask a question about that, first.

Page 36

1    A.  Okay.
2    Q.  In that box, on the first pages it says OTE
3  package, says, "Base salary 41,000, target commission
4  6,500, with an OTE of 102,500"; do you see that?
5    A.  Yes.
6    Q.  What does that mean?
7    A.  If you look at what on the architecture, it's
8  the same thing as on the comp architecture plan on a
9  page, that is exactly what it is, is that it's filling
10  in for the OTE, which is on target earnings, how much
11  the employee can earn from Sun.
12    Q.  Is that from that date forward or is that on
13  an annualized basis?
14    A.  It's annualized.
15    Q.  But Ms. Kelley -- after Ms. Kelley executed
16  this document, her base salary didn't go down; did it?
17    MR. STRETTON:  Objection.
18    THE WITNESS:  What it is, is the plan on a
19  page, I thought was her -- if it is on an annual plan,
20  that means you would have been eligible for that plan
21  affective July 1st.  If Ms. Kelley came aboard on the
22  plan after July 1st, her salary would be prorated.
23    MR. LUCAS:  Q.  Ms. Kelley, was she paid at a
24  rate of $41,000 a year or 52,000 a year, her base
25  salary?

Page 37

1    A.  In this example, from this goal sheet, it says
2  she would be paid 41,000.
3    Q.  That is not my question.  My question is what
4  was she paid?
5    A.  You want me to go back and confirm that from a
6  previous document for what she exactly was paid, because
7  I don't -- I don't know that now off the top of my head.
8    Q.  What document would you have to look at?
9    A.  I believe it was the summary that the counsel
10  presented before, which was 737.
11    Q.  Okay, why don't we pull out 737 and mark that
12  as HHH.
13    MR. BRIONES:  Excuse me, this is Paul Briones,
14  I would like to confirm that the last exhibit we looked
15  at was JJJ; is that correct?
16    MR. STRETTON:  You know what, that is correct.
17  It should be KKK.
18    (Whereupon, marked for identification,
19    Exhibit KKK - Copy of a document
20    entitled, "Netscape YTD Detail.")
21    THE WITNESS:  But before we get to this, is it
22  okay if we -- I take a quick break for a bathroom break;
23  is that okay?
24    MR. STRETTON:  Absolutely.
25    THE WITNESS:  How much time?

Anjali Jhangiani  /  June 7, 2004

Page 38

1    MR. LUCAS:  Q.  I am going to be here so when
2  you get back, let me know you are back.
3    MR. STRETTON:  Thank you.  Give me a second.
4  (Recess taken.)
5    THE WITNESS:  Okay, we are back.
6    MR. LUCAS:  Q.  Do you have Exhibit KKK?
7    A.  Yes.
8    Q.  Looking at that -- first of all, did you look
9  at KKK and your reconciliation document to determine
10  whether Meg Kelly was paid the annual salary she was
11  suppose to be paid?
12    A.  Yes, we did.
13    Q.  At what rate did you use?
14    A.  We based it upon the actual payments that she
15  received, so we received information from payroll to
16  tell us exactly what they paid Ms. Kelly, and we just
17  put a spreadsheet similar to what document KKK is.  But
18  I did not do again a salary calculation.
19    Q.  So all you did was verify that she was paid
20  what payroll said she was paid?
21    A.  That is correct.
22    Q.  You didn't do an analysis as to whether she
23  was paid the salary she was suppose to be paid other
24  than indirectly through payroll?  In other words, if
25  payroll told you she was paid what she was suppose to be

Page 39

1  paid, you took her word for it?
2    MR. STRETTON:  Objection.
3    THE WITNESS:  Yes, that's what we did.
4    MR. LUCAS:  Q.  Looking at Exhibit KKK on the
5  column marked "Salary," those are the salary payments
6  she received in the calendar year 2001?
7    A.  That is correct.
8    Q.  You looked at whatever you needed to look at
9  to satisfy yourself that these payments were in fact
10  made; correct?
11    A.  That is correct.
12    Q.  And that is the same for all the payments
13  indicated on KKK?
14    A.  No, we did not look at the Sun Flex or the car
15  allowance or the stock that are referenced here.  The
16  only things that I reconciled to were payments that were
17  made by commission accounting, and those would be the
18  draw payments, the commission payments, and that's what
19  we validated.
20    Q.  First of all, just going back to JJJ so I can
21  move on --
22    A.  Yes.
23    Q.  -- that is the -- these all seem to be, other
24  than the numbers that are filled out for the goal, the
25  form, itself, seem to be the same for all three

Page 40

1  instances, your understanding -- or let me rephrase
2  that.
3    Is this the form that is typically used for
4  re-goaling?
5    A.  Yes, it is.
6    Q.  This is a form that was in effect in calendar
7  year 2000, 2001?
8    A.  I am going to assume that it is, yes, because
9  that is what was presented here.
10    Q.  Have you ever had any occasion to interpret or
11  deal with the language in the acknowledgement on these
12  re-goaling forms?
13    A.  Not directly to the commission accounting, no.
14  No one has come to us and questioned a goal sheet.
15    Q.  So you never had occasion to interpret or
16  analyze that language; is that accurate?
17    A.  That's correct.
18    Q.  Did you interpret it or analyze it in making a
19  determination as to whether the commission payments to
20  Ms. Kelley were accurate?
21    A.  I looked at the goal sheet and validated to
22  insure that the target commission was correctly noted on
23  the goal sheet based upon a proration, yes.
24    Q.  That is the number on the first pages of these
25  three goal sheets; right?

Page 41

1    A.  That is correct.
2    Q.  You didn't analyze or use the language in the
3  acknowledgement; correct?
4    MR. STRETTON:  Objection.
5    THE WITNESS:  Analyze the acknowledgement.  I
6  don't understand the question.
7    MR. LUCAS:  Q.  Look at Exhibit JJJ.
8    A.  Uh-huh.
9    Q.  Look, for example, the second page, number
10  178.
11    A.  Yes.
12    Q.  See the block, legalize language that says,
13  "Acknowledgement," got all that language after it?
14    A.  Yes.
15    Q.  Do you look at that, analyze it, and apply it
16  to Ms. Kelley?
17    A.  No.
18    Q.  You never had occasion to do that for any
19  employee; correct?
20    A.  Just based upon what I understand the
21  acknowledgement to be, there are times where sales reps
22  will question how they receive payment, and I will refer
23  back to the goal sheet.  So I would say no to your
24  question.
25    Q.  In what way do you use the acknowledgement?

Anjali Jhangiani  /  June 7, 2004

Page 42

1     A.    That this goal sheet becomes their contractual
2  agreement, so if at any point in time they are
3  questioning their TI or their salary or their goals,
4  that they should have had that discussion prior to
5  signing that goal sheet.
6     Q.    Now moving on to Exhibit KKK, I want to ask
7  you a few questions about the nature of the document
8  first.
9        The first column is "Pay date." I take it
10  that it represents the date that in which either checks
11  or wire transfers were made to Ms. Kelley?
12     A.    That is correct.
13     Q.    And then the next column are check numbers, is
14  that the corresponding either check number or wire
15  transfer number?
16     A.    I am going to assume so.
17     Q.    You didn't actually pull the check, yourself,
18  to verify these numbers; did you?
19     A.    No, I did not.
20     Q.    Then the next column is "Date Salary Payments
21  Were Made"; is that accurate?
22     A.    Yes.
23     Q.    What did you do to insure that those salary
24  payments were, in fact, made to Ms. Kelley?
25     A.    Again, I just based IT off of what we received

Page 43

1  from payroll to see these were the dates that these
2  payments were made and the dollar amounts they
3  administered.
4     Q.    And those are the dollar amounts lined up with
5  what is on Exhibit KKK; is that correct?
6     A.    On Exhibit KKK, yes.
7     Q.    And then you said you didn't look at the stock
8  reference; right?
9     A.    That's correct.
10     Q.    You didn't look at the Sun Flex?
11     A.    That is correct.
12     Q.    You did not look at the car allowance?
13     A.    That is correct.
14     Q.    By the way, if her car allowance is as we saw
15  in her offer letter, Exhibit C, $450 a month --
16     A.    Uh-huh.
17     Q.    -- do you have any idea why each payment is
18  only 207.69?
19     A.    Again, I have no idea. Those are administered
20  by payroll.
21     Q.    The next column says, "Draw," what does that
22  column represent?
23     A.    Those are compensation advancements.
24     Q.    We saw in her offer letter, Exhibit C, that
25  the first six months of her employment, she was to get a

Page 44

1  draw of 5525 a month; correct?
2     A.    Correct.
3     Q.    Are you still there?
4     A.    Yes, I said yes, that was correct. 5525 is
5  what she should have received.
6     Q.    Sorry, that didn't come through.
7        And the next column, what is the next column?
8  Says, "Comm$$."
9     A.    Commissions.
10     Q.    Those are commissions she received?
11     A.    That is correct.
12     Q.    We will come back to that in a minute.
13        How about the next thing, "IB Draw," what is
14  that?
15     A.    Again, in the next few columns, which is IB
16  draw, IB bonus, those are basically payment types that
17  get separated on a general ledger for internal purposes
18  here at Sun. And an example would be an IB draw would
19  be for a manager, would be different than a draw for a
20  sales rep.
21     Q.    What does "IB draw" mean?
22     A.    It's just an incentive bonus draw.
23     Q.    Why in her case is it negative 15,000? Why is
24  that?
25     A.    You are talking about where on the bottom,

Page 45

1  November 25th?
2     Q.    Right.
3     A.    What payroll did at that point in time is they
4  went and did a reconciliation, themselves, and they
5  calculated her on target earnings to what was actually
6  paid out, and that $15,000 is what they would have paid
7  out, and the difference is what they administered as a
8  payment, the 3800.
9     Q.    So you are saying somebody went and
10  reconciled -- I want to be sure I understand.
11        You said payroll reconciled something?
12     A.    That is correct.
13     Q.    What did they reconcile?
14     A.    They reconciled OTE from the date of July 1st
15  to -- I believe it was July 1st to the termination date,
16  and then they went back in and subtracted out the
17  payments that were made and then they determine if they
18  owed the employee money or not.
19        And just for the record, Ms. Kelley in this
20  example was overpaid, because that was an incorrect
21  calculation.
22     Q.    Where did the 15,350 come from originally?
23  What form of payment to her?
24     A.    So that's what we went back to payroll to take
25  a look at, where did they get this 15,350, and it's

Anjali Jhangiani  /  June 7, 2004

Page 46

1  based on OTE payments that were paid out to her.
2      Q.   Where on Exhibit KKK do the OTE payments
3  appear?
4      A.   Okay, hang on one second.  Let me go back and
5  make sure I got this right.
6          The first OET payment would have been the
7  10,650 on September 7th.
8      Q.   What month was that for?
9      A.   That one was for July 1st to August 20th.
10         MR. STRETTON:  This time we are referring to
11 the OTE commission payment column?
12         MR. LUCAS:  I don't see any OTE.  I see
13 commissions.
14         THE WITNESS:  Again, those are -- or what I
15 was trying to state earlier is these are just payment
16 types.  At the end of the day, I think what
17 Ms. Kelley -- you know, we should be concerned about
18 whether she received payment for those -- for the dates
19 in question.  I would not be worried about what bucket
20 they fall into.
21         MR. LUCAS:  Q.  I need to understand the
22 buckets in order to be able to understand what she was
23 paid, so --
24     A.   Okay.
25     Q.   So what you are saying is in the column

Page 47

1  "Commissions" is a payment on September 7th of 10,650
2  that is not a commission but is on target earning
3  payment?
4      A.   Yes.
5      Q.   For the months of July and August; correct?
6      A.   Not the entire month of August.  July 1st to
7  August 20th.
8      Q.   August 20th, okay.  Where is there another OTE
9  payment reflected on Exhibit KKK?
10     A.   The next payment, the next OTE payment was
11 8850.  I believe that was paid on September 21st.
12     Q.   What month or months is that for?
13     A.   I believe that was for August up until
14 September, mid September.  I don't have the exact date.
15     Q.   What makes you think that is an OTE and not a
16 commission?
17     A.   Because we did not -- Ms. Kelley did not earn
18 commissions in fiscal year '02.  So anything in that
19 column that doesn't represent prior year commissions
20 would be OTE that we would have calculated and paid out
21 for her.
22     Q.   How do I know that represents prior year
23 commissions or not?
24     A.   You can look at the commission statements.  I
25 believe that June, part one, and June, part two, and

Page 48

1  those will tell what those payments were made for, and
2  when they were made.  So for example, September 7th,
3  there is another payment that was made for $40,000, and
4  that was for prior fiscal year commissions.
5      Q.   That is for sales made in '01, the year '01?
6      A.   That is correct.
7      Q.   And was she paid on sales made in fiscal year
8  '01 but was shipped after July 1?
9      A.   No.
10     Q.   Why was that?
11     A.   Ms. Kelley did not have a contractual
12 agreement signed, which would be a goal sheet, that
13 would indicate those shipments she would have received
14 compensation for.
15     Q.   Let me just understand, I want to break down
16 certain time periods; okay?
17     A.   Okay.
18     Q.   I just want you as best you can, I will be as
19 clear as I can.
20     A.   Okay.
21     Q.   I want to understand what she was paid and
22 what she wasn't paid.  Not the amounts but in the
23 contexts, okay.
24         Sales that were made, shipped and booked prior
25 to July 1, 2001, was she paid on those?

Page 49

1      A.   Yes.  That she was assigned for, that is
2  correct.
3      Q.   Sales made and shipped and booked during the
4  period July 1, 2001 to July 23rd, 2001, was she paid on
5  those?
6      A.   I want to make sure I understand.  When you
7  used the word "booked," just a clarification on my part.
8  Any sales rep that procures a purchase order does not
9  guarantee that they will receive compensation for that
10 purchase order.  There is no guarantee for that.  That
11 is not what their comp architecture is designed to
12 state.  Once -- Sun Microsystems recognizes revenue at
13 the time of shipment.
14         At the time of shipment is when the employee
15 who is assigned to that sales order is eligible to
16 receive compensation on the next comp cycle.
17         So in Ms. Kelley's situation, when you are
18 crossing fiscal years, unless you have a signed goal
19 sheet for that new fiscal year, anything that you may
20 have procured for the company in the prior year does not
21 guarantee that you are eligible to receive that
22 compensation unless you have a new signed goal sheet
23 with the same territory.
24         You could have a new signed goal sheet and you
25 could be assigned to a different territory with

DEPOBOOK REPORTING SERVICES (800) 830-8885

Anjali Jhangiani  /  June 7, 2004

Page 50

1  different accounts.  Then you would not be eligible for
2  what you brought in from the prior year, and it could be
3  already booked.
4      Q.    Okay, so if I understand you correctly, unless
5  a sale that Ms. Kelley made was in fact shipped prior to
6  July 1, 2001, she did not receive any commission payment
7  for it?
8      A.    Correct.
9      Q.    That makes it easy.
10     A.    Sorry.
11     Q.    Can you show me where in Exhibit A --
12     A.    Exhibit A.
13     Q.    Exhibit A, the sales compensation plan.
14     A.    One moment.
15         (Pause in the proceedings.)
16         MR. LUCAS:  Q.  Do you have a document there,
17 Ms. Jhangiani, that is the FY '01, American Sales
18 Compensation Plan.
19     A.    I don't have it right here in the room, but I
20 do have one in my office.
21     Q.    Can we take a break and go grab it?
22     A.    Yes, hold on one second.
23         (Discussion off the record.)
24         MR. LUCAS:  Q.  Ms. Jhangiani, you have in
25 front of you a document that is entitled, "San Mateo FY

Page 51

1  '01, American Sales Compensation Plan"?
2      A.    Yes.
3      Q.    Exhibit A.  Assuming as we going through.  It
4  doesn't seem to be any discrepancies --
5          I don't think we need to copy that whole
6  thing, Lowell, and mark it.
7          John, I defer to you on that, but let's see
8  how it --
9          MR. STRETTON:  At this point, you already have
10 one marked, and I imagine -- assuming no discrepancies,
11 and I doubt there will be any, that she can just refer
12 to that and go forward on that basis.
13         MR. LUCAS:  Q.  Is there a provision in this
14 sales compensation plan that supports what you just told
15 me is the interpretation of commissions earned by sales
16 reps?
17     A.    Yes, there is.
18     Q.    Where is this?
19     A.    There is the first page, section one, where it
20 says, "Introduction, general provisions and management
21 summary."
22         Do you have that copy?
23     Q.    Under the DODAHs?
24     A.    DODAHs.
25     Q.    "DODAHs," is that how you say it?

Page 52

1      A.    Yes.
2      Q.    So you're on section one, okay.
3      A.    If you look at the bottom paragraph where it
4  says, "General provisions."
5      Q.    Right.
6      A.    Effective July 1st, and it just goes through
7  and just talks about, "Will remain in full force until
8  superseded by a new approved plan or until it's
9  cancelled by the Vice-president of Americas."
10     Q.    Right.
11     A.    "Earned incentive compensation on all products
12 invoiced prior to July 1st, 2000 will be paid according
13 to the plan in effect at the time of product shipment."
14     Q.    Where are you reading?
15     A.    Where it says, "General provision," the
16 effective date.
17     Q.    Okay.
18     A.    It's the second to last paragraph.
19     Q.    Okay.
20     A.    And then it says, "For each participant, the
21 plan will become effective July 1st, 2000."
22     Q.    I see that.
23     A.    Then the last paragraph states, "A copy of
24 each representative's account or territory must
25 accompany every representative's goal sheet.  Prior to

Page 53

1  the submission to areas, the forms must be signed by the
2  participant and the appropriate field management.
3  Signed copies of the forms will be maintained in the
4  area office.  No incentive compensation payments will be
5  made to anyone covered by this plan until a fully
6  executed copy of the goal sheet is signed by the
7  participants and two levels of management and area
8  controller."
9          The last part, it says, "Incentive
10 compensation calculation for all participants will be
11 based upon fiscal weeks, months or quarters as
12 appropriately defined and as defined by Sun's applicable
13 fiscal year calendar."
14         And then in parentheses it just says,
15 "Included in the form section of this handbook."
16     Q.    Is there anything else in Exhibit A that
17 supports your interpretation of when commissions are
18 earned?
19     A.    Yes, there is another section, let me see if I
20 can find it.
21         Seventeen, I think it is.  Yes.  Seventeen.
22     Q.    Okay.
23     A.    Section 17, "Earned commissions."
24     Q.    One second.  Let me find it.  Okay.  Go ahead.
25     A.    "Commissions as earned on direct business and

Anjali Jhangiani  /  June 7, 2004

Page 54

1   considered due and payable to any participant in the
2   commission plan" --
3       Q.   Where are you reading, on page -- I am
4   sorry -- 17?
5       A.   The first paragraph where it says, "Earned
6   commissions."
7       Q.   All right.
8       A.   Again, "Commissions as earned on direct
9   business and considered due and payable to any
10  participants in the commission plan upon revenue
11  recognition and receipt of Sun a full payment of all
12  commissionable products.  For direct purchase
13  commissions are advanced at fifty percent of net value
14  to Sun at the time of shipment and the remaining
15  50 percent of commissions is paid upon receipt by Sun of
16  payments for all authorized products."
17      Q.   That is the first paragraph, you are referring
18  to?
19      A.   That's correct.
20      Q.   Now, do you know whether Ms. Kelley sold
21  direct business?
22      A.   Yes.
23      Q.   Your testimony is she did?
24      A.   Yes, she did.
25      Q.   Didn't she sell passports?

Page 55

1       A.   She has a passport memo goal, yes.  So whether
2   she sold or met her goal for passports, I am assuming
3   she did, because she received her acceleration.
4       Q.   Wasn't passports virtually the only thing she
5   sold?
6       A.   No.
7       Q.   The next paragraph applies to indirect
8   purchase transactions including passports?  Correct?
9       A.   Can I just pause for one second, sir?
10      Q.   Not while a question --
11      A.   Oh, I am sorry.  Can you repeat the question
12  for me?
13      Q.   Second paragraph of Section 17 --
14      A.   Uh-huh.
15      Q.   -- it's indirect purchase transactions,
16  correct?
17      A.   That's correct.
18      Q.   That would include passport sales?
19      A.   Yes.
20      Q.   That doesn't contain the same limiting
21  language you just read in the first paragraph; does it?
22      A.   That's correct.
23      Q.   Is it your testimony that is not applicable to
24  Ms. Kelley?
25           MR. BRIONES:  Objection, calls for a legal

Page 56

1   conclusion.
2           MR. STRETTON:  Wait a minute, you know, I
3   can't get my objections in over the pace back and forth.
4           MR. LUCAS:  Okay.  Only one person can make
5   objections.  I don't want two lawyers making objections.
6           MR. STRETTON:  I think Paul may have heard
7   that I was trying to object to that line of questioning
8   and it wasn't coming through.
9           MR. LUCAS:  Can you repeat the question,
10  Lowell.
11          THE WITNESS:  Mr. Lucas, can you repeat your
12  question?
13          MR. LUCAS:  Lowell will.
14          (Whereupon, the record was read as
15          follows:  "Question:  Is it your
16          testimony that is not applicable to
17          Ms. Kelley?")
18          MR. LUCAS:  Q.  I was referring to the second
19  full paragraph.
20          MR. STRETTON:  I think it was two or three
21  questions before that I was trying to put objections in,
22  and I will continue with that one, as well.
23          MR. LUCAS:  You are not directing her not to
24  answer; correct?
25          MR. STRETTON:  No, I'm not.

Page 57

1           THE WITNESS:  I am not understanding the
2   question.  If you can maybe rephrase the question for
3   me, Mr. Lucas.
4           MR. LUCAS:  Q.  Let me start again.
5           The second full paragraph of Section 17, that
6   is the one that is numbered -- well, you don't have the
7   numbers on it, but the second full paragraph on Section
8   17 does not contain the same limitations on payment as
9   the first paragraph you were just reading from; correct?
10          MR. STRETTON:  I will object to that.
11          THE WITNESS:  Make it clear, on the first
12  paragraph is for direct business and the way the
13  compensation is calculated and paid is on a 50/50 comp
14  plan at the time of shipment and at the time of cash
15  receipts.  That is what the first paragraph states.
16          The second paragraph states that:  For
17  indirect purchase transactions, commissions are earned
18  upon the date of shipment from provider to end user.
19  Indirect commission payments are made normally upon
20  receipt and approval of the PSR by commission
21  accounting.  Alternative to this process are manuals,
22  which is our map transactions.  In addition the solution
23  partner must have a contract in place with Sun and prior
24  contractural approval to allow either of these
25  transactions, and additionally commissions may also be

15 (Pages 54 to 57)

Page 58

1  paid through the use of passport process details in
2  Section 22.  So --
3  　　　MR. LUCAS:  I know what it says.  My question
4  was, the limitations in the first paragraph don't
5  pertain to the second paragraph; correct?
6  　　　MR. STRETTON:  Let me -- what limitations are
7  you referring to?
8  　　　MR. LUCAS:  Q.  Payment upon shipment.
9  A.  Yes.
10  Q.  Yes, what?
11  A.  They are different.
12  Q.  Okay.  And passport is something that Meg
13  Kelly sold; correct?
14  A.  Yes.
15  Q.  And that is governed by Section 22 of the
16  DODAHs; isn't it?
17  A.  It's governed by Section 22, yes.
18  　　　Counsel, can I -- you just helped me recall
19  another statement I want to make sure I clarified for
20  you.  That you stated that what she sold, passports,
21  again because this was a shared goal, I cannot state
22  whether she actually sold it or not, or if she was the
23  sole sales rep responsible for selling that business.  I
24  can just tell you for what was assigned to her.
25  Q.  If she was assigned as the lead passport sales

Page 59

1  person for GE; right?
2  　　　MR. STRETTON:  Objection.
3  　　　MR. LUCAS:  Q.  Do you know whether that is
4  true or not?
5  A.  No, it's -- I would have to answer no, that I
6  don't know if she was the lead passport sales rep.
7  Q.  Okay, that's fair enough.
8  　　　Do you know that she was not?
9  A.  No, I do not know that, either.
10  Q.  Okay.
11  A.  That's correct.
12  Q.  If you look at DODAH Section 22 for the
13  passport program.
14  A.  Okay.
15  Q.  Goes on for three pages; is that correct?
16  Make sure your copy is the same as mine.
17  A.  That is correct.
18  Q.  The last page is "Compensation, need to know,"
19  with a whole bunch of bullet points after it; right?
20  A.  Yes.
21  Q.  Do you know whether any limitation regarding
22  payment only upon shipment is contained in this
23  description of the passport program?
24  A.  Counsel, I have not actually reviewed this
25  section.

Page 60

1  Q.  All right.  That is fair enough.
2  　　　Turn to what is Section 27.
3  A.  Okay.
4  Q.  Called "Mandatory Play Out"; do you see that?
5  A.  Yes.
6  Q.  Is that applicable at all to Ms. Kelley?
7  A.  Play out generally is from year to crossing
8  fiscal year, and it applies to goaling, and I believe in
9  this instance for Ms. Kelley, she was employed and she
10  signed one fiscal year's goal sheet, so, in this case,
11  because she did not have a signed goal sheet for the
12  fiscal year in July or August, the following fiscal
13  year, so no play out rule, or play out rule would not
14  have been applicable to her.
15  Q.  So the last deterrent to the back page,
16  Section 27, the last paragraph starts, "For participants
17  leaving the company"; do you see that?
18  A.  Yes.
19  Q.  You say that was not applicable to Ms. Kelley?
20  　　　MR. STRETTON:  Objection, asked and answered.
21  　　　THE WITNESS:  Objection, what did he say?
22  　　　MR. LUCAS:  Q.  Are you saying that sentence
23  was not applicable to Ms. Kelley?
24  　　　THE WITNESS:  Can I answer?
25  　　　MR. BRIONES:  If you know.

Page 61

1  　　　THE WITNESS:  Yes.
2  　　　MR. LUCAS:  Q.  Yes.
3  A.  No, in this example, it would not, because she
4  did not sign a contractual agreement for the new fiscal
5  year.  So in this example, there is predetermination to
6  say she would have signed a goal sheet.
7  Q.  Is the goaling sheet the contractual
8  commitment you are referring to?
9  A.  Yes, sir.
10  Q.  Going back to Exhibit KKK.
11  A.  Yes.
12  Q.  You identified in a column under
13  "commissions" --
14  A.  Yes.
15  Q.  -- the entry for 10,650 and the entry for
16  8,850, two OTE payments or on track earning payments
17  taking us through some date in September; is that
18  accurate?
19  A.  Correct.
20  Q.  And is there another OTE payment reflected in
21  the commissions column?
22  A.  Yes.
23  Q.  Where is that?
24  A.  October 19th.  That would be six times --
25  6,500.

Anjali Jhangiani  /  June 7, 2004

Page 62

1    Q.   And that is an OTE payment?
2    A.   That is correct.
3    Q.   For what period?
4    A.   I believe it's for October.
5    Q.   Any other OTE payments reflected in this
6  document?
7    A.   Yes.
8    Q.   Where?
9    A.   November 16th, under the IB bonus section.
10   Q.   Okay.
11   A.   37 -- $3,796.56.
12   Q.   Any idea why that is in the IB bonus column?
13   A.   That, I cannot answer, no.
14   Q.   How do you know that the payments you have
15  identified as OTE payments are, in fact, OTE payments?
16   A.   Ms. Kelley in anything that she would have
17  received in this fiscal year after July, the basic
18  concept that I used was to separate what commissions she
19  would have earned from a previous fiscal year, and that
20  was the basis for my first premise, and then I went back
21  over and did some validations through the actual
22  payments we submitted through payroll, and they
23  identified that to be an OTE payment.
24   Q.   So you totalled up all her OTE payments?
25   A.   Yes, we did.

Page 63

1    Q.   What is the total amount of OTE she received?
2    A.   I do not have the document in front of me, but
3  I can tell you she did receive full earned OTE.
4    Q.   You don't know the total amount?
5    A.   No, sir, I am sorry, I don't have a total
6  document -- I don't have that number in front of me.
7  And I can tell you, if it is okay for me to say, we do
8  overpay her on OTE from the payroll reconciliation, as
9  well.
10   Q.   Well, she got OTE payments, and then you
11  backed off $15,000 from the OTE payments made to her; is
12  that accurate?
13        MR. STRETTON:  Objection.
14        THE WITNESS:  Yes.
15        MR. LUCAS:  Q.  Did she sign any kind of
16  document authorizing the take back of that $15,000?
17        MR. STRETTON:  I believe there may have been a
18  miscommunication there between the question and answer.
19  I am not sure that's what the testimony was.
20        THE WITNESS:  Can I just clarify that 19,200
21  and the subtraction of $15,000?
22        MR. LUCAS:  Q.  Okay.
23   A.   Again, the $19,000 and the takeaway of 15, you
24  cannot look at the $15,000 and immediately say that we
25  took money away from Ms. Kelley that she earned.  That

Page 64

1  is an incorrect assumption.  What payroll did is they
2  did a calculation of how much earned OTE that she should
3  have earned, and which is 19,200, and they subtract away
4  payments already paid to her, that was the 15,000, and
5  that is how they came up with a 3800, you know, $3,850.
6    Q.   Now you lost me.  The $19,200 should have been
7  total OTE paid to her?
8    A.   Yes, from payroll's calculations, that's what
9  they calculated OTE to be, yes.
10   Q.   They took away 15,350 because why?
11   A.   Because you can see that we already paid her
12  10,000 in September, 8800 and then 6500.
13   Q.   The 10,650, the 8850, were those in fact
14  commission payments which were then reversed and
15  reconciled with what should have been her OTE payment?
16   A.   No, she -- it has nothing to do with
17  commissions because Ms. Kelley did not sign a goal
18  sheet; therefore, she did not earn any commissions.
19   Q.   What I am saying is -- I understand your
20  position.
21   A.   Okay.
22   Q.   But did the company, either by mistake or
23  otherwise, make commission payments for her for sales in
24  fiscal year '01 after July 1 which should not have been
25  made based on your interpretation?

Page 65

1    A.   Is that for FY '01 commissions or potentially
2  earned commissions she had been on the same account and
3  signed a goal sheet?
4    Q.   Right.
5    A.   No.
6    Q.   Because if you look -- we will move on to KKK,
7  triple K in front of you; okay?
8    A.   Yes.
9    Q.   If you look at Exhibit E, as in elephant?
10   A.   There is no Exhibit E on KKK.
11   Q.   No, leave Exhibit KKK in front of you.
12   A.   Okay.
13        MR. LUCAS:  Lowell, if you could hand from the
14  previously marked exhibits Exhibit E?
15        THE WITNESS:  Okay, I have Exhibit E in front
16  of me.
17        MR. LUCAS:  Q.  Start, if you would, on page
18  118.
19   A.   Okay.
20   Q.   And you will see, there is a statement for the
21  fiscal month 2001, 12, which is June of 2001, which
22  starts about a quarter way down the page?
23   A.   Uh-huh.
24   Q.   Do you see that?
25   A.   Could you -- mine, there are numbers on the

Anjali Jhangiani / June 7, 2004

Page 66

1  left-hand side, if you can refer to one of those, like
2  011, 012.
3      Q.   Start with 001.
4      A.   Okay.
5      Q.   And veer down the rest of the page. Those are
6  sales for the fiscal year '01 calculated as of
7  August 22nd, 2001; correct?
8      A.   No.
9      Q.   Look at the run date on line 01, double 01.
10 It says 8-22-01?
11     A.   Okay.
12     Q.   Is that not the date that this is as of?
13     A.   No, what this -- what that date stamp means is
14 the date that the report was run.
15     Q.   A run date, right?
16     A.   Well, said another way, it is the date that
17 the report was printed or requested. It doesn't
18 necessarily mean the calculation month.
19     Q.   If you would turn to page 114, see line one,
20 001?
21     A.   Uh-huh.
22     Q.   Has a date of 7-15-01. How can you have
23 different run dates in the same document?
24     A.   Those -- okay, let me rephrase that, make sure
25 we are on the same page.

Page 67

1          Those are the dates from when the commissions
2  were originally ran through the system and calculated,
3  and the reports were run. So it is -- it does not mean
4  that today, June 8th, if I run the reports, that will be
5  the date stamp on this report. I would have to go into
6  the commission system and request the original run, and
7  you will see that date of when it was run, original run
8  date.
9      Q.   So going back to page 118 on August 22nd,
10 2001, the summary of June 2001 was run; correct?
11     A.   Okay, Counsel, if I could just make sure that
12 I got this clear. These dates do not represent the
13 calculation dates. So if the system ran a specific date
14 and if you are to ask me, you know, was I there when it
15 was run or who ran it, how it was run, I cannot answer
16 that for you.
17          I can tell you what the commission date
18 represents, and where the date stamps really are
19 relevant to whether Ms. Kelley should have received
20 compensation for revenue, but, Counsel, for those dates,
21 I think that those are irrelevant to what we are trying
22 to move forward with. I mean, in my opinion.
23     Q.   Well, ultimately a judge will decide that. I
24 just need to understand this document; okay?
25     A.   I am sorry, Counsel, you are absolutely right.

Page 68

1          MR. BRIONES: Just answer.
2          MR. LUCAS: Q. What I want to know --
3      A.   Okay.
4      Q.   -- the date, 8-22-01 is a date that the June
5  portion of Exhibit E was run; is that accurate?
6          MR. STRETTON: Objection, ambiguous.
7          THE WITNESS: Counsel, I believe that this --
8  again, I don't know exactly what the date represents.
9  Let me leave it at that.
10         MR. LUCAS: Q. In any event, part one is
11 commissioning revenues for June, that is what it is
12 entitled, and on line 001 --
13         MR. STRETTON: Which page are you looking at?
14 118?
15         MR. LUCAS: Yes.
16     Q.   What does that section represent?
17     A.   That represents any revenues that were sent to
18 the application called "Sum Com" for that revenue to be
19 calculated for fiscal -- for the last fiscal period in
20 June.
21     Q.   And these -- this is to the accounts that were
22 assigned to Ms. Kelley in fiscal year '01; are they not?
23     A.   That would be correct, sir.
24     Q.   If she was credited in June with the four
25 million four hundred and -- no, let me withdraw it.

Page 69

1          She was credited with $4,471,904.13 in
2  commissions for that month?
3      A.   That was the revenue that was assigned to her
4  for calculations.
5      Q.   And if we turn to the next page, page 119,
6  based on the accounts assigned to her, she would have
7  received, had she been paid this, commissions in the
8  amount of $58,156?
9      A.   That is correct.
10     Q.   Your testimony, I believe, correct me if I am
11 wrong, she was not paid this?
12     A.   She was paid this, sir.
13         MR. STRETTON: Objection on that.
14         MR. LUCAS: Q. Was she paid the $58,156?
15     A.   She was paid for commissions earned in the
16 fiscal period of June.
17     Q.   Was she paid that $58,156.93?
18     A.   Yes.
19     Q.   Where is that on Exhibit KKK?
20     A.   Okay, she received on September 7th, $40,078.
21 Then she also received commissions on July 27th,
22 $18,000, which I believe adds up to your $58,000.
23     Q.   So she should have received a total of
24 102,247.54 for the commissions through that period; is
25 that right?

Page 70

1    A.    For the fiscal year, correct.
2    Q.    Then if you turn to the next page, page 120.
3    A.    Yes.
4    Q.    She was credited in June with sales of a
5 little over two million dollars; right?
6    A.    Where do you see that, Counsel?
7    Q.    It's between 10-20 -- I am sorry, I am reading
8 that wrong.
9        Okay, withdrawn.
10    A.    Okay.
11    Q.    Was this revenue that she was credited with in
12 June?
13    A.    Yes.
14    Q.    Fiscal year '01, was that shared equally with
15 Miss Powers and Mr. Kozak?
16    A.    Again, Counsel, it would depend upon how the
17 revenue was assigned, so in this example, I believe that
18 Ms. Powers had 33.4 percent and Meg Kelly 33.3, and I
19 believe that the third sales representative also had
20 33.3, so unless I go through line action by line action
21 on each of the revenues that was submitted and I do a
22 reconciliation with all three of them, I could not
23 honestly tell you if that split was accurate.
24    Q.    Have you looked at the commission accounting
25 for Miss Powers and Mr. Kozak?

Page 71

1    A.    No, sir, I have not.
2    Q.    If I told you they each got $72,000 in
3 commissions for that same month, would that indicate
4 anything to you with regard to how the revenue credits
5 were split?
6    A.    No, it would not because each of them have a
7 different PCR.
8    Q.    If you look at the last page of Exhibit E --
9    A.    Yes.
10    Q.    -- it is a payment for, says year-to-date
11 commission earned 5,205.46.
12    A.    This is document 125; correct?
13    Q.    Right.
14    A.    Yeah.
15    Q.    Is that for -- was she paid that amount?
16 Looks like she was, if you look at Exhibit Triple K.
17    A.    My first -- is to say yes, but I don't know if
18 there -- let me see what month this was. Hang on, you
19 have to give me one second, Counsel. I just want to
20 look at the beginning of the statement.
21        So, Counsel, what happened on this one, she
22 was paid that. Let me state that.
23    Q.    Is that a fiscal year '01 or '02 payment?
24    A.    Fiscal year '01.
25    Q.    Even though it seems to indicate in this

Page 72

1 report that it is '02, if you look at the year-to-date
2 figure.
3    A.    You are absolutely right, Counsel. This was
4 the remaining 50 percent of commissions where cash was
5 applied to the open AR balances, and quite frankly in
6 this example, Ms. Kelley should not have been paid this
7 payment and yet she was paid.
8    Q.    If you add up the 5,205 and the 103, you get
9 $108,000 and some change as a total commission earned by
10 Ms. Kelley for sales in her territory; see that?
11    Q.    Counsel, one more time, the 5,205 plus the 103
12 on Exhibit KKK.
13    Q.    If you add the year-to-date for her on Sun
14 Exhibit 121, is 103,274?
15    A.    I am just looking, so one second. On Exhibit
16 121?
17    Q.    Page 121 of Exhibit E.
18        MR. STRETTON: At line number 98.
19        MR. LUCAS: Q. Yes.
20    A.    So that would be 103,274.54?
21    Q.    Right, that is what is earned by sales
22 credited to her for fiscal year '01 through -- through
23 the end of the year without tallying the 5,205; right?
24        MR. BRIONES: Objection, vague and ambiguous.
25        MR. LUCAS: Q. Do you understand the

Page 73

1 question?
2    A.    Yes, Counsel, I just -- I have to go through
3 this commission statement to really evaluate if that's
4 accurate or not.
5    Q.    It says, "Year-to-date commission earned";
6 right?
7    A.    Yes.
8    Q.    What does that mean to you?
9    A.    That means to me this is how much commission
10 she's earned up to the end of June for the final June
11 calculation.
12    Q.    Right. And she was paid another 5,205;
13 correct?
14    A.    That's correct.
15    Q.    And that makes 108; right?
16    A.    That's correct.
17    Q.    And if you look at KKK, for commissions
18 earned, that matches, it's 108? The next few figures
19 are off a little bit, but basically 108,000; right?
20    A.    Yes.
21    Q.    So how is it then that you are saying the sum
22 of the column, in the column of commissions, is OTE and
23 not commissions earned?
24    A.    Because 5,200 was commissions that were cash
25 receipts that were calculated by Sum Com and it was paid

Anjali Jhangiani  /  June 7, 2004

Page 74

1  out to her which should not have been paid out to her,
2  and the 103 again when we did the reconciliation and
3  looked at that 5200 and 103, at that point in time the
4  $103 was recovered from the OTE payment made the
5  following period, and then an additional payment on
6  December 28th for $72.03 was also an overpayment, which
7  was not recovered.
8      Q.    What I am trying to say, Ms. Jhangiani, is
9  that the commission she earned according to Sun's
10  calculation for the fiscal year '01 total at least
11  103,000, and yet you told me that at least $24,000 of
12  the commission column is OTE and not commissions earned,
13  and I don't understand how you are differentiating.
14      A.    Okay.
15          MR. BRIONES:  Objection, assumes facts not in
16  evidence.
17          THE WITNESS:  Okay, so what we did is, again,
18  we went back and then looked at -- calculated OTE from
19  July 1st up to a termination date.  So the calculation
20  that we did, and again I don't know the exact figure to
21  tell you, Counsel, I am sorry, I didn't bring my
22  document with me, but what we did is, we went back in
23  and calculated again what was her OTE commissions that
24  she should have been paid.
25          Then we redid our reconciliation again,

Page 75

1  subtracting what we had already paid her, so each of
2  these payments I went back and I looked at, saying that
3  $40,000 was hers for the prior year that we had paid her
4  and looking at the 5200 and when I saw that was a
5  commission payment, I went back and said how could we
6  pay her out a commission, and I started questioning did
7  she have a signed goal sheet and when she did not have a
8  signed goal sheet, then I went back and looked at the
9  details of where that $5200 came from, and that $5200,
10  sir, came from cash applications that were applied to
11  the open air invoices that were calculated for
12  Ms. Kelley and subsequently paid out to her in an error.
13  So --
14      Q.    When did you do this reconciliation?
15      A.    When did I do it?
16      Q.    For the first time?
17      A.    Had to have been before this three-day
18  weekend, right before the three-day weekend, sir.
19      Q.    This year?
20      A.    Yes.
21      Q.    But who did the original calculations that are
22  on KKK?
23      A.    That, I don't know.  I don't know.
24      Q.    Did somebody go through the same exercise you
25  did before Ms. Kelley's last paycheck was done in

Page 76

1  December of '01; right?
2      A.    That would be correct, sir.
3      Q.    You don't know when that was done?
4      A.    No, I do not.
5      Q.    What was done -- were there any documents that
6  you looked at showing that was done?
7          MR. STRETTON:  Objection.
8          MR. LUCAS:  What is the objection?
9          MR. STRETTON:  I don't even know what you are
10  referring to with that question, to be honest with you.
11          MR. LUCAS:  Let me clarify.
12      Q.    Did you see any documents relating to the
13  original reconciliation exercise that was done prior to
14  Ms. Kelley's last paycheck in December of '01?
15      A.    Counsel, the only reconciliation I received
16  was this one that is documented as KKK.
17      Q.    And you discussed earlier that somebody did
18  the same exercise that you did in 2001, right?
19      A.    Not in 2001.  In preparation for this
20  deposition.
21      Q.    Right.
22      A.    And prior to, I believe it was done -- I'd
23  have to go back in time, sir, sorry.  I'd have to
24  remember.
25          But what our first process was to determine,

Page 77

1  did we accurately pay Ms. Kelley in accordance with the
2  contract.
3          MR. BRIONES:  You answered the question.
4          MR. LUCAS:  Q.  What you did, correct me if I
5  am wrong, is payments of commissions beyond July 1 were
6  treated as OTE even though they came to Ms. Kelley as
7  commission payments?
8          MR. STRETTON:  Objection, that is a
9  mischaracterization.
10          THE WITNESS:  Counsel, what we identified to
11  you as payments of OTE is what we had calculated for
12  OTE.  Any other payments that we indicated on here, as I
13  have already stated, were overpayments from the previous
14  fiscal year commissions that she should not have been
15  eligible to receive.
16          MR. LUCAS:  Q.  I think we are talking by each
17  other.
18          How many times is OTE paid a month?
19      A.    In reference to, sir?
20      Q.    In reference to company practice.
21          MR. BRIONES:  Objection, calls for
22  speculation.
23          MR. LUCAS:  This is a 30(B)(6) witness who is
24  suppose to have knowledge of compensation practices.
25      Q.    When OTE is paid, how many times a month is it

Anjali Jhangiani  /  June 7, 2004

Page 78

1  paid?
2      MR. STRETTON:  OTE salary commission, OTE
3  commission payments?
4      MR. LUCAS:  Q.  Both.
5      MR. STRETTON:  Okay.
6      THE WITNESS:  Okay, so, Counsel, FY '01 was
7  the first time that we had our redeployment so it would
8  really vary because each fiscal year we had a change in
9  the process and policy for our reduction in work forces.
10  So I can honestly tell you that year after year our
11  practices have changed.  At the time, because this is
12  confidential information, when an employee is going to
13  be notified to the time, when the employee is notified,
14  commission accounting is not aware of who those people
15  are until after the fact.
16      So if you look at the gap in some of these
17  instances, you can see that by the time that we were
18  notified and we determined that the employee did not
19  have a contractual agreement, which is a signed goal
20  sheet, to earn commissions in July, which is the new
21  fiscal year, therefore, we started calculating OTE for
22  her.  And that was the first payment that we made.  That
23  was the $10,000 that I indicated in September.
24      MR. LUCAS:  Q.  In September is when you
25  switched her from commissions to OTE?

Page 79

1      MR. STRETTON:  Objection.
2      THE WITNESS:  Sir, you cannot really switch a
3  person.
4      MR. LUCAS:  Q.  Let me rephrase it then.
5      In September is when you were notified that
6  Meg Kelly, under your standards, would not be eligible
7  for commissions and you started applying OTE to her?
8      MR. STRETTON:  Objection.  Again, I think that
9  is a mischaracterization.
10      THE WITNESS:  Counsel, what we would classify
11  her to be is unassigned.  And --
12      MR. LUCAS:  Q.  You classified her as
13  unassigned in September; is that right?
14      A.  That is correct.  Or sometimes -- again, I
15  cannot say exactly in September.  I would have to say
16  that I would have known this at least a few days prior
17  to September.
18      MR. BRIONES:  Wait until the question is
19  asked.
20      MR. LUCAS:  Q.  In September, she started
21  being paid OTE retroactively?
22      A.  Correct.
23      Q.  And because she had gotten commissions in June
24  and July, it resulted in an overpayment; correct?
25      A.  One more time, Counsel, can you repeat the

Page 80

1  question for me?
2      Q.  Because she had, in fact, been paid
3  commissions in July and August, your retroactive payment
4  of OTE resulted in an overpayment to her at the end --
5  by the time the year-end came?
6      MR. STRETTON:  Objection, mischaracterization.
7      THE WITNESS:  Counsel, no.
8      MR. LUCAS:  Q.  Okay.  Then how did you
9  determine the 15,350 ought to be deducted from her pay?
10      MR. BRIONES:  Objection, assumes facts not in
11  evidence.
12      THE WITNESS:  Again, Counsel, what we did is
13  we went back in, the system paid her commissions earned
14  for her for the fiscal year where she had a signed goal
15  sheet, and commission accounting, as I indicated,
16  revalidated and confirmed that I did pay her for
17  revenues, commissionable revenues that were assigned to
18  her appropriate PCRs, and I did actually physically cut
19  a check out to her, send the information to payroll for
20  payroll to administer the payroll for us, and I can
21  honestly say whether that payment was submitted to her
22  in July or in September, those are just pay dates of
23  when we made those payments physically to Ms. Kelley,
24  but those were for commissions earned for FY '01.
25      MR. LUCAS:  Q.  How was she overpaid?  I don't

Page 81

1  understand.
2      A.  Okay.  When we open up the new fiscal year,
3  Ms. Kelley still had under her employee number open
4  invoices where she -- where she's eligible to earn the
5  remaining 50 percent of her commissions on direct
6  business.  It is systematically processed where when
7  cash is applied to the invoice at the time of shipment,
8  that is when she received the remaining 50 percent of
9  her commissions.  And again, that's predicated upon the
10  employee having a signed goal sheet at the time when
11  that payment was generated or eligible for being
12  generated.
13      Q.  Right.  And you made a determination that
14  those payments were in error; right?
15      A.  In my reconciliation is when I determined that
16  those payments were made to her in error.
17      Q.  That was the reconciliation done when?
18      A.  That was part of the preparation for this
19  deposition, sir.
20      Q.  Someone had to make that same calculation in
21  2001 in order to derive the figure $15,350, negative, in
22  the IB draw column; would you agree?
23      A.  Sir, at some time, Ms. Kelley did not get
24  compensation taken away from her.  You are looking at
25  that, you know, you are making a determination that was

Anjali Jhangiani / June 7, 2004

Page 82

1  money taken away from her.
2        If you look at the column right over it, next
3  to it, it's $19,200, and all that is -- and if you look
4  at the column all the way to the right, to the second to
5  the last column, which it says 3850, 3,850, that is the
6  actual gross amount that she received. So it's in the
7  net difference. That is all this reconciliation is
8  showing you. It's not showing that we took away $15,000
9  from Ms. Kelley's paycheck.
10       In essence the $3800 is the reconciliation
11  between $19,200 to what we have already paid her. And
12  an example would be the 10,000, the 8800, and the 6500.
13  Q.   Try there again. All right.
14       The commission statements indicate that
15  Ms. Kelley earned 103,000 in commission for fiscal year
16  '01; correct?
17  A.   At the time when it was calculated, that is
18  correct.
19  Q.   Is it wrong?
20       MR. BRIONES: Answer only if you know.
21       THE WITNESS: At the time, it was calculated,
22  sir, $103,000 was earned for Ms. Kelley, correct --
23       MR. LUCAS: Q. Is it wrong as you sit here
24  today?
25  A.   Yes, because I also calculated after the

Page 83

1  fiscal year closed additional payments for Ms. Kelley
2  that was the 52 -- $5,205.
3  Q.   And that amount should not have been paid to
4  her?
5  A.   That is correct.
6  Q.   That amount was paid to her and then --
7  A.   I never took that money back from her.
8  Q.   But you credited it toward OTE; right?
9  A.   No.
10  Q.   But she was overpaid $58,000; is that your
11  testimony?
12       MR. STRETTON: Objection, that is what -- 52,
13  I think is the number, 5205.
14       MR. LUCAS: I think that it was 58, but all
15  right.
16       MR. STRETTON: Well, if you could point that
17  out. Otherwise, I would object to the question.
18       MR. LUCAS: Q. Look at Exhibit E, page 121,
19  the figures there, $58,156.93; do you see that?
20  A.   Yes, sir.
21       MR. STRETTON: I am not following you.
22       MR. LUCAS: Q. Exhibit E, as in elephant,
23  page 121.
24       MR. STRETTON: Okay.
25       MR. LUCAS: Q. Is it your testimony,

Page 84

1  Ms. Jhangiani, that that $58,156 was credited to
2  Ms. Kelley erroneously?
3  A.   Sir, that was not credited to her erroneously.
4  Q.   Was any of that amount used to -- let me
5  restate.
6        Was any of that money considered OTE after you
7  did your reconciliation?
8  A.   No, sir.
9        MR. LUCAS: Take a break for a minute.
10       (Recess taken.)
11       MR. LUCAS: Q. Ms. Jhangiani.
12  A.   Yes.
13  Q.   Ms. Kelley, according to Exhibit E, earned
14  $108,000 in commission for fiscal year '01, 5,000 of
15  which you said was in error; right?
16  A.   That's correct.
17  Q.   And you also said she should be paid OTE for
18  the months July through her termination date; right?
19  A.   Yes.
20  Q.   OTE is $78,000, divided by twelve is $6,500 a
21  month; right?
22  A.   I am going to --
23       MR. STRETTON: Objection, calls for
24  speculation.
25       MR. LUCAS: Q. I think we can all take

Page 85

1  judicial notice that 78 divided by 12 is 6500.
2        MR. STRETTON: Same objection.
3        MR. LUCAS: Q. She should have gotten from
4  July -- four and a half months, July, August, September,
5  October and part of November?
6  A.   Up to her termination date, yes.
7  Q.   So that's 29,250 in OTE.
8        MR. BRIONES: Objection.
9        MR. LUCAS: Q. Plus $103,000 in commission,
10  plus another $5,000 in what you say were erroneous
11  commissions, plus her salary of $47,000, the other items
12  on here, you quickly get over $200,000, and she wasn't
13  paid $200,000; correct?
14       MR. STRETTON: Objection.
15       THE WITNESS: Sir, she did not get paid $103.
16       MR. LUCAS: Q. 103,000?
17  A.   No, the 100 -- maybe if you go back and
18  retrace that for me. I lost you in all those numbers.
19  I'm sorry.
20  Q.   Okay. We will go slowly.
21  A.   Yes, I am sorry. Thank you.
22  Q.   Earned in commission according to Exhibit E --
23  I am rounding down now -- $103,000 in commissions.
24  A.   Okay.
25  Q.   Through June. Then she got an additional

Anjali Jhangiani  /  June 7, 2004

Page 86

1    $5,000 payment, you said was in error for a total of
2    $108,000 in commissions; right?
3        A.    Yes.  I follow you.
4        Q.    She also got paid $47,000 in salary.  That was
5    correct; right?
6        A.    Okay, yes.
7        Q.    And she had her car allowance of $,4799.  She
8    had her store stock of 2218.
9        A.    Uh-huh.
10       Q.    She had her Sun Flex of five-six-three-two-oh-
11   eight, and her draw of 13,812 sheet, her IB bonus of
12   3796, item in severance column was 129, two.  And she
13   got -- she had the federal, FICA and state taxes and all
14   the other columns, and then if you add on top of that
15   four and a half months of OTE of $6500 is far in excess
16   of 189,431?
17           MR. BRIONES:  Objection.
18           MR. STRETTON:  Assumes facts not in evidence.
19           MR. LUCAS:  Q.  Do you agree with that?
20       A.    No.
21       Q.    You don't?
22       A.    No.
23       Q.    You do the math.
24       A.    Okay.  What you are looking at is based
25   upon Exhibit KKK?

Page 87

1        Q.    Right.
2        A.    You have the 47,000 in salary.
3        Q.    Right.
4        A.    You have the 2200 in stock.
5        Q.    Right.
6        A.    Fifty-six in Sun Flex.
7        Q.    Right.
8        A.    4700 in car allowance.
9        Q.    Right.
10       A.    About $14,000 in draw.
11       Q.    Right.
12       A.    $108,000 in commissions, which includes OTE.
13       Q.    But not if you go by what she earned?  This is
14   where you and I are losing each other.
15       A.    Okay.
16       Q.    Some of her earned commissions are being
17   treated as OTE by you?
18       A.    Counsel, then I am not sure where I indicated
19   that I included her commissions in OTE.
20       Q.    But her commissions according to Exhibit E or
21   her account total $108,000, the same amount that is in
22   the bottom line on the commission column.
23       A.    Out of which I am indicating $5,200 is an
24   overpayment.
25       Q.    Right.  And you are also indicating some

Page 88

1    $26,000 is OTE, so you're treating some of her earned
2    commissions as OTE.
3           MR. STRETTON:  Objection.  Argumentative.
4           MR. LUCAS:  Q.  Are you not?
5           MR. STRETTON:  Same objection.
6           MR. LUCAS:  Q.  You can answer.
7        A.    No, I know -- but, sir, let me clarify.  When
8    you look at the draw, that is also commissions, so you
9    have to include the $13,000 plus the IB bonus in that
10   total.
11       Q.    Even if you do that --
12       A.    And?
13       Q.    Some aren't some of the commissions in OTE?
14       A.    No, I would disagree.
15       Q.    You just told me before the $10,650 on
16   September 7th, the 8,850 on September 21, the 6500 on
17   October 19 are all OTE, not commissions?
18           MR. BRIONES:  Objection, mischaracterization.
19           MR. STRETTON:  At this point, I will note for
20   the record that Counsel is completely raising his voice
21   at the witness.  There is no need for that.
22           MR. LUCAS:  Well, I am not raising my voice.
23           MR. STRETTON:  Well, I think that is apparent
24   to everyone else in the room.  Let's go off the record a
25   second.

Page 89

1           MR. LUCAS:  Why are we going off the record?
2           MR. STRETTON:  Then continue on.
3           MR. LUCAS:  Thank you.
4           THE WITNESS:  Counsel, the $137,000 under draw
5    section --
6           MR. LUCAS:  Q.  I understand what you are
7    saying, that it is part of the commissions, you are
8    saying.
9        A.    Yes, if you are looking at the 108, please add
10   in the 13.8 into that figure.
11       Q.    Okay.
12       A.    Please add in the 3700, 3796, plus, please add
13   in the additional payment on November 26th of $3,850.
14       Q.    Whoever was talking to you, stop talking while
15   you are answering.
16       A.    He thought I was giving an incorrect dollars
17   figure.  It looked incorrect.  I am sorry.
18       Q.    So you are taking from different columns, you
19   are saying no matter what they are called, they came
20   from the different columns, they are OTE?
21           MR. STRETTON:  Objection, vague and ambiguous.
22           THE WITNESS:  Counsel, if I can offer, you
23   know, some suggestions on determining what commissions
24   were earned and how much of the payments on this
25   document were, in fact, OTE, my suggestion would be to

23 (Pages 86 to 89)

Page 90

1  take the combination of the one, two, three, four, five
2  sections which is the draw, commission, IB draw, IB
3  bonus and severance, and subtract out the OTE payment,
4  and that should get you to commissions for FY '01, and
5  that is including the overpayment.
6      MR. LUCAS:  Q.  I understand your position
7  now.
8      A.  Okay.
9      Q.  Exhibit E does not include any items shipped
10  after July; is that correct?
11     A.  That is correct, sir.
12     Q.  Even though they might have been sold by
13  Ms. Kelley in FY '01; correct?
14     MR. STRETTON:  Objection.
15     THE WITNESS:  Again, I don't know if it was
16  sold or -- a deal or a purchase order was procured by
17  Ms. Kelley.
18     MR. LUCAS:  Q.  Okay.
19     A.  But there were -- she did not receive any
20  assignment for shipments after July 1st.
21     Q.  For the period of July 1 through July 23rd,
22  what she was doing was, she was selling Sun products
23  totally unaware she had been slated for reassignment and
24  none of those commissions were paid to her; right?
25     MR. STRETTON:  Objection, mischaracterization.

Page 91

1      MR. LUCAS:  Q.  Okay, you still have to
2  respond.
3      A.  Those commissions were not paid to her.
4  They're not earned by Ms. Kelley.  Therefore, they were
5  not paid.
6      Q.  And any sales that would have been credited to
7  her between the period July 23rd to August 20th, the
8  date she was terminated from the position, were not
9  credited to her; right?
10     MR. STRETTON:  Objection, assuming there was
11  sales.
12     THE WITNESS:  That is correct, they were not
13  credited.
14     MR. LUCAS:  Q.  If you would look at Exhibit
15  Triple K, the second to last column where it says,
16  "gross."
17     A.  Yes.
18     Q.  The figure 189,431.15?
19     A.  Yes.
20     Q.  Did you reconcile that number?
21     A.  No, I did not, sir.
22     Q.  Do you know whether that is the amount she
23  was, in fact, paid for the year?
24     A.  I am going to -- again, I am going to have to
25  assume because I did not reconcile the stock, Sun Flex

Page 92

1  or car allowance or federal tax or FICA, any of those.
2      Q.  Do you know how Exhibit Triple K was created?
3      A.  Sir, I do not.
4      Q.  Is there some central -- it says at the top
5  for the website, "Paycheck dot central dot Sun dot com."
6  Is there some central database where all money paid out
7  are logged?
8      A.  I am sorry, Counsel, those are payroll
9  generated so I cannot answer since I don't know how the
10  payroll department works.  I am sorry.
11     Q.  If Ms. Kelley's W-2 has a different figure for
12  gross income, you wouldn't know why that is; right?
13     A.  No.
14     Q.  Have you ever seen the submission by the
15  company to the Kennedy Commission on Human Rights and
16  Opportunities?
17     A.  No, sir, I have not.
18     Q.  Did you work with Vera Willow, legal counsel,
19  in coming up with the gross amount earned by Ms. Kelley
20  in 2001?
21     A.  No, I have not.
22     Q.  If that figure differs from both her W-2 and
23  the amount on Exhibit KKK, you wouldn't know why?
24     A.  I could speculate, but I could not answer you,
25  no.

Page 93

1      Q.  Have you seen Ms. Kelley's final paycheck?
2      A.  No, sir, I have not.
3      Q.  If that amount is yet a fifth amount and
4  different from all these figures, would you know why?
5      A.  One more time.
6      Q.  If the amount on the paycheck is different
7  from the W-2, Exhibit KKK, the issued W-2 and the VLR
8  position, would you have an explanation for that?
9      A.  No, sir, I would not.
10     MR. LUCAS:  Lowell, if you could show
11  Ms. Jhangiani Exhibit Triple G.
12     THE WITNESS:  I have that in front of me, sir.
13     MR. LUCAS:  Q.  Have you seen that document
14  before?
15     A.  Yes, I have.
16     Q.  When is the first time you saw the E-mail
17  marked GGG?
18     A.  It was submitted by legal counsel,
19  representative, Mr. John --
20     Q.  John Stretton?
21     A.  Yes.
22     Q.  You didn't see it in September of '01?
23     A.  Not that I recall, sir.
24     Q.  Do you recall having any discussions with
25  either Cheryl Deborja or Kelly Maraxas about the topics

Anjali Jhangiani  /  June 7, 2004

Page 94

1  that -- in item number one on Exhibit GGG?
2     A.   Not that I recall.  But I can tell you we had
3  many conversations with our HR department and some of
4  the other managers regarding the risk, because this is
5  the first time that our company had a mass layoff so
6  there were a lot of questions that were asked to
7  commission accounting.
8     Q.   Was Ms. Kelley one of the persons to ever
9  receive OTE earnings while on notification of a
10  termination?
11    A.   She was one of many.
12    Q.   That was the first time the company
13  implemented that policy?
14    A.   During my tenure here, yes.
15        MR. LUCAS:  Lowell, could you show the witness
16  Exhibit Triple H, please.
17        THE WITNESS:  I have that in front of me.
18        MR. LUCAS:  Q.  Just glance through it, and
19  let me know whether any portion of -- this is a series
20  of E-mails, whether you have ever seen any of those
21  E-mails before you began preparing for your deposition?
22    A.   I have not seen any of these prior to the
23  deposition to my recollection, sir.
24    Q.   And, again, do you recall any discussions with
25  Cheryl Deborja or Kelly Maraxas about Ms. Kelley in

Page 95

1  2001?
2     A.   Not to my knowledge, sir.
3     Q.   How about, anyone in your department indicated
4  they were in contact with either Cheryl Deborja or Kelly
5  Maraxas with regard to Ms. Kelley's commission payments?
6     A.   I didn't ask any of my staff if they did or
7  not.
8     Q.   Nothing comes to mind as you sit here today;
9  right?
10    A.   No.
11        MR. LUCAS:  I want to mark two more exhibits.
12  Let's start with one, I guess, it's Sun Commission
13  Summary Report for Mr. Kozak.  It is Sun 154 through
14  175.
15        (Whereupon, marked for identification,
16         Exhibit LLL - Commission Summary Report,
17         William Kozak.)
18        MR. LUCAS:  Q.  Is that in front of you?
19    A.   Yes, it is, sir.
20    Q.   Turn, if you would, to page 157.
21    A.   Okay, I have that in front of me.
22    Q.   That indicates, does it not, that that month
23  Mr. Kozak got commissions of 72,130?
24        MR. BRIONES:  Objection, vague.
25        MR. LUCAS:  Q.  On line 108.

Page 96

1     A.   Yes, sir.  $72,130.40.
2     Q.   Then this report, this exhibit continues on
3  through the month of December '01.  Are these all
4  payments on items sold in fiscal year '01 but shipped
5  after July 1?
6     A.   Can you be specific on when the commission
7  statement is, sir?  I haven't look at anything that
8  happened in July when we opened up the fiscal year in
9  August to see if I paid anything out to Mr. Kozak.  I
10  can just flip through these and determine which month it
11  is.
12    Q.   This is the Commission Summary Report.
13    A.   Yes.
14    Q.   Go through because I think this is through
15  '01.  And my question is this:  Are these sales for '02
16  or are they -- I don't know what the term is -- or are
17  they leftover sales from '01 being credited and booked
18  for Mr. Kozak?
19        MR. STRETTON:  Objection, vague.
20        THE WITNESS:  Okay, this is -- I am going to
21  look at Exhibit 168, is what I am looking at.
22        MR. LUCAS:  Q.  Right, from there to the end
23  is what I am asking.
24    A.   Yes.  From my -- let me make sure this is
25  accurate, Counsel, if you could just give me one second,

Page 97

1  please.
2        So what was your question now, sir, again?
3     Q.   Is there any way to tell if these are sales
4  credited to fiscal year '01?
5     A.   These are shipments -- I mean, again, try to
6  use accurate terminology here -- for Mr. Kozak.  If
7  Mr. Kozak signed a goal sheet and on the goal sheet it
8  indicated the territory and account that he is to
9  receive compensation for and those accounts were
10  shipped, and those -- you know, any PO's that were
11  shipped or PSI transaction or indirect business that was
12  assigned to Mr. Kozak for July or August, September,
13  October, November, this is what it would represent.  It
14  does not state looking at these statements whether it
15  had anything to do with the previous fiscal year's
16  account booking.
17    Q.   So there is no way to tell; is that right?
18    A.   On these summary statements, correct.
19    Q.   Is there something else you can look at to
20  determine that?
21    A.   No, sir.  I could not.
22        MR. LUCAS:  If we could mark as Exhibit MMM
23  the packet that starts Sun 126 to 153, it is another set
24  of Commission Summary Reports.
25        (Whereupon, marked for identification,

25 (Pages 94 to 97)

Page 98

1          Exhibit MMM - Commission Summary Report,
2     Kristen Powers.)
3          THE WITNESS:  Thank you.  Sir, I have it in
4     front of me.
5          MR. LUCAS:  Q.  Turn, if you would, turn to
6     page 145.
7          A.   Okay.
8          Q.   That shows, does it not, Ms. Powers also
9     received 70 plus thousand dollars in commissions in
10    June, for June of '01?
11         A.   Yes, it does, sir.  $71,304.52.
12         Q.   Again looking at the balance of Exhibit
13    Triple M from 146 to 153, there is no way to tell when
14    those sales were booked, if it was '01 or '02; right?
15         A.   That would be correct.  And again, Counsel,
16    you are going to make an assumption that this sales rep
17    had the same territory and same account coverage, 'cause
18    it very well could be they had in the new fiscal year a
19    different territory or they have gained accounts or they
20    have reduced accounts.
21         Q.   Thank you.
22              Take a couple of minutes of break, okay?
23         A.   Sure.  Okay.
24              (Recess taken.)
25         MR. LUCAS:  Back on the record.

Page 99

1          Q.   Ms. Jhangiani, you indicated when we started
2     this deposition that you weren't sure on Exhibit KKK
3     about the column IB draw, IB bonus and severance,
4     exactly what they stood for; do you recall that
5     testimony?
6          MR. STRETTON:  Objection, I don't believe that
7     was what she testified to.
8          THE WITNESS:  No, sir, I don't believe I
9     stated that.
10         MR. LUCAS:  Q.  Let me ask you again -- I am
11    sorry if I am repeating myself -- IB draw means what?
12         A.   Incentive bonus.  It is definitely for IB and
13    draw is just another form of commissions.  It is just an
14    advancement of commissions.
15         Q.   Instead of an incentive bonus, draw is what I
16    am looking at, IB draw?
17         A.   Yes.
18         Q.   What is that?
19         A.   The definition for IB draw means incentive
20    bonus draw, and in realty what that equates to is an
21    advancement of compensation.
22         Q.   That is a bonus?
23         A.   No, it is commissions.
24         Q.   What is the next column, IB bonus?
25         A.   Again, that is just -- IB draw and IB bonus

Page 100

1     are generally used again as a pay type that we submit to
2     payroll for our general ledger to separate out our sales
3     reps' earned commissions from different types of sales
4     in the sales organization.
5          One of the sales organizations that we use for
6     managers is IB draw and IB bonus.  It is just a pay type
7     but they equal commissions or advancement of
8     commissions.
9          Q.   Well, would that include, when you look at the
10    architecture for Ms. Kelley, the bonus sum?  Get the
11    exact terminology here.
12         A.   I am sorry, Counsel, was that a question?
13         Q.   Yes, let me rephrase it.
14              If Ms. Kelley was entitled to a linearity
15    bonus, what column would that appear in?
16         A.   Commissions.
17         Q.   Excuse me?
18         A.   Commissions.
19         Q.   Commissions?
20         A.   Yes, sir.
21         Q.   And is there a linearity bonus commission
22    payment on Exhibit KKK?
23         A.   No, sir.
24         Q.   Do you know why not?
25         A.   I do not know.

Page 101

1          Q.   You said you didn't know whether she was
2     entitled to leasing bonus; right?
3          A.   Sir, originally, I said I did not know if she
4     was.  But I recall when I went through some of the
5     summaries reports that this was a bonus for leasing
6     bonus that was paid out to her.
7          Q.   Where does that appear on KKK?
8          A.   It would be under commissions.  It would be
9     embedded in the final payment that we sent to payroll.
10         Q.   How much was it; do you know?
11         A.   The one that I glanced at, sir, was about $99,
12    and I believe it would have been part or it's part of
13    the total commissions paid out to her.
14         Q.   Okay.  You said if the linearity bonus was
15    paid, it would have been in the commissions?
16         A.   I believe that's where it would be indicated,
17    sir, yes.
18         MR. LUCAS:  Well, subject to the
19    reconciliation report, that is all I have.
20         MR. STRETTON:  Okay.  I obviously, at this
21    point, you are aware that that report is attorney work
22    product, and we will look into your request being made
23    to produce it.
24         MR. LUCAS:  I think it's subsumed in my prior
25    request.  If you need a new one, you need a new one,

Anjali Jhangiani  /  June 7, 2004

Page 102

1  okay.
2        Thank you, Ms. Jhangiani.
3        THE WITNESS:  Thank you, Counsel.
4        (Whereupon, the deposition concluded at
5  12:40 p.m.)
6
7        _____
        ANJALI JHANGIANI
8
9              -o0o-
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 103

1  COUNTY OF SAN FRANCISCO        )
                              ) SS.
2  STATE OF CALIFORNIA          )
3        I do hereby certify that the witness in the
4  foregoing deposition was by me duly sworn to testify to
5  the truth, the whole truth and nothing but the truth in
6  the within entitled cause; that said deposition was
7  taken down at the time and place therein named; that the
8  testimony of the said witness was reported by me, a
9  Certified Shorthand Reporter and a disinterested person,
10  and was under my supervision thereafter transcribed
11  under my direction into typewriting; the witness given
12  an opportunity to read and correct the deposition
13  transcript, and to subscribe the same; that if unsigned
14  by the witness, the signature has been waived in
15  accordance with stipulation between counsel for the
16  respective parties.
17        And I further certify that I am not of counsel
18  or attorney for either or any of the parties to said
19  deposition, nor in any way interested in the outcome of
20  the cause named in said caption.
21        IN WITNESS WHEREOF, I have hereunto set my
22  hand the _____ day of _____, 2004.
23        _____
        LOWELL E. TORNO
24        CSR NO. 2131
25