UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| MARGARET MARY KELLEY, | : | CIVIL ACTION NO. |
| | : | 03-CV-57 (CFD) |
| Plaintiff, | : | |
| | : | |
| V. | : | |
| | : | |
| SUN MICROSYSTEMS, INC., | : | |
| | : | |
| Defendant. | : | SEPTEMBER 27, 2004 |

### DEFENDANT SUN MICROSYSTEMS, INC.'S
### MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Defendant Sun Microsystems, Inc. submits this Memorandum of Law in Support of its Motion for Summary Judgment pursuant to Rule 56 dismissing each and every count of Plaintiff's First Amended Complaint dated April 7, 2003.

### INTRODUCTION

This is an action by a former employee, Margaret Mary Kelley, of Sun Microsystems, Inc. Plaintiff is a fifty-two year old female who was employed by Sun Microsystems in its Stamford, Connecticut office from September 18, 2000 to November 19, 2001. Plaintiff was fifty years old when she was hired by Steven Fugazy, the individual who would remain her direct supervisor throughout her thirteen month tenure at Sun Microsystems. She was hired as a Sales Representative B[1] and was assigned to service the product needs for the General Electric account, an international account. Plaintiff was also responsible for reporting on designated international product sales to G.E. made by sales representatives stationed outside the United States, otherwise known as Passport reporting.

In July of 2001, approximately ten months after Plaintiff was hired, Sun Microsystems, along with countless other technology companies, was forced to undergo a reduction in force ("RIF") due to a

---

[1] Sales representatives are classified by letter, with a Sales Representative A representing the first, or lowest, alphabetical level and a Sales Representative E representing the final, or highest, level. *See FY'01 Americas Sales Compensation Plan, Section 1 (Exhibit A).*

declining economy and a dramatic downturn in the technology industry. The goal of the RIF was to reduce the workforce by nine percent, which equaled approximately three thousand six hundred (3600) employees.

At the time, the Stamford, Connecticut office was the only Sun Microsystems' office with three sales representatives dedicated to the G.E. account. The three Stamford sales representatives servicing the G.E. account were Plaintiff, a Sales Representative B, Kristen Powers, a Sales Representative B, and Michael Kozak, a Sales Representative A. Plaintiff was chosen for termination because she ranked at the bottom of the sales representatives regionally and was, of the three Stamford G.E. sales representatives, considered to have the least potential. Plaintiff, although she had prior sales experience, was slow to develop her product knowledge, which she acknowledged in a self-assessment completed at the end of April 2001, and had difficulty gaining the respect of her teammates, a matter that was documented in February 2001.

Plaintiff acknowledges that she has no direct evidence that her termination was the result of discrimination based on her age and sex. Plaintiff will also be unable to demonstrate that her termination was a pretext for discrimination as Sun Microsystems has a legitimate and nondiscriminatory reason for Plaintiff's discharge, an economically motivated RIF. Given the lack of any evidence of discrimination, summary judgment should enter in favor of Sun Microsystems on Counts One through Three, Plaintiff's sex and age discrimination claims.

Summary Judgment should also enter in favor of Sun Microsystems on Plaintiff's "unpaid wage" claim under Connecticut General Statutes § 31-72 (Count Four) and Plaintiff's unjust enrichment claim (Count Five). Both claims concern commissions Plaintiff claims she earned during Sun Microsystems' fiscal year 2002 ("FY02"), which began July 1, 2001. Plaintiff's wage claims must fail for two reasons. First, sales representatives designated for the RIF were not assigned territories or accounts for FY02 and,

therefore, were ineligible to earn commissions. Second, Plaintiff, similar to all other sales representatives identified for the RIF, was paid full "on target" earnings[2] from the beginning of FY02, July 1, 2001, through her termination date, November 18, 2001, even though she was not assigned any accounts or territories and, once informed of the RIF, was instructed not to work on any accounts. Plaintiff was compensated above and beyond that which was due to her under the Sales Compensation Plan. Summary judgment should also enter in favor of Sun Microsystems on Counts Four and Five.

## FACTUAL BACKGROUND

### I. PLAINTIFF'S EMPLOYMENT HISTORY WITH SUN MICROSYSTEMS

#### A. The Stamford G.E. Sales Team

Plaintiff was hired by Sun Microsystems as a Sales Representative B on September 18, 2000. *Complaint, ¶ 6; Deposition of Plaintiff at 40 (Exhibit B); Offer Letter (Exhibit C)*. Plaintiff was stationed in Sun Microsystems' Stamford, Connecticut office and was assigned to sell product to the G.E. account. *Deposition of Plaintiff at 40 (Exhibit B)*. Fugazy, the district manager and individual who would be Plaintiff's direct supervisor, extended the offer of employment to Plaintiff. *Deposition of S. Fugazy at 48-49 (Exhibit D); see also Job Offer Form (Exhibit E) (identifies hiring manager as Steven Fugazy)*. Fugazy envisioned that Plaintiff, given her experience, would be capable of serving as the lead sales representative for the Stamford G.E. team. *Deposition of S. Fugazy at 103 (Exhibit D)*. Plaintiff was fifty years old when hired by Fugazy. *Complaint, ¶ 15*.

At the time of Plaintiff's arrival, the Stamford G.E. team was comprised of Steven Fugazy, the district manager, Kristen Powers, a Sales Representative B[3], and two sales engineers[4], Denise Thomas

---

[2] "On target earnings" is defined as the amount of base salary plus incentive dollars an employee will earn annually at assigned levels of Performance. *FY'01 Americas Sales Compensation Plan, Section 21 (Exhibit A)*.

[3] Powers became a Sales Representative B, the same position held by Plaintiff, on September 25, 2000. Affidavit of S. Fugazy, ¶ 4 (Exhibit F); Deposition of S. Fugazy at 44-45 (Exhibit D). At the time of Plaintiff's arrival, Powers had been employed by Sun Microsystems for approximately a year and one half. Deposition of Plaintiff at 126 (Exhibit B).

and Michael Cademartori. *Deposition of Plaintiff at 38, 126 (Exhibit B); Deposition of D. Thomas at 10 (Exhibit G)*. Michael Kozak joined the Stamford G.E. team as a Sales Representative A on January 2, 2001, three and one half months after Plaintiff was hired. *Deposition of M. Kozak at 34 (Exhibit H)*. Therefore, as of January 2001, three sales representatives from the Stamford, Connecticut office serviced the G.E. account.

As part of the Stamford G.E. team, Plaintiff was responsible for domestically selling product to G.E. Plaintiff was also responsible for reporting on certain international product sales to G.E. made by sales representatives stationed outside the United States, a responsibility known as Passport reporting. *See Re-Goaling Forms (Exhibit I) (identifying G.E. as the account assigned to Plaintiff and listing the countries assigned to Plaintiff for purposes of Passport reporting); Email correspondence dated November 20, 2000 (Exhibit J) (identifying Plaintiff's responsibilities as qualifying and seizing domestic business opportunities and accurately forecasting passport sales); see also Deposition of S. Fugazy at 96 (Exhibit D) (describing Plaintiff's duties)*. Passport was largely a clerical process of reporting sales made by non-U.S. sales representatives so that sales representatives in the United States could also receive commissions from these transactions. *Deposition of S. Fugazy at 43, 123, 192 (Exhibit D); Affidavit of M. Cademartori, ¶ 6 (Exhibit M)*.

Plaintiff's domestic selling responsibilities, as well as her Passport responsibilities, were outlined in a document called a Goal Sheet or Re-Goaling Form. *Re-Goaling Forms (Exhibit I)*. Goal Sheets identify both the territories and/or accounts assigned to each sales representative as well as the annual sales revenue goal that the sales representative must attain in order to earn full on-target commission earnings. *FY'01 Sales Compensation Plan, Sections 1 and 11 (Exhibit A)*. Each sales representative must sign a Goal Sheet in order to be eligible to earn commission payments. *Id.*

---

[4] Sales engineers supported the sales representatives by providing in-depth product knowledge, such as the technical capabilities of various software programs or servers, that was routinely needed to respond to inquiries posed by customers. *Deposition of D. Thomas at 8 (Exhibit G)*.

NYC_182277_1.DOC/JSTRETTON

While Goal Sheets were individually assigned, Plaintiff and Powers agreed to combine their goals and work together, as a team, towards the target sales goal. *Deposition of Plaintiff at 37-38*. While each continued to sell product domestically, which was their primary responsibility, Plaintiff took over responsibility for reporting on Passport on behalf of the team. *Deposition of S. Fugazy at 151 (Exhibit D)*; see also *Deposition of S. Fugazy at 96-98 (Plaintiff was not as strong in domestic sales)*. When Kozak joined Sun Microsystems in January of 2001, he was not immediately included in the Powers/Kelley team and, as a consequence, had to work on his own towards achieving his sales. *Deposition of S. Fugazy at 113-115 (Exhibit D); Deposition of M. Kozak at 41-42 (Exhibit H)*. This changed on April 2, 2001 upon the recommendation of both Plaintiff and Powers, who hoped that Kozak's addition to the team would provide the team with a better opportunity to reach their annual sales goal. *Id.; Deposition of M. Kozak at 41(Exhibit H); E-mail Correspondence dated April 10, 2001 (Exhibit K)*. In the end, all three sales representatives exceeded their sales goal for fiscal year 2001. *Deposition of S. Fugazy at 95-98, 171-172 (Exhibit D)*.

**B.     Plaintiff's Performance Issues**

Plaintiff received her first disciplinary memo on February 1, 2001. *Disciplinary Memo dated February 1, 2001 (Exhibit L)*. The disciplinary memo concerned complaints by Plaintiff's teammates, which included sales engineers and the two sales representatives, that Plaintiff was both missing meetings and not arriving on time for scheduled meetings, actions her teammates interpreted as a lack of respect. *Id.* Fugazy documented this problem and discussed these issues with Plaintiff. *Id.; Deposition of Plaintiff at 67-68 (Exhibit B)*. In addition to Plaintiff's problems with her teammates, Fugazy also became increasingly disappointed with Plaintiff's lack of industry knowledge given her level of experience. *Deposition of Plaintiff at 65 (Exhibit B) ("one particular instance, I was in his office and the conversation was about something that I was somewhat familiar with, not totally, regarding something to do with*

*distributors or something like that and he appeared to be surprised that I didn't know what he was talking about so he said, you know, I'm surprised with your experience you don't know this or something like that").*

In April of 2001, Fugazy was asked to rate the performance of the sales representatives under his supervision and also to stack rank these individuals. *April Performance Criteria Tool – Individual Contributors for Plaintiff (Exhibit N) (rating performance in the areas of "Achievements/Results Against Goals," "Functional/Technical Contribution," and "Competencies"); April 5th Stack Ranking (Exhibit O); Affidavit of S. Fugazy, ¶ 5 (Exhibit F)*. Sun Microsystems routinely requested district managers to perform such a stack ranking. *Affidavit of S. Fugazy, ¶ 5 (Exhibit F)*.

Fugazy ranked both Plaintiff and Powers in the mid-seventy percentile[5]. *April 5th Stack Ranking (Exhibit O)*. Four days later, on April 9, 2001, Fugazy amended his stack ranking to include the results of the "Performance Criteria Tool – Individual Contributors" and to include a ranking for Kozak. *April 9th Stack Ranking (Exhibit P); see also April Performance Criteria Tool – Individual Contributors for Plaintiff and M. Kozak (Exhibits N and Q)*. The results from the Performance Criteria Tool – Individual Contributors, which rated the performance of each sales representative in a number of different categories, helped to further differentiate between those individuals ranked in the mid-seventy percentile.

The Performance Criteria Tool – Individual Contributors demonstrates that Powers outperformed both Plaintiff and Kozak. *April 9th Stack Ranking (Exhibit P)*. On a one to five scale, with "5" representing a problem area and "1" representing a genuine strength, Powers received a "2" on "Achievements/Results Against Goals" and a "2" on "Functional/Technical Contribution." *Id.* In the "Competencies" category, which is a combination of six subcategories, namely, Dealing with People, Communication, Teamwork & Leadership, Problem Solving & Decision Making, Planning & Organizing, and Results Orientation, Powers received a "15," which is an average score of 2.5 in each of

---

[5] This stack ranking split employees into three categories, the top 20%, the middle 70% and the bottom 10%.

the six subcategories. *Id.* Kozak, who was a Sales Representative A, also outranked Plaintiff in the "Competencies" category, receiving a "15," an average score of 2.5 in each of the six subcategories, as compared to the "22," an average score of 3.7 in each of the six subcategories, awarded to Plaintiff. *Id.*[6]; *see also April Performance Criteria Tool – Individual Contributors for Plaintiff and M. Kozak (Exhibits N and Q)*.

At the end of April, 2001, Plaintiff completed a self evaluation, an "AFO STAR Process Skills Assessment."[7] *Deposition of Plaintiff at 181-182 (Exhibit B); Plaintiff's AFO STAR Process Skills Assessment (Exhibit R)*. In the areas of "Market Knowledge," "Technical Proficiency" and "Consultative Selling," Plaintiff acknowledged that she was not yet competent in these areas and needed considerable improvement, which was consistent with the scores she received from Fugazy in the April Performance Criteria Tool – Individual Contributors. *Plaintiff's AFO STAR Process Skills Assessment (Exhibit R) (scoring herself with 1's and 2's, indicating a need for development)*.

On May 4, 2001, the regional director, Phil Clark, ranked the sales representatives in his region. *5/4/01 Regional Stack Ranking (Exhibit S); Affidavit of P. Clark, ¶ 4 (Exhibit T)*. Clark used the same three category assessments used in the April Performance Criteria Tool – Individual Contributors, namely, Achievements/Results Against Goals, Functional/Technical Contribution and Competencies. Plaintiff ranked 33rd out of 37 sales representatives in the region. *5/4/01 Regional Stack Ranking*.

June 30, 2001 marked the close of Sun Microsystems' FY01. *Deposition of Plaintiff at 40-41 (Exhibit B); Deposition of A. Jhangiani at 5 (Exhibit U)*. As FY01 came to a close, each district manager was asked to recommend coverage for FY02, including the number of sales representatives that should be

---

[6] Kozak also outperformed Plaintiff in the "Functional/Technical Contribution" category, receiving a "3" as compared to the "4" awarded to Plaintiff. In the third category, "Achievements/Results Against Goals," Plaintiff received a "3" and Kozak received a "4."

[7] The scale utilized in the "AFO STAR Process Skills Assessment" was as follows: "1" indicated a need for development; "3" indicated that the sales representative felt she was competent in this area; and "5" was reserved for "exemplary" performance.

assigned to each district. *Coverage Memorandum dated June 25, 2001 (Exhibit V); Affidavit of S. Fugazy, ¶ 7 (Exhibit F)*. Fugazy recommended to his regional manager, Clark, that Sun Microsystems retain all three sales representatives from the Stamford G.E. account, the "Tri-State" area district. *Coverage Memorandum dated June 25, 2001 (Exhibit V) (wherein Fugazy recommended that the "3" "Sales" representatives covering the "Tri-State" area for FY01 be retained in FY02); Deposition of S. Fugazy at 326 (Exhibit D)*.

In July of 2001, the district managers were again asked to rank the sales representatives. *July Initial Performance Rating Spreadsheet (Exhibit W)*. As with the April 9th ranking, each of the three Stamford sales representatives ranked in the middle seventy percentile. *Id.* Plaintiff once again ranked in the bottom half of the ranked employees. *Id.*

### C.    The Reduction in Force

The year 2001 was a difficult year for many industries, especially the technology industry. Throughout the year, Sun Microsystems had been circulating memoranda to its employees asking each employee to watch expenses. *Deposition of Plaintiff at 91-92, 133-134 (acknowledging receipt of memos to reduce expenses and that the technology market was plummeting)*. As of July 2001, which also marked the beginning of Sun Microsystems' new fiscal year, FY02, Sun Microsystems' economic outlook still did not look promising and, as a result, it was forced to implement a company-wide RIF. *Id. at 91-92 (testifying that it was her understanding that the RIF was company wide and necessitated by a need to reduce expenses)*. The goal of the RIF was to reduce the workforce by nine percent, a reduction that would equal approximately 3600 employees. *Affidavit of P. Clark, ¶ 5 (Exhibit T)*.

Fugazy first learned of the RIF in mid July 2001, a few days in advance of the RIF meeting set up in Somerset, N.J. between the new regional manager, David Vogelzang, and each of the district managers to discuss the performance of the various sales representatives in the region in light of the company-wide

RIF. *Deposition of S. Fugazy at 182, 296, 306-308 (Exhibit D)*. Thus, Fugazy was not aware that Sun Microsystems would be implementing a RIF when he completed each of the stack rankings referenced above. *Affidavit of S. Fugazy, ¶ 6-7 (Exhibit F)*.

During the RIF meeting, held on or about Tuesday, July 17, 2001, Fugazy provided feedback on the three Stamford G.E. account sales representatives. *Deposition of S. Fugazy at 306-308 (Exhibit D)*. Based on this feedback, and the feedback from the other district managers, a regional stack ranking of sales representatives was created on a whiteboard in the conference room. *Id. at 310*. Plaintiff's name appeared near the bottom of the list. *Id.* Fugazy left the meeting unaware of the number of sales representatives that would be terminated or even whether any of his sales representatives would be affected by the RIF. *Id. at 313*.

Later that day, or possibly the following morning, Fugazy was notified that Plaintiff would be terminated. *Id. at 314*. Fugazy was then asked to memorialize the rationale supporting the decision to terminate Plaintiff based on the criteria that had been discussed during the July 17th Meeting. *Email correspondence dated July 18, 2001 (Exhibit X); Deposition of S. Fugazy at 184, 314-315 (Exhibit D); Affidavit of S. Fugazy, ¶ 8 (Exhibit F)*.

Plaintiff was selected for termination for a number of reasons. First, Stamford, Connecticut was the only Sun Microsystems' location to have three sales representatives assigned to the G.E. account. *RIF Memo dated July 19, 2001 (Exhibit Y); Affidavit of S. Fugazy, ¶ 8 (Exhibit F)*. Given the need to reduce the number of employees, coupled with the national coverage demands of the G.E. account, it was determined that one of the Stamford sales representatives would be terminated. Second, based on the pertinent criteria, namely "skill set" and "industry/market knowledge," Fugazy concluded that Plaintiff demonstrated less potential than the other two Stamford sales representatives. *RIF Memo dated July 19, 2001 (Exhibit Y); see also Email correspondence dated July 18, 2001 (Exhibit X)*. For instance, while

NYC_182277_1.DOC/JSTRETTON

Kozak and Plaintiff each ranked in the bottom half of the sales representatives supervised by Fugazy, Plaintiff was slower to advance her product and industry knowledge. *RIF Memo dated July 19, 2001 (Exhibit Y); Deposition of S. Fugazy at 187.* Indeed, Plaintiff acknowledged that she was not competent in this area when she completed her self-assessment at the end of April. <u>See</u> *Plaintiff's AFO STAR Process Skills Assessment (Exhibit R).* Plaintiff was also inferior to the other two sales representatives in "teamwork and leadership." Due to her sub-standard product and industry knowledge and inconsiderate behavior towards the other sales representatives and systems engineers, Plaintiff was less respected professionally than the other two sales representatives. *RIF Memo dated July 19, 2001 (Exhibit Y);* <u>see also</u> *Disciplinary Memo dated February 1, 2001 (Exhibit L); Deposition of M. Kozak at 45-47 (describing Plaintiff as an "ok" salesperson and Powers as a "very good" salesperson); Deposition of J. Davis at 15-16 (Exhibit EE) (evidencing surprise at the lack of sales initiative shown by Plaintiff at event sponsored by Sun Microsystems); Affidavit of D. Thomas (Exhibit Z) (plaintiff's lack of product knowledge frustrated sales engineers); Affidavit of M. Cademartori, ¶ 5 (Exhibit M) (describing Plaintiff as slower to develop her product knowledge).*

On Monday, July 23, 2001, Plaintiff was informed by Fugazy, her direct supervisor, and Vogelzang, the regional manager, that she had been selected for termination. *Deposition of Plaintiff at 93-94 (Exhibit B); Deposition of S. Fugazy at 197-198 (Exhibit D); Complaint, ¶ 11.* Plaintiff's employment officially terminated on November 18, 2001. *Complaint, ¶ 11.*

## II.   PLAINTIFF'S COMPENSATION ARRANGMENT WITH SUN MICROSYSTEMS

Plaintiff was hired on September 18, 2000 by Sun Microsystems as a Sales Representative B at a base salary of $52,000.00 annualized. *Offer Letter (Exhibit C); Deposition of A. Jhangiani[8] at 17 (Exhibit U); Deposition of Plaintiff at 40, 203 (Exhibit B).* As a Sales Representative B, Plaintiff's on-target

---

[8] Anjali Jhangiani is the Financial Manager, otherwise known as the Commission Accounting Manager, at Sun Microsystems. *Deposition of A. Jhangiani at 7-8.*

commission earnings goal was $78,000.00. *Offer Letter (Exhibit C); Deposition of Plaintiff at 203 (Exhibit B).* In other words, if Plaintiff met her annual sales revenue goal, she could expect to earn $78,000.00 in commissions, which would make her annual on-target earnings (base salary plus commissions) for FY01 $130,000.00. *Offer Letter (Exhibit C); see also FY'01 Americas Sales Compensation Plan, Section 21, Compensation Definitions (Exhibit A) (Defining "On Target Earnings" as "the amount of base salary plus incentive dollars an employee will earn annually at assigned levels of performance").* Plaintiff's offer letter, which she signed on September 6, 2000, instructed Plaintiff to refer to the Sales Compensation Plan[9] for additional information concerning her assigned on-target commission earnings goal of $78,000.00 annualized. *Offer Letter (Exhibit C) ("Details of your on-target earnings and additional bonus programs are outlined in the Sales Compensation Plan . . .").*

The introductory section of the FY01 Sales Compensation Plan provides an overview of Sun Microsystems' commission policy. In the introductory section, the Plan provides that a fully executed Goal Sheet is a condition precedent to receiving incentive, or commission, payments[10]. *FY'01 Americas Sales Compensation Plan, Section 1 (Exhibit A) ("No incentive compensation payments will be made to anyone covered by this Plan until a fully executed copy of the Goal Sheet is signed by the participant, two levels of management and the Area controller"); see also Deposition of A. Jhangiani at 48-53, 64 (Exhibit U).* Goal Sheets identify the territories and/or accounts assigned to each sales representative and identify the annual sales goal that the sales representative must attain in order to earn full on-target incentive

---

[9] July 1, 2000 marked the beginning of FY01 and the effective date of the FY01 Sales Compensation Plan. *Deposition of A. Jhangiani at 5 (Exhibit U); Deposition of Plaintiff, at 40-41 (Exhibit B) (acknowledging that Sun's fiscal year runs from July 1 through June 30); FY'01 Americas Sales Compensation Plan, Section 1 (Exhibit A) (The FY01 Sales Compensation Plan went into effect on July 1, 2000).* Plaintiff began her employment with Sun Microsystems on September 18, 2001, approximately two and one half months into FY01.

[10] Similar to the FY01 Sales Compensation Plan, the FY02 Sales Compensation Plan, effective July 1, 2001, provided that a fully executed Goal Sheet was a condition precedent to receiving commission payments. *FY'02 GSO Americas Sales Compensation Plan, Section 1 (Exhibit AA) ("No incentive compensation payments will be made to anyone covered by this Plan until a fully executed copy of the Goal Sheet is signed by the participant, two levels of management and the Area controller").*

earnings. *FY'01 Americas Sales Compensation Plan, Section 1 and Section 11 (Exhibit A); Re-Goaling Forms (Exhibit I); Deposition of A. Jhangiani at 39-42, 48-50 (Exhibit U).*

The Goal Sheet itself further emphasizes the importance of a signed Goal Sheet. The Goal Sheet provides that a sales representative is only eligible to receive commissions on the accounts or territories listed on the Goal Sheet. *Re-Goaling Forms (Exhibit I)* ("*In order to receive commission dollars on an account or territory, the account or territory must be included in the Goaling and Coverage Tool and a copy of the account(s)/territory must be attached. Passport must be goaled by account and all buying location must be identified*"); see also *Deposition of A. Jhangiani at 48-50 (Exhibit U)*. The Goal Sheet also serves to inform the sales representatives that all commission payments will be made in accordance with the Sales Compensation Plan. *Re-Goaling Forms (Exhibit I)* ("*ACKNOWLEDGEMENT I have received, read and understand the Sun Microsystems Inc. (Sun), Americas United States Fiscal Year 2001 Sales Compensation Plan (PLAN) and all appendices . . . All payments are based on this PLAN . . .*").

Plaintiff signed her first Goal Sheet on October 17, 2000, shortly after commencing employment with Sun Microsystems. *Re-Goaling Forms (Exhibit I)*. Due to a combination of declining market conditions and an agreement between Plaintiff and the other Stamford sales representatives to share goals, Plaintiff's Goal Sheet was twice amended during FY01, both times reducing Plaintiff's annual sales revenue goal. *Id. (the first Goal Sheet was executed on October 17, 2000, which was superceded by the Goal Sheet executed January 25, 2001, which was superceded by the Goal Sheet executed May 18, 2001).*

The July 2001 RIF followed the close of fiscal year 2001. Plaintiff, similar to every other sales representative affected by the RIF, was not provided a Goal Sheet for FY02 due to the fact that her position was being eliminated. In other words, Plaintiff was not assigned accounts or territories for FY02

due to the RIF. Without assigned accounts or territories, which could only be assigned through a Goal Sheet, Plaintiff was not eligible to earn commissions. *FY'01 Americas Sales Compensation Plan, Section 1 and Section 11 (Exhibit A)*. Plaintiff acknowledges that she did not sign a Goal Sheet for FY02. *Deposition of Plaintiff at 163, 237 (Exhibit B)*.

However, despite the fact that Plaintiff was not eligible to earn commission in FY02, Plaintiff was paid, as were all other sales representatives affected by the RIF, full on-target earnings from the beginning of FY02, July 1, 2001, through her termination date, November 18, 2001. *Affidavit of A. Jhangiani, ¶ 5 (Exhibit KK); Deposition of S. Fugazy at 141 (Exhibit D); Payment Summary (Exhibit BB)*; see also *Deposition of Plaintiff at 161-162 (Exhibit B)*. In other words, Plaintiff was paid during this period a prorated portion of the $130,000.00 annualized on-target salary outlined in her offer letter dated September 18, 2000. *Affidavit of A. Jhangiani, ¶ 5 (Exhibit KK); Payment Summary (Exhibit BB); Offer Letter (Exhibit C)*. Plaintiff was not required to perform any services for Sun Microsystems during her notification period, which period was intended to allow Plaintiff time to locate new employment opportunities. *Affidavit of S. Fugazy, ¶ 9 (Exhibit F); Deposition of C. DeBorja at 50 (Exhibit CC)*; see also *Deposition of Plaintiff at 142 (Exhibit B) (wherein Plaintiff acknowledges that she eventually stopped coming into the office sometime near the end of August 2001)*.

## ARGUMENT

### I.   SUMMARY JUDGMENT STANDARD

Summary judgment is proper only where there is no genuine issue of material fact to be tried on a matter and the moving party is entitled to summary judgment as a matter of law. *Fed. R. Civ. P. 56(c); Donahue v. Windsor Locks Board of Fire Comm'rs*, 834 F.2d 54, 57 (2d. Cir. 1987). In determining whether there is a genuine issue of material fact, the court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 91

L.Ed. 2d. 202, 106 S. Ct. 2505 (1986). "The genuine issue aspect of summary judgment procedure requires the parties to bring forward before trial evidentiary facts, or substantial evidence outside of the pleadings, from which material facts alleged in the pleadings can be warrantably inferred." *United Oil Co. v. Urban Redevelopment Comm'n*, 158 Conn. 364, 378-79, 260 A.2d 596 (1969); *Van Dine v. Robert Bosch Corp.*, 62 F. Supp. 2d 644, 646 (D.Conn. 1999). Indeed, a party may not "rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Zabelle v. Coratolo*, 816 F. Supp. 115, 119 (D. Conn. 1993); see also *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 249 (a legally sufficient opposition must submit admissible evidence that is more than "merely colorable"); *Hildabrand v. Diffeo P'ship, Inc.*, 89 F. Supp. 202, 205 (D. Conn. 2000). "The very purpose of summary judgment is to weed out those cases that are destined to be dismissed on a motion for directed verdict . . . ." *Weinstock v. Columbia University*, 224 F.3d 33, 49 (2d Cir. 2000).

## II. PLAINTIFF'S SEX AND AGE DISCRIMINATION CLAIMS ARE INSUFFICIENT TO WITHSTAND SUMMARY JUDGMENT

Whether the charge is one of age discrimination in violation of the Age Discrimination in Employment Act ("ADEA") or of sex discrimination in violation of Title VII, it is Plaintiff's burden to establish not only that her termination was not for a legitimate reason, but also that it violated the provisions of either the ADEA or Title VII[11]. *Weinstock v. Columbia University*, 224 F.3d at 42; *Van Dine v. Robert Bosch Corp.*, 62 F.Supp.2d at 647; *Dobrich v. General Dynamics Corp.*, 40 F.Supp.2d

---

[11] In addition to the age discrimination claim under the ADEA and the sex discrimination claim under Title VII, Plaintiff also advances a claim for age and sex discrimination under Connecticut's Fair Employment Practices Act. It is well established that Connecticut courts look to federal case law for guidance in interpreting its discrimination statute. See *Grey v. City of Norwalk Board of Education*, 2004 U.S. Dist. LEXIS 6703 at *29 (D.Conn. 2004) ("the court looks to federal employment anti-discrimination law for guidance in enforcing Connecticut's anti-discrimination statute"); *Wroblewski v. Lexineton Gardens, Inc.*, 188 Conn. 44, 53 (1982) (Connecticut guided by federal law in sex discrimination action); *Pik-Pwik Stores Inc. v. Commission on Human Rights and Opportunities*, 170 Conn. 327, 331 (1976) (Connecticut guided by federal case law); *Ford v. Blue Cross and Blue Shield of Connecticut, Inc.*, 216 Conn. 40 (1990); *Perodeau v. Hartford*, 259 Conn. 729, 738 ("This court has previously recognized that in construing the Federal Employment Practices Act, 'we are properly guided by the case law surrounding federal fair employment legislation") (quoting *Bridgeport Hospital v. Commission on Human Rights and Opportunities*, 232 Conn. 91, 108 (1995)). Therefore, the dismissal of Plaintiff's federal sex and age discrimination claims should also result in the dismissal of Plaintiff's state law sex and age discrimination claims.

*90, 102 (D.Conn. 1999)*. The ADEA prohibits employers from discriminating because of age against any employee in the protected age group – over 40. *See 29 U.S.C. § 631(a)*. Title VII prohibits employers from discriminating against any employee because of the individual's sex. *See 42 U.S.C. 2000e-2(a)(1)*. An employer does not violate the ADEA if it takes adverse action against an employee in the protected age group for a reason other than the employee's age. *Tutko v. James River Paper Co., Inc., 1999 U.S. App. LEXIS 28455 at *4 (2d Cir. 1999) quoting Norton v. Sam's Club, 145 F.3d 114, 120 (2d Cir. 1998)* ("the ADEA does not make employers liable for doing stupid or even wicked things; it makes them liable for discriminating, for firing people on account of their age"). Likewise, an employer does not violate Title VII if it takes adverse action against an employee in a protected class for a reason that is not premised on the employee's race, color, religion, sex or national origin. *James v. New York Racing Association, 233 F.3d 149, 154-155 (2d Cir. 2000)*. Under both statutes, the burden rests with Plaintiff to prove that her gender or age made the difference in her employer's decision to terminate her employment. *Id. quoting St. Mary's Honor Ctr. v. Hicks, 509 U.S. at 507*.

Whether under the ADEA or Title VII, cases are analyzed in the manner outlined in McDonnell Douglas Corp. v. Green, 411 U.S. 793, 802-804, 93 S. Ct. 1817, 1824-1825, 36 L.Ed.2d 668 (1973). *Roge v. NYP Holdings, Inc., 257 F.3d 164, 168 (2d Cir. 2001)*. The McDonnell Douglas test is a three-part test and involves a shifting of the burden of proof. The first part of this test requires that Plaintiff establish a prima facie case of discrimination.

In order to set forth a *prima facie* case of discrimination under the ADEA or Title VII, Plaintiff must prove the following:

> (1) she belongs to a protected class;
> (2) she was performing satisfactorily;
> (3) she was discharged; and
> (4) the decision to discharge occurred under circumstances giving rise to an inference of discrimination based on her membership in the protected class

*Williams v. R.H. Donnelley, Corp.*, 368 F.3d 123, 126 (2d Cir. 2004); *Duncan v. New York City Transit Authority*, 45 Fed. Appx. 14, 15-16 (2d Cir. 2002); *see also Thomas v. St. Francis Hospital and Medical Center*, 990 F. Supp. 81, 86 (D.Conn. 1998); *Viola v. Philips Medical Systems of North America*, 42 F.3d 712, 716 (2d Cir. 1994). If Plaintiff establishes each element of her *prima facie* case, the burden then shifts to Defendant to provide a legitimate nondiscriminatory reason for the discharge. Defendant's "burden to articulate legitimate, nondiscriminatory rationales for Plaintiff's discharge is 'one of production, not persuasion, involving no credibility assessment.' Defendant meets this burden if its evidence, 'taken as true, would permit the conclusion that there was a nondiscriminatory reason for the adverse action.'" *Soderberg v. Gunther Int'l, Ltd.*, 2004 U.S. Dist. LEXIS 57380 at *3 (D.Conn. 2004) quoting *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 142 (2000) and *Schnabel v. Abramson*, 232 F3d 83, 88 (2d Cir. 2000) (internal quotation omitted).

After Defendant articulates a legitimate, nondiscriminatory reason for the discharge, the burden of production shifts back to Plaintiff to demonstrate pretext by proving by a preponderance of the evidence that her age or sex played a motivating force in the adverse employment action and that the employer's proffered explanation is unworthy of credence. *Weinstock v. Columbia University*, 224 F.3d at 42; *Vallone v. Lori's Natural Food Center, Inc.*, 1999 U.S. App. LEXIS 26455 at *3 (2d Cir. 1999); *Van Dine v. Robert Bosch Corp.*, 62 F.Supp.2d at 647; *Dobrich v. General Dynamics Corp.*, 40 F.Supp.2d at 102; *Ferrand v. Credit Lyonnais*, 2003 U.S. Dist. Lexis 17202 at * (S.D.N.Y. 2003). It remains always Plaintiff's burden to prove discrimination existed. *St. Mary's v. Hicks*, 509 U.S. 502, 507, (1993).

    A.    **Sun Microsystems' Reason for Terminating Plaintiff is Legitimate and Nondiscriminatory**

Sun Microsystems has a legitimate, non-discriminatory reason for terminating Plaintiff's employment: Sun Microsystems' company-wide RIF. *See Deposition of S. Fugazy at 164 (Exhibit D);*

*Deposition of Plaintiff at 91-94 (Exhibit B) (acknowledging that her termination was part of a RIF).* A RIF is a legitimate, nondiscriminatory reason for an employer's decision to terminate an employee. Duncan v. New York City Transit Authority, 45 Fed. Appx. at 16; Tutko v. James River Paper Co., 1999 U.S. App. LEXIS 28455 at *3; Sawenko v. Lockheed-Martin Corp., 201 F.3d 432 (2d Cir. 1999); Van Dine v. Robert Bosch Corp., 62 F.Supp.2d at 647; Blanchard v. Stone Safety Corp., 1991 U.S. Dist. LEXIS 1992 at *5 (D.Conn. 1991). Production by Sun Microsystems of a legitimate, non-discriminatory reason for its employment decision necessitates that any presumption of discrimination that may or may not have been established by the *prima facie* showing completely "drop out of the picture." James v. New York Racing Association, 233 F.3d at 154; see also Duncan v. New York City Transit Authority, 45 Fed. Appx. at 16; Weinstock v. Columbia University, 224 F.3d at 42.

The burden now shifts back to Plaintiff to demonstrate by a preponderance of the evidence that the legitimate, non-discriminatory reason is merely a pretext for discrimination. Duncan v. New York City Transit Authority, 45 Fed. Appx. at 16. "An employer's reason for termination cannot be proved to be a pretext for discrimination unless it is shown to be false and that discrimination was the real reason." Van Dine v. Robert Bosch Corp., 62 F.Supp.2d at 647; see also Weinstock v. Columbia University, 224 F.3d at 42 ("the plaintiff must produce not simply 'some' evidence, but 'sufficient' evidence to support a rational finding that the legitimate, nondiscriminatory reasons proffered by the defendant were false, and that more likely than not discrimination was the real reason for the employment action"); Vallone v. Lori's Natural Food Center, Inc., 1999 U.S. App. LEXIS 26455 at *3 (2d Cir. 1999); Dobrich v. General Dynamics Corp., 40 F.Supp.2d. at 102 ("to defeat a properly supported motion for summary judgment, plaintiff must produce sufficient evidence to support a rational finding that the employer's proffered nondiscriminatory reason was false and that discrimination was the real reason)"; Ferrand v. Credit Lyonnais, 2003 U.S. Dist. Lexis 17202 at *23-24 ("The standard for proving pretext is not negligible: "A

*reason can not be proved to be a 'pretext for discrimination' unless it is shown both that the reason was false, and that discrimination was the real reason").* "To get to the jury, 'it is not sufficient to disbelieve the employer; the fact finder must also believe the plaintiff's explanation of intentional discrimination.'" *Weinstock v. Columbia University*, 224 F.3d at 42 quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. at 519; *Soderberg v. Gunther Int'l, Ltd.*, 2004 U.S. Dist. LEXIS 57380 at *5 *("even if Defendant's reasons are rejected entirely, Plaintiff must produce evidence from which a reasonable fact finder could infer that a discriminatory motive played a role in her discharge").* "The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated remains at all time with the plaintiff." *James v. New York Racing Association*, 233 F.3d at 154 quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. at 507. Plaintiff will be unable to satisfy her burden of demonstrating: (1) that the RIF was a pretext for discrimination; and (2) that her termination was the result of discrimination based on her age and/or her sex.

### 1. Plaintiff Cannot Demonstrate That the Reduction In Force Was a Pretext For Discrimination

In reviewing a claim of pretext, "it is not the duty of a court nor is it within the expertise of the courts to attempt to decide whether the business judgment of the employer was right or wrong. The court is not a super personnel department." *Verneiro v. Air Force Acad. Sch. Dist. No. 20*, 705 F.2d 388, 390 (10th Cir. 1983); *see also Newsom-Lang v. Warren International, Inc.*, 80 Fed. Appx. 124, 126 (2d. Cir 2003); *Duncan v. New York City Transit Authority*, 45 Fed. Appx. at 16; *Scaria v. Rubin*, 117 F.3d 652, 655 (2d. Cir. 1997); *Tutko v. James River Paper Co. Inc.*, 1999 U.S. App. LEXIS 28455 at *4 *("Neither the Court, nor a jury, sits as a 'super-personnel department' to reexamine an entity's decisions on the usefulness to the enterprise of an at-will employee").* An employer is entitled to base employment decisions on subjective criteria and, as such, need not prove that the person terminated had "superior objective qualifications, or [even] that it made the wisest choice, but only that the reasons for the decision

were nondiscriminatory." *Thomesen v. West*, 2001 U.S. Dist. LEXIS 21566 at \*12 (E.D.N.Y. 2001) quoting *Davis v. State Univ. of New York*, 802 F.2d 638, 641 (2d Cir. 1986). Neither Title VII nor the ADEA require that all adverse employment actions make "good business sense." *Holdmeyer v. Veneman*, 2004 U.S. Dist. LEXIS 11004 at \*24-25 (D.Conn. 2004) (". . . people of all backgrounds can make poor business decisions without discrimination playing a role in those decisions"); *Graham v. Texasgulf, Inc.*, 662 F. Supp. 1451, 1461 (D.Conn. 1987).

"In determining whether an employee's job performance is satisfactory, courts may – as they must – rely on the evaluations rendered by supervisors. After all, job performance cannot be assessed in a vacuum; the ultimate inquiry is whether an employee's performance 'meets his employer's legitimate expectations.'" *Meiri v. Dacon*, 759 F.2d 989, 995 (2d Cir. 1985) quoting *Huhn v. Koehring Co.*, 718 F.2d 239, 244 (7th Cir. 1983); *Leveen v. Stratford Housing Authority*, 629 F. Supp. 228, 234 (D. Conn. 1986). "It is the perception of the decision-maker, and not that of plaintiff, which is relevant." *Rosen v. Columbia University*, 1995 WL 464991 at \*7 (S.D.N.Y. 1995); see also *Campbell v. Daytop Village, Inc.*, 1999 U.S. Dist. LEXIS 34232 at \*9 (2d Cir. 1999) ("An employee's subjective opinion about whose qualifications are superior is not dispositive); *Ferguson v. Barram*, 2000 WL 375243 at \*7 (S.D.N.Y. 2000).

Plaintiff consistently ranked in the bottom half of the sales representatives Fugazy supervised. *See April 9th Stack Ranking (Exhibit P); July Initial Performance Rating Spreadsheet (Exhibit W); RIF Memo dated July 19, 2001 (Exhibit Y)*. Similarly, each time a regional ranking was performed, Plaintiff ranked at the bottom of the list. *See 5/4/01 Regional Stack Ranking (Exhibit S); Deposition of S. Fugazy at 310 (Exhibit D) (testifying that Plaintiff ranked near the bottom of the sales representatives as part of the regional RIF ranking)*. The fact that Plaintiff's July RIF ranking matches closely with her previous

NYC_182277_1.DOC/JSTRETTON

performance rankings strongly suggests that her selection for the RIF was not a pretext for discrimination. *Duncan v. New York City Transit Authority*, 45 Fed. Appx. at 16.

In addition, the fact that Plaintiff was not far superior to the other two sales representatives will make her burden of proving pretext especially weighty. *Thomesen v. West*, 2001 U.S. Dist. LEXIS 21566 at *11-12; *Scaria v. Rubin*, 117 F.3d 652, 654-655 (2d. Cir. 1997). For instance, Plaintiff consistently ranked below Powers, the other Sales Representative B. *See April 5th Stack Ranking (Exhibit O); April 9th Stack Ranking (Exhibit P); 5/4/01 Regional Stack Ranking (Exhibit L); July Initial Performance Rating Spreadsheet (Exhibit W); see also Deposition of M. Kozak (Exhibit H)* (describing Powers as "a very good salesperson" while describing Plaintiff only as "an okay salesperson"). With regards to Kozak, who was a Sales Representative A, Plaintiff also cannot demonstrate that she consistently outranked Kozak. *See April 9th Stack Ranking (Exhibit P)* (wherein Kozak ranked superior to Plaintiff in two out of the three categories); *July Initial Performance Rating Spreadsheet (Exhibit W)* (wherein both Plaintiff and Kozak were similarly ranked).

While Plaintiff may have considered herself a "top performer" based on the fact that she achieved her sales goal for FY01[12], neither her self imposed label as a "top performer" nor the fact that she met her sales goal is particularly relevant. *Deposition of S. Fugazy at 171-172 (Exhibit D); Rosen v. Columbia University*, 1995 WL 464991 at *7 ("It is the perception of the decision-maker, and not that of plaintiff, which is relevant"). What is relevant is that Fugazy, her direct supervisor, did not consider Plaintiff to be a "top performer," *Deposition of S. Fugazy at 192-193*, and her termination was based on objective and verifiable criteria. *See RIF Memo dated July 19, 2001 (Exhibit Y); see also Disciplinary Memo dated February 1, 2001 (Exhibit L); AFO Star Process Skills Assessment (Exhibit R)* (wherein Plaintiff stated

---

[12] In her Complaint, Plaintiff alleges she "generated over $20 million in revenues" for FY01. Complaint, ¶ 10. As can be seen from the Commission Summary Report, Plaintiff generated only $12,785,424.07 in revenues for FY01. *FY01 Commission Summary Report for Plaintiff, June 2001, Part 3 – Actual Revenue vs. Sales Target(Exhibit DD); see also Deposition of Plaintiff at 58-62(Exhibit B)* (acknowledging that she is not really sure of the final sales revenue number she achieved during FY01).