UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

MARGARET MARY KELLEY,                  :      CIVIL ACTION NO. 27 A 10: 16
                                       :      03-CV-57 (DJS)
               Plaintiff,              :
                                       :
V.                                     :
                                       :
SUN MICROSYSTEMS, INC.,                :
                                       :
               Defendant.              :      JUNE 24, 2005

## DEFENDANT SUN MICROSYSTEMS, INC.'S
## MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Defendant Sun Microsystems, Inc. submits this Memorandum of Law in Support of its Motion

for Summary Judgment pursuant to Rule 56 dismissing each and every count of Plaintiff's Second

Amended Complaint.

## INTRODUCTION

This is an action by a former employee, Margaret Mary Kelley, of Sun Microsystems, Inc.

Plaintiff is a fifty-two year old female who was employed by Sun Microsystems in its Stamford,

Connecticut office from September 18, 2000 to November 19, 2001. Plaintiff was fifty years old when

she was hired by Steven Fugazy, the individual who would remain her direct supervisor throughout her

thirteen month tenure at Sun Microsystems. She was hired as a Sales Representative B[1] and was assigned

to service the product needs for the General Electric account, an international account. Plaintiff was also

responsible for reporting on designated international product sales to G.E. made by sales representatives

stationed outside the United States, otherwise known as Passport reporting.

In July of 2001, approximately ten months after Plaintiff was hired, Sun Microsystems, along

with countless other technology companies, was forced to undergo a reduction in force ("RIF") due to a

---

[1] Sales representatives are classified by letter, with a Sales Representative A representing the first, or lowest,
alphabetical level and a Sales Representative E representing the final, or highest, level. *See FY'01 Americas Sales
Compensation Plan, Section 1 (Exhibit A).*

declining economy and a dramatic downturn in the technology industry. The goal of the RIF was to reduce the workforce by nine percent, which equaled approximately three thousand six hundred (3600) employees.

At the time, the Stamford, Connecticut office was the only Sun Microsystems' office with three sales representatives dedicated to the G.E. account. The three Stamford sales representatives servicing the G.E. account were Plaintiff, a Sales Representative B, Kristen Powers, also a Sales Representative B, and Michael Kozak, a Sales Representative A. Plaintiff was chosen for termination because she ranked at the bottom of the sales representatives regionally and was, of the three Stamford G.E. sales representatives, considered to have the least potential. Plaintiff, although she had prior sales experience, was slow to develop her product knowledge, which she acknowledged in a self-assessment completed at the end of April 2001, and had difficulty gaining the respect of her teammates, a matter that was documented in February 2001.

Plaintiff acknowledges that she has no direct evidence that her termination was the result of discrimination based on her age and sex. Plaintiff will also be unable to demonstrate that her termination was a pretext for discrimination as Sun Microsystems has a legitimate and nondiscriminatory reason for Plaintiff's discharge, an economically motivated RIF. Given the lack of any evidence of discrimination, summary judgment should enter in favor of Sun Microsystems on Counts One through Three, Plaintiff's sex and age discrimination claims.

Plaintiff does not dispute that, while employed by Sun Microsystems, she never once complained that she was a victim of discriminatory treatment. Moreover, when Plaintiff did complain of unfair but not discriminatory treatment, these complaints followed notification by Sun Microsystems to Plaintiff that her position would be eliminated in the RIF, a fact which necessarily destroys any attempt by

NYC_179044_6/JSTRETTON

Plaintiff to create a causal continuum for her retaliation claims. Therefore, Plaintiff's retaliation claims, like her other claims of discrimination, are unfounded and should be dismissed.

Summary Judgment should also enter in favor of Sun Microsystems on Plaintiff's "unpaid wage" claim under Connecticut General Statutes § 31-72 (Count Seven) and Plaintiff's unjust enrichment claim (Count Eight). Both claims concern commissions Plaintiff claims she earned during Sun Microsystems' fiscal year 2002 ("FY02"), which began July 1, 2001. Plaintiff's wage claims must fail for two reasons. First, sales representatives designated for the RIF were not assigned territories or accounts for FY02 and, therefore, were ineligible to earn commissions. Second, Plaintiff, similar to all other sales representatives identified for the RIF, was paid full "on target earnings"[2] from the beginning of FY02, July 1, 2001, through her termination date, November 18, 2001, even though she was not assigned any accounts or territories and was instructed not to work on any accounts following her pre-notification of termination. Plaintiff was compensated above and beyond that which was due to her under the Sales Compensation Plan. Summary judgment should also enter in favor of Sun Microsystems on Counts Seven and Eight.

## FACTUAL BACKGROUND

### I.   PLAINTIFF'S EMPLOYMENT HISTORY WITH SUN MICROSYSTEMS

#### A.   The Stamford G.E. Sales Team

Plaintiff was hired by Sun Microsystems as a Sales Representative B on September 18, 2000. *Complaint, ¶ 6; Deposition of Plaintiff at 40 (Exhibit B); Offer Letter (Exhibit C).* Plaintiff was stationed in Sun Microsystems' Stamford, Connecticut office and was assigned to sell product to the G.E. account. *Deposition of Plaintiff at 40 (Exhibit B).* Fugazy, the district manager and individual who would be Plaintiff's direct supervisor, extended the offer of employment to Plaintiff. *Deposition of S. Fugazy at 48-49 (Exhibit D); see also Job Offer Form (Exhibit E) (identifies hiring manager as Steven Fugazy).*

---

[2] "On target earnings" is defined as the amount of base salary plus incentive dollars an employee will earn annually at assigned levels of Performance. *FY'01 Americas Sales Compensation Plan, Section 21 (Exhibit A).*

NYC_179044_6/JSTRETTON

Fugazy envisioned that Plaintiff, given her experience, would be capable of serving as the lead sales representative for the Stamford G.E. team. *Deposition of S. Fugazy at 103 (Exhibit D)*. Plaintiff was fifty years old when hired by Fugazy. *Complaint, ¶ 15.*

At the time of Plaintiff's arrival, the Stamford G.E. team was comprised of Steven Fugazy, the district manager, Kristen Powers, a Sales Representative B[3], and two sales engineers[4], Denise Thomas and Michael Cademartori. *Deposition of Plaintiff at 38, 126 (Exhibit B); Deposition of D. Thomas at 10 (Exhibit G)*. Michael Kozak joined the Stamford G.E. team as a Sales Representative A on January 2, 2001, three and one half months after Plaintiff was hired. *Deposition of M. Kozak at 34 (Exhibit H)*. Therefore, as of January 2001, three sales representatives from the Stamford, Connecticut office serviced the G.E. account.

As part of the Stamford G.E. team, Plaintiff was responsible for domestically selling product to G.E. Plaintiff was also responsible for reporting on certain international product sales to G.E. made by sales representatives stationed outside the United States, a responsibility known as Passport reporting. *See Re-Goaling Forms (Exhibit I) (identifying G.E. as the account assigned to Plaintiff and listing the countries assigned to Plaintiff for purposes of Passport reporting); Email Correspondence Dated November 20, 2000 (Exhibit J) (identifying Plaintiff's responsibilities as qualifying and seizing domestic business opportunities and accurately forecasting passport sales); see also Deposition of S. Fugazy at 96 (Exhibit D) (describing Plaintiff's duties)*. Passport was largely a clerical process of reporting sales made by non-U.S. sales representatives so that sales representatives in the United States could also receive

---

[3] Powers became a Sales Representative B, the same position held by Plaintiff, on September 25, 2000. Affidavit of S. Fugazy, ¶ 4 (Exhibit F); Deposition of S. Fugazy at 44-45 (Exhibit D). At the time of Plaintiff's arrival, Powers had been employed by Sun Microsystems for approximately a year and one half. Deposition of Plaintiff at 126 (Exhibit B).
[4] Sales engineers supported the sales representatives by providing in-depth product knowledge, such as the technical capabilities of various software programs or servers, that was routinely needed to respond to inquiries posed by customers. *Deposition of D. Thomas at 8 (Exhibit G)*.

NYC_179044_6/JSTRETTON

commissions from these transactions. *Deposition of S. Fugazy at 43, 123, 192 (Exhibit D); Affidavit of M. Cademartori, ¶ 6 (Exhibit M).*

Plaintiff's domestic selling responsibilities, as well as her Passport responsibilities, were outlined in a document called a Goal Sheet or Re-Goaling Form. *Re-Goaling Forms (Exhibit I).* Goal Sheets identify both the territories and/or accounts assigned to each sales representative as well as the annual sales revenue goal that the sales representative must attain in order to earn full on-target commission earnings. *FY'01 Sales Compensation Plan, Sections 1 and 11 (Exhibit A).* Each sales representative must sign a Goal Sheet in order to be eligible to earn commission payments. *Id.*

While Goal Sheets were individually assigned, Plaintiff and Powers agreed to combine their goals and work together, as a team, towards the target sales goal. *Deposition of Plaintiff at 37-38.* While each continued to sell product domestically, which was their primary responsibility, Plaintiff took over responsibility for reporting on Passport on behalf of the team. *Deposition of S. Fugazy at 151 (Exhibit D); see also Deposition of S. Fugazy at 96-98 (Plaintiff was not as strong in domestic sales).* When Kozak joined Sun Microsystems in January of 2001, he was not immediately included in the Powers/Kelley team and, as a consequence, had to work on his own towards achieving his individual sales goal. *Deposition of S. Fugazy at 113-115 (Exhibit D); Deposition of M. Kozak at 41-42 (Exhibit H).* This changed on April 2, 2001 upon the recommendation of both Plaintiff and Powers, who hoped that Kozak's addition to the team would provide the team with a better opportunity to reach their annual sales goal. *Id.; Deposition of M. Kozak at 41(Exhibit H); E-mail Correspondence Dated April 10, 2001 (Exhibit K).* In the end, all three sales representatives exceeded their sales goal for fiscal year 2001. *Deposition of S. Fugazy at 95-98, 171-172 (Exhibit D).*

NYC_179044_6/JSTRETTON

**B.      Plaintiff's Performance Issues**

Plaintiff received her first disciplinary memo on February 1, 2001. *Disciplinary Memo Dated February 1, 2001 (Exhibit L).* The disciplinary memo concerned complaints by Plaintiff's teammates, which included sales engineers and the two sales representatives, that Plaintiff was both missing meetings and not arriving on time for scheduled meetings, actions her teammates interpreted as a lack of respect. *Id.* Fugazy documented this problem and discussed these issues with Plaintiff. *Id.; Deposition of Plaintiff at 67-68 (Exhibit B).* In addition to Plaintiff's problems with her teammates, Fugazy also became increasingly disappointed with Plaintiff's lack of industry knowledge given her level of experience. *Deposition of Plaintiff at 65 (Exhibit B) ("one particular instance, I was in his office and the conversation was about something that I was somewhat familiar with, not totally, regarding something to do with distributors or something like that and he appeared to be surprised that I didn't know what he was talking about so he said, you know, I'm surprised with your experience you don't know this or something like that").*

In April of 2001, Fugazy was asked to rate the performance of the sales representatives under his supervision and also to stack rank these individuals. *April Performance Criteria Tool – Individual Contributors for Plaintiff (Exhibit N) (rating performance in the areas of "Achievements/Results Against Goals," "Functional/Technical Contribution," and "Competencies"); April 5th Stack Ranking (Exhibit O); Affidavit of S. Fugazy, ¶ 5 (Exhibit F).* Sun Microsystems routinely requested district managers to perform such a stack ranking. *Affidavit of S. Fugazy, ¶ 5 (Exhibit F).*

Fugazy ranked both Plaintiff and Powers in the mid-seventy percentile[5]. *April 5th Stack Ranking (Exhibit O).* Four days later, on April 9, 2001, Fugazy amended his stack ranking to include the results of the "Performance Criteria Tool – Individual Contributors" and to include a ranking for Kozak. *April 9th Stack Ranking (Exhibit P); see also April Performance Criteria Tool – Individual Contributors for*

---

[5] This stack ranking split employees into three categories, the top 20%, the middle 70% and the bottom 10%.

NYC_179044_6/JSTRETTON

*Plaintiff and M. Kozak (Exhibits N and Q)*. The results from the Performance Criteria Tool – Individual

Contributors, which rated the performance of each sales representative in a number of different

categories, helped to further differentiate between those individuals ranked in the mid-seventy percentile.

The Performance Criteria Tool – Individual Contributors demonstrates that Powers outperformed

both Plaintiff and Kozak. *April 9th Stack Ranking (Exhibit P)*. On a one to five scale, with "5"

representing a problem area and "1" representing a genuine strength, Powers received a "2" on

"Achievements/Results Against Goals" and a "2" on "Functional/Technical Contribution." *Id.* In the

"Competencies" category, which is a combination of six subcategories, namely, Dealing with People,

Communication, Teamwork & Leadership, Problem Solving & Decision Making, Planning &

Organizing, and Results Orientation, Powers received a "15," which is an average score of 2.5 in each of

the six subcategories. *Id.* Kozak, who was a Sales Representative A, also outranked Plaintiff in the

"Competencies" category, receiving a "15," an average score of 2.5 in each of the six subcategories, as

compared to the "22," an average score of 3.7 in each of the six subcategories, awarded to Plaintiff. *Id.*[6];

*see also April Performance Criteria Tool – Individual Contributors for Plaintiff and M. Kozak (Exhibits*

*N and Q)*.

At the end of April, 2001, Plaintiff completed a self evaluation, an "AFO STAR Process Skills

Assessment."[7] *Deposition of Plaintiff at 181-182 (Exhibit B); Plaintiff's AFO STAR Process Skills*

*Assessment (Exhibit R)*. In the areas of "Market Knowledge," "Technical Proficiency" and "Consultative

Selling," Plaintiff acknowledged that she was not yet competent in these areas and needed considerable

improvement, which was consistent with the scores she received from Fugazy in the April Performance

---

[6] Kozak also outperformed Plaintiff in the "Functional/Technical Contribution" category, receiving a "3" as
compared to the "4" awarded to Plaintiff. In the third category, "Achievements/Results Against Goals," Plaintiff
received a "3" and Kozak received a "4."

[7] The scale utilized in the "AFO STAR Process Skills Assessment" was as follows: "1" indicated a need for
development; "3" indicated that the sales representative felt she was competent in this area; and "5" was reserved for
"exemplary" performance.

NYC_179044_6/JSTRETTON

Criteria Tool – Individual Contributors. *Plaintiff's AFO STAR Process Skills Assessment (Exhibit R)* *(scoring herself with 1's and 2's, indicating a need for development).*

On May 4, 2001, the regional director, Phil Clark, ranked the sales representatives in his region. *5/4/01 Regional Stack Ranking (Exhibit S); Affidavit of P. Clark, ¶ 4 (Exhibit T).* Clark used the same three category assessments used in the April Performance Criteria Tool – Individual Contributors, namely, Achievements/Results Against Goals, Functional/Technical Contribution and Competencies. Plaintiff ranked 33rd out of 37 sales representatives in the region. *5/4/01 Regional Stack Ranking.*

June 30, 2001 marked the close of Sun Microsystems' FY01. *Deposition of Plaintiff at 40-41 (Exhibit B); Deposition of A. Jhangiani at 5 (Exhibit U).* As FY01 came to a close, each district manager was asked to recommend coverage for FY02, including the number of sales representatives that should be assigned to each district. *Coverage Memorandum dated June 25, 2001 (Exhibit V); Affidavit of S. Fugazy, ¶ 7 (Exhibit F).* Fugazy recommended to his regional manager, Clark, that Sun Microsystems retain all three sales representatives from the Stamford G.E. account, the "Tri-State" area district. *Coverage Memorandum Dated June 25, 2001 (Exhibit V) (wherein Fugazy recommended that the "3" "Sales" representatives covering the "Tri-State" area for FY01 be retained in FY02); Deposition of S. Fugazy at 326 (Exhibit D).*

In July of 2001, the district managers were again asked to rank the sales representatives. *July Initial Performance Rating Spreadsheet (Exhibit W).* As with the April 9th ranking, each of the three Stamford sales representatives ranked in the middle seventy percentile. *Id.* Plaintiff once again ranked in the bottom half of the ranked employees. *Id.*

## C.    The Reduction in Force

The year 2001 was a difficult year for many industries, especially the technology industry. Throughout the year, Sun Microsystems had been circulating memoranda to its employees asking each

NYC_179044_6/JSTRETTON

employee to watch expenses. *Deposition of Plaintiff at 91-92,133-134 (acknowledging receipt of memos to reduce expenses and that the technology market was plummeting).* As of July 2001, which also marked the beginning of Sun Microsystems' new fiscal year, FY02, Sun Microsystems' economic outlook still did not look promising and, as a result, it was forced to implement a company-wide RIF. *Id. at 91-92 (testifying that it was her understanding that the RIF was company wide and necessitated by a need to reduce expenses); Affidavit of D. Vogelzang, ¶ 3 (Exhibit NN).* The goal of the RIF was to reduce the workforce by nine percent, a reduction that would equal approximately 3600 employees. *Affidavit of P. Clark, ¶ 5 (Exhibit T).*

Fugazy first learned of the RIF in mid July 2001, a few days in advance of the RIF meeting set up in Somerset, N.J. between the new regional manager, David Vogelzang, and each of the district managers to discuss the performance of the various sales representatives in the region in light of the company-wide RIF. *Deposition of S. Fugazy at 182, 296, 306-308 (Exhibit D); see also Affidavit of D. Vogelzang, ¶ 3 (Exhibit NN).* Thus, Fugazy was not aware that Sun Microsystems would be implementing a RIF when he completed each of the stack rankings referenced above. *Affidavit of S. Fugazy, ¶ 6-7 (Exhibit F).*

During the RIF meeting, held on or about Tuesday, July 17, 2001, Fugazy provided feedback on the three Stamford G.E. account sales representatives. *Deposition of S. Fugazy at 306-308 (Exhibit D); Affidavit of D. Vogelzang, ¶ 4 (Exhibit NN).* Based on this feedback, and the feedback from the other district managers, a regional stack ranking of sales representatives was created on a whiteboard in the conference room. *Id. at 310.* Plaintiff's name appeared near the bottom of the list. *Id.* Fugazy left the meeting unaware of the number of sales representatives that would be terminated or even whether any of his sales representatives would be affected by the RIF. *Id. at 313.*

Later that day, or possibly the following morning, Fugazy was notified that Plaintiff would be terminated. *Id. at 314.* Fugazy was then asked to memorialize the rationale supporting the decision to

NYC_179044_6/JSTRETTON

terminate Plaintiff based on the criteria that had been discussed during the July 17th Meeting. *Email correspondence dated July 18, 2001 (Exhibit X); Deposition of S. Fugazy at 184, 314-315 (Exhibit D); Affidavit of S. Fugazy, ¶ 8 (Exhibit F); Affidavit of D. Vogelzang, ¶ 4 (Exhibit NN).*

Plaintiff was selected for termination for a number of reasons. First, Stamford, Connecticut was the only Sun Microsystems' location to have three sales representatives assigned to the G.E. account. *RIF Memo dated July 19, 2001 (Exhibit Y); Affidavit of S. Fugazy, ¶ 8 (Exhibit F).* Given the need to reduce the number of employees, coupled with the national coverage demands of the G.E. account, it was determined that one of the Stamford sales representatives would be terminated. Second, based on the pertinent criteria, namely "skill set" and "industry/market knowledge," Fugazy concluded that Plaintiff demonstrated less potential than the other two Stamford sales representatives. *RIF Memo dated July 19, 2001 (Exhibit Y); see also Email correspondence dated July 18, 2001 (Exhibit X).* For instance, while Kozak and Plaintiff each ranked in the bottom half of the sales representatives supervised by Fugazy, Plaintiff was slower to advance her product and industry knowledge. *RIF Memo dated July 19, 2001 (Exhibit Y); Deposition of S. Fugazy at 187.* Indeed, Plaintiff acknowledged that she was not competent in this area when she completed her self-assessment at the end of April. *See Plaintiff's AFO STAR Process Skills Assessment (Exhibit R).* Plaintiff was also inferior to the other two sales representatives in "teamwork and leadership." Due to her sub-standard product and industry knowledge and inconsiderate behavior towards the other sales representatives and systems engineers, Plaintiff was less respected professionally than the other two sales representatives. *RIF Memo dated July 19, 2001 (Exhibit Y); see also Disciplinary Memo dated February 1, 2001 (Exhibit L); Deposition of M. Kozak at 45-47 (describing Plaintiff as an "ok" salesperson and Powers as a "very good" salesperson); Deposition of J. Davis at 15-16 (Exhibit FF) (evidencing surprise at the lack of sales initiative shown by Plaintiff at event sponsored by Sun Microsystems); Affidavit of D. Thomas (Exhibit AA) (plaintiff's lack of product*

NYC_179044_6/JSTRETTON

*knowledge frustrated sales engineers); Affidavit of M. Cademartori, ¶ 5 (Exhibit M) (describing Plaintiff as slower to develop her product knowledge).*

On Monday, July 23, 2001, Plaintiff was informed by Fugazy, her direct supervisor, and Vogelzang, the regional manager, that she had been selected for termination. *Deposition of Plaintiff at 93-94 (Exhibit B); Deposition of S. Fugazy at 197-198 (Exhibit D); Affidavit of D. Vogelzang, ¶ 6 (Exhibit NN); Complaint, ¶ 11.* Plaintiff's employment officially terminated on November 18, 2001. *Complaint, ¶ 11.*

### D.    The Alleged Retaliation

During the July 23rd meeting with Fugazy and Vogelzang, Plaintiff was advised that her position would be eliminated in the scheduled RIF and that she was immediately relieved of all responsibilities associated with her position as a sales representative. Plaintiff asked Fugazy and Vogelzang for clarification on why she was selected for termination as part of the RIF. *Continued Deposition of Plaintiff at 6-7 (Exhibit OO); see also Deposition of Plaintiff at 93-99 (Exhibit B); Deposition of S. Fugazy at 197-198 (Exhibit D); Affidavit of S. Fugazy, ¶ 9 (Exhibit F); Complaint, ¶ 11.* Following this meeting, Plaintiff had additional questions and sent Fugazy and Human Resources emails wherein she asked questions such as: how would she be paid during the pre-notification period; whether she could stay in the office to look for a new position[8]; what kind of reference would she get from Fugazy; how did the RIF selection process work; and whether she could still attend the Hawaii sales reward trip. *Continued Deposition of Plaintiff at 8.* These questions, according to Plaintiff, were the impetus for the retaliation she then claims to have been subjected to by Sun Microsystems. *Id. at 8.*

Plaintiff provides four examples of retaliation she alleges she was subjected to following the July 23rd meeting. *Id. at 4-5.* The four examples of retaliation are described as follows: (1) Fugazy's alleged

---

[8] All employees whose position was to be eliminated in the upcoming RIF were pre-notified in an effort to provide these employees time, with pay, to locate a new position, whether inside or outside of Sun Microsystems. *See Affidavit of S. Fugazy, ¶ 9 (Exhibit F); Deposition of C. DeBorja at 50 (Exhibit DD).*

NYC_179044_6/JSTRETTON

refusal to respond to Plaintiff's questions regarding the RIF and his alleged "berating" of Plaintiff in response to her questions; (2) Human Resources', namely Cheryl DeBorja and Kelly Marazas', alleged refusal to respond to Plaintiff's questions regarding the RIF; (3) being ostracized by her colleagues as a result of Fugazy's instructions to Plaintiff's former colleagues, following notification to Plaintiff of her termination and that she was relieved of her responsibilities, not to speak to Plaintiff about Sun Microsystems' accounts; and (4) Fugazy's alleged attempt to sabotage her efforts to regain employment elsewhere within Sun Microsystems. *Id.*

Although Plaintiff claims Fugazy attempted to sabotage her efforts to regain employment within Sun Microsystems, it is undisputed that Plaintiff can adduce no evidence in support of this theory and, further, that the undisputed evidence demonstrates that Fugazy did not attempt to sabotage her employment efforts. *Deposition of Plaintiff at 140-143 (Exhibit B); Deposition of C. DeBorja at 25-26 (Exhibit DD); Deposition of S. Fugazy at 205-207 (Exhibit D); Affidavit of M. McDonagh, ¶¶ 5-6 (Exhibit GG).* It is also undisputed that Plaintiff was relieved of her job responsibilities when she was pre-notified of her termination on July 23rd and, therefore, there would have been no reason for Plaintiff's former colleagues to discuss with her business pertaining to Sun Microsystems. *Deposition of Plaintiff at 93-98 (Exhibit B).* Plaintiff also acknowledges that she never once complained to anyone of discriminatory treatment while employed by Sun Microsystems, which is a necessary component of demonstrating that she engaged in a protected activity. *Deposition of Plaintiff at 150-151, 156, 248-249, 302-303.* Finally, not one of the foregoing examples of alleged retaliatory conduct constitutes an adverse employment action.

NYC_179044_6/JSTRETTON

## II.    PLAINTIFF'S COMPENSATION ARRANGMENT WITH SUN MICROSYSTEMS

Plaintiff was hired on September 18, 2000 by Sun Microsystems as a Sales Representative B at a base salary of $52,000.00 annualized. *Offer Letter (Exhibit C); Deposition of A. Jhangiani[9] at 17 (Exhibit U); Deposition of Plaintiff at 40, 203 (Exhibit B).* As a Sales Representative B, Plaintiff's on-target commission earnings goal was $78,000.00. *Offer Letter (Exhibit C); Deposition of Plaintiff at 203 (Exhibit B).* In other words, if Plaintiff met her annual sales revenue goal, she could expect to earn $78,000.00 in commissions, which would make her annual on-target earnings (base salary plus commissions) for FY01 $130,000.00. *Offer Letter (Exhibit C); see also FY'01 Americas Sales Compensation Plan, Section 21, Compensation Definitions (Exhibit A) (Defining "On Target Earnings" as "the amount of base salary plus incentive dollars an employee will earn annually at assigned levels of performance").* Plaintiff's offer letter, which she signed on September 6, 2000, instructed Plaintiff to refer to the Sales Compensation Plan[10] for additional information concerning her assigned on-target commission earnings goal of $78,000.00 annualized. *Offer Letter (Exhibit C) ("Details of your on-target earnings and additional bonus programs are outlined in the Sales Compensation Plan . . .").*

The introductory section of the FY01 Sales Compensation Plan provides an overview of Sun Microsystems' commission policy. In the introductory section, the Plan provides that a fully executed Goal Sheet is a condition precedent to receiving incentive, or commission, payments[11]. *FY'01 Americas Sales Compensation Plan, Section 1 (Exhibit A) ("No incentive compensation payments will be made to*

---

[9] Anjali Jhangiani is the Financial Manager, otherwise known as the Commission Accounting Manager, at Sun Microsystems. *Deposition of A. Jhangiani at 7-8.*

[10] July 1, 2000 marked the beginning of FY01 and the effective date of the FY01 Sales Compensation Plan. *Deposition of A. Jhangiani at 5 (Exhibit U); Deposition of Plaintiff, at 40-41 (Exhibit B) (acknowledging that Sun's fiscal year runs from July 1 through June 30); FY'01 Americas Sales Compensation Plan, Section 1 (Exhibit A) (The FYO1 Sales Compensation Plan went into effect on July 1, 2000).* Plaintiff began her employment with Sun Microsystems on September 18, 2001, approximately two and one half months into FY01.

[11] Similar to the FY01 Sales Compensation Plan, the FY02 Sales Compensation Plan, effective July 1, 2001, provided that a fully executed Goal Sheet was a condition precedent to receiving commission payments. *FY'02 GSO Americas Sales Compensation Plan, Section 1 (Exhibit BB) ("No incentive compensation payments will be made to anyone covered by this Plan until a fully executed copy of the Goal Sheet is signed by the participant, two levels of management and the Area controller").*

NYC_179044_6/JSTRETTON

*anyone covered by this Plan until a fully executed copy of the Goal Sheet is signed by the participant, two levels of management and the Area controller")*; *see* <u>*also*</u> *Deposition of A. Jhangiani at 48-53, 64 (Exhibit U)*. Goal Sheets identify the territories and/or accounts assigned to each sales representative and identify the annual sales goal that the sales representative must attain in order to earn full on-target incentive earnings. *FY'01 Americas Sales Compensation Plan, Section 1 and Section 11 (Exhibit A); Re-Goaling Forms (Exhibit I); Deposition of A. Jhangiani at 39-42, 48-50 (Exhibit U).*

The Goal Sheet itself further emphasizes the importance of a signed Goal Sheet. The Goal Sheet provides that a sales representative is only eligible to receive commissions on the accounts or territories listed on the Goal Sheet. *Re-Goaling Forms (Exhibit I) ("In order to receive commission dollars on an account or territory, the account or territory must be included in the Goaling and Coverage Tool and a copy of the account(s)/territory must be attached. Passport must be goaled by account and all buying location must be identified")*; *see* <u>*also*</u> *Deposition of A. Jhangiani at 48-50 (Exhibit U)*. The Goal Sheet also serves to inform the sales representatives that all commission payments will be made in accordance with the Sales Compensation Plan. *Re-Goaling Forms (Exhibit I) ("ACKNOWLEDGEMENT  I have received, read and understand the Sun Microsystems Inc. (Sun), Americas United States Fiscal Year 2001 Sales Compensation Plan (PLAN) and all appendices . . . All payments are based on this PLAN . . .").*

Plaintiff signed her first Goal Sheet on October 17, 2000, shortly after commencing employment with Sun Microsystems. *Re-Goaling Forms (Exhibit I)*. Due to a combination of declining market conditions and an agreement between Plaintiff and the other Stamford sales representatives to share goals, Plaintiff's Goal Sheet was twice amended during FY01, both times reducing Plaintiff's annual sales revenue goal. <u>*Id.*</u> *(the first Goal Sheet was executed on October 17, 2000, which was superceded by the*

NYC_179044_6/JSTRETTON

*Goal Sheet executed January 25, 2001, which was superceded by the Goal Sheet executed May 18, 2001).*

The July 2001 RIF followed the close of fiscal year 2001. Plaintiff, similar to every other sales representative affected by the RIF, was not provided a Goal Sheet for FY02 due to the fact that her position was being eliminated. In other words, Plaintiff was not assigned accounts or territories for FY02 due to the RIF. Without assigned accounts or territories, which could only be assigned through a Goal Sheet, Plaintiff was not eligible to earn commissions. *FY'01 Americas Sales Compensation Plan, Section 1 and Section 11 (Exhibit A).* Plaintiff acknowledges that she did not sign a Goal Sheet for FY02. *Deposition of Plaintiff at 163, 237 (Exhibit B).*

However, despite the fact that Plaintiff was not eligible to earn commission in FY02, Plaintiff was paid, as were all other sales representatives affected by the RIF, full on-target earnings from the beginning of FY02, July 1, 2001, through her termination date, November 18, 2001. *Affidavit of A. Jhangiani, ¶ 5 (Exhibit LL); Deposition of S. Fugazy at 141 (Exhibit D); Payment Summary (Exhibit CC); see also Deposition of Plaintiff at 161-162 (Exhibit B).* In other words, Plaintiff was paid during this period a prorated portion of the $130,000.00 annualized on-target salary outlined in her offer letter dated September 18, 2000. *Affidavit of A. Jhangiani, ¶ 5 (Exhibit LL); Payment Summary (Exhibit CC); Offer Letter (Exhibit C).* Plaintiff was not required to perform any services for Sun Microsystems during her notification period, which period was intended to allow Plaintiff time to locate new employment opportunities. *Affidavit of S. Fugazy, ¶ 9 (Exhibit F); Deposition of C. DeBorja at 50 (Exhibit DD); see also Deposition of Plaintiff at 142 (Exhibit B) (wherein Plaintiff acknowledges that she eventually stopped coming into the office sometime near the end of August 2001).*

NYC_179044_6/JSTRETTON