UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| MARGARET MARY KELLEY, | : | CIVIL ACTION NO. |
| | : | 3:03 CV 57 (CFD) |
| Plaintiff, | : | |
| | : | |
| V. | : | |
| | : | |
| SUN MICROSYSTEMS, INC., | : | |
| | : | AUGUST 30, 2005 |
| Defendant. | : | |

PLAINTIFF'S OPPOSITION TO
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

*PRELIMINARY STATEMENT*

Plaintiff Margaret Mary Kelley submits this brief in opposition to defendant's Motion for Summary Judgment dated June 24, 2005 (hereinafter "Defendant's Motion") As more fully set forth below, defendant has misstated and skewed both the facts and, in many instances, the applicable law in an effort to wrongly deprive plaintiff of her day in court. For example, in its memorandum in support of its Motion (hereinafter "Defendant's Memo"), defendant ignores the fact defendant clearly understood plaintiff's complaints to be those of age and gender discrimination, and declines to address its failure to apply any corrective measures. In addition, not only is defendant inconsistent in its own recitation of operative facts, its version in many instances lies in stark contrast to sworn testimony and defendant's own documents. This results in a myriad of disputed issues of material fact, any one of which provides an adequate basis to deny defendant's Motion for Summary Judgment.

*STATEMENT OF FACTS*

I.  *OVERVIEW.*

Plaintiff, a 52-year-old female, brings this action alleging she was the victim of sex and age discrimination while employed with defendant Sun Microsystems, Inc. ("Sun"). Moreover, when plaintiff asserted her rights in light of defendant's unlawful conduct, defendant used threats and

intimidation in an attempt to stifle plaintiff's complaints, and retaliated against and ultimately terminated her. In so doing, defendant failed to pay plaintiff all wages due her in further retaliation for her actions.[1]

## II.   *OPERATIVE FACTS.*

Defendant Sun is a corporation with an office in Stamford, Connecticut and is in the business of, *inter alia*, selling hardware, software and consulting services. Ms. Kelley is an experienced salesperson in the technology arena. Prior to becoming employed with defendant, Ms. Kelley worked for over 14 years with IBM (and its predecessors in interest) selling hardware and software products, first to Chase Manhattan Bank and then exclusively to General Electric. (Kelley Depo. at 33-35 (P.Ex. 2)[2]; plaintiff's resume (P.Ex. 8.) Ms. Kelley was recruited for a sales position with defendant and interviewed with a District Sales Manager located in Stamford, Connecticut responsible for selling defendant's services and products to General Electric. (Id. at 21, 27-28 (P.Ex. 2).) It was this manager, Bruce Likely, who made the decision to interview plaintiff. (Id. at 28 (P.Ex. 2); Fugazy Depo. at 45-46 (P.Ex. 3).) At the time of this interview, Mr. Likly had two sales representatives reporting to him at Stamford, Mr. Steve Fugazy and Kristen Powers.

Ms. Kelley interviewed with Mr. Likly. (Kelley Depo. at 31 (P.Ex. 2); Fugazy at 45-46 (P.Ex. 3).) Thereafter, Mr. Likly was promoted and Mr. Fugazy took over Mr. Likly's role. (Kelley Depo. at 29-30 (P.Ex. 2); Fugazy Depo. at 48 (P.Ex. 3).) Mr. Fugazy then promoted Ms. Powers to "Sales Rep B"[3] and extended the offer to Ms. Kelley to also become Sales Rep B servicing the General Electric

---

[1] In her Second Amended Complaint, plaintiff alleges: (1) in the First Count against defendant, sex discrimination pursuant to 29 U.S.C. §2000 (Title VII); (2) in the Second Count against defendant, age discrimination pursuant to 29 U.S.C §623(d) (ADEA); (3) in the Third Count against defendant, sex and age discrimination pursuant to C.G.S. §46a-60(a) (CFEPA); (4) in the Fourth Count against defendant, retaliation pursuant to 42 U.S.C §2000e-3 (Title VII); (5) in the Fifth Count against defendant, retaliation pursuant to 29 U.S.C. §623(d) (ADEA); (6) in the Sixth Count against defendant, retaliation pursuant to C.G.S. §46a-60(4); (7) in the Seventh Count against defendant, a violation of C.G.S. §31-72 for unpaid wages; and (8) in the Eight Count against defendant, unjust enrichment.
[2] "D.Ex. ___" shall refer to defendant's Index of Exhibits Volumes 1 and 2 submitted with its Motion for Summary Judgment. "P.Ex ___" shall refer to plaintiff's Appendix of Exhibits submitted herewith.
[3] Sales representatives are classified by letter from A to E depending upon characteristics of the assignment and the skill/experience level of the employee. Sales Representative A represents the lowest alphabetically-ranked employee, and Sales Representative E represents the highest ranked employee. See FY'01 Americas Sales Compensation Plan, Section 1 (D.Ex. A).

account. (Kelley Depo. at 27-30 (P.Ex. 2); D.Ex. C.) While Mr. Fugazy communicated the offer, he was not sure if Mr. Likly had made the hiring decision. (Fugazy Depo. at 48-49 (P.Ex. 3); Kelley Depo. at 63 (P.Ex. 2).)

Ms. Kelley began her employment with defendant on September 18, 2000. (Kelley Depo at 40 (P.Ex. 2).) Plaintiff's immediate sales team was comprised of Kristen Powers, the 33-year-old Sales Representative B, and herself. She reported to Mr. Fugazy, who prior to this never held a position supervising anyone. (Fugazy Depo. at 29 (P.Ex. 3).) Ms. Kelley was responsible for sales to GE Capital and GE Supply (Kelley Depo. at 43 (P.Ex. 2); Fugazy Depo. at 82 (P.Ex. 3), and also in charge of all international sales to GE, referred to as "Passport" sales (Fugazy Depo. at 121 (P.Ex. 3); Kelley Depo. at 43 (P.Ex. 2); P.Ex. 9. Her duties included generating sales, communicating defendant's strategy and product information to certain accounts, reporting her findings to management and developing client relationships. (Kelley Depo. at 43-45 (P.Ex. 2); Fugazy Depo. at 96 (P.Ex. 3)) Ms. Kelley's compensation was comprised of salary, commission, benefits and a car allowance. (Kelley Depo. at 36-39 (P.Ex. 2); D.Ex. C; P.Ex. 10.) She received a salary of $52,000, and commission based upon a "PCR" or personal commission rate. (P.Ex. 10; Fugazy Depo. at 57-62 (P.Ex. 3).) This rate was calculated as the potential commission she could earn if she reached 100% of her assigned goal, divided by the monetary goal assigned, and was a figure determined by Fugazy. (D.Exs. A and C; P.Ex. 10); Fugazy Depo. at 57-62, 65 (P.Ex. 3).) In Ms. Kelley's case, she could earn commissions of $78,000 if she reached her goal. Her $52,000 salary and $78,000 commission, when combined, equal a figure known as "OTE," or "on target earnings." (Fugazy Depo. at 61 (P.Ex. 3); Jhangiani Depo. at 26-27 (P.Ex. 6).) Sales achieved in excess of the assigned goal resulted in application of an "acceleration" or a multiple up to 3 times the PCR and commission earnings potential well in excess of the $78,000 "OTE" rate. (Fugazy Depo. at 62 (P.Ex. 3); (P.Ex. 10); Jhangiana Depo. at 26-27 (P.Ex. 6).)

Tracking revenue earned was very complicated at Sun. Domestic sales were tracked directly by a service, indirect sales (through a reseller) were tracked through a process called "PCR," and Passport

(i.e., international) sales were tracked through its own process. (Fugazy Depo. at 52 (P.Ex. 3).) Sales figures for Passport could be delayed for up to 3 months from the date of sale. (Fugazy Depo. at 53, 123-24 (P.Ex. 3); Kelley Depo. at 55-56 (P.Ex. 2).) Commissions were "earned" at different times depending upon the type of sale (e.g., direct, indirect, or Passport). (Fugazy Depo. at 53, 123-24; FY01 Sales Compensation Plan §17 (direct and indirect sales) and §22 (Passport sales) (P.Ex. 11).)

Each sales representative's selling responsibilities were outlined in documents defendant identifies as "Goal Sheets." (Kelley Depo. at 190-204 (P.Ex. 3); D.Ex. I.) Goal Sheets identify both the territories and/or accounts assigned to each sales representative, as well as the annual sales revenue goal that the sales representative must attain in order to achieve his or her commissions. (Kelley Depo. at 40, 50 (P.Ex. 2); Fugazy Depo. at 89 (P.Ex. 3); FY'01 Sales Compensation Plan, Sections 1 & 11 (D.Ex. A).) Though Goal Sheets were individually assigned, plaintiff and Ms. Powers initially shared a combined goal. (Kelley Depo. at 37-38 (P.Ex. 2); P.Ex. 12.) The goal sheets provided they could be changed "upon notice" by defendant, and they were periodically changed by Mr. Fugazy for his team as he added new members. (Fugazy Depo. at 89 (P.Ex. 3).) The Goal Sheets signed by Ms. Kelley were the "contract" that controlled her compensation and unequivocally stated that: "If I were to become separated from Sun, either voluntarily or involuntarily, I shall be paid salary and earned commissions up to my termination date." (Jhangiana Depo. at 41-42 (P.Ex. 6); D.Ex. I "Acknowledgement".)

Shortly after becoming District Sales Manager, Fugazy began hiring young males to his team. Specifically, he hired Jamie Magnum, who was in his early 30s, and a former hockey player/enthusiast like Mr. Fugazy. (Fugazy Depo. at 30, 90, 93, 234-35 (P.Ex. 3); Kozak Depo. at 36-37 (P.Ex. 4).) Mr. Magnum worked in Virginia, not in the Stamford office. (Kozak Depo. at 36-37 (P.Ex. 4).) Thereafter, Mr. Fugazy interviewed and then hired Mr. Kozak, also in his early 30s, and a hockey player, to work as a "Sales Rep A" on the GE account in Stamford. (Fugazy Depo. at 85 (P.Ex. 3); Kozak Depo. at 33-34 (P.Ex. 4).) Mr. Kozak had absolutely no technical sales experience, and his primary prior employment was selling tickets, community programs and corporate partnerships for the New Jersey Devils hockey

4

franchise. (Kozak Depo. at 12-17 (P.Ex. 4).) At one time, Mr. Kozak had pursued a professional hockey career. (Kozak Depo. at 9 (P.Ex. 4).)

Ms. Kelley, due to her experience and expertise with General Electric, was appointed the Senior Leader of the sales team in Stamford. (Kelley Depo. at 27-28 (P.Ex. 2); Fugazy Depo. at 96, 103 (P.Ex. 3); Kozak Depo. at 36 (P.Ex. 4).) As the senior account executive on the GE team, she "set the bar" in terms of business planning and organization. (D.Ex. J.) Ms. Kelley hit the ground running. She was accorded a "recoverable draw" the first few months, but by the end of the fourth month of her employment (end of the calendar year), she had achieved 107.78% of her assigned sales goal. (P.Ex. 13 SUN0095.) At this juncture, Mr. Kozak had not yet been hired, and Ms. Kelley and Ms. Powers were still sharing revenue credit on an equal basis.

Defendant would have this Court believe plaintiff was a poor or inadequate performer. In support of this contention, defendant cites to a single memorandum created on February 1, 2001 by Mr. Fugazy, a memorandum indicative of Mr. Fugazy's unwillingness to accord to plaintiff the latitudes he accorded to Mr. Kozak and to Ms. Powers. (Kelley Depo. at 67-74 (P.Ex. 2); D.Ex. L.) This memorandum admonishes plaintiff's attendance issues only. It fails to accord plaintiff the professional attitude she deserved, and is indicative to Mr. Fugazy's overall contempt for plaintiff as a professional older woman. There are other examples. Mr. Kozak would attend hockey games with Mr. Fugazy to associate "Koz," as Fugazy affectionately called Mr. Kozak, with defendant's clients and other member of defendant's management team. (Fugazy Depo. at 115-116 (P.Ex. 3); Kozak Depo. at 9 (P.Ex. 4); Kelley Depo. at 251 (P.Ex. 2).) In fact, another female subordinate of Fugazy testified that he "favored" Mr. Kozak over plaintiff. (Thomas Depo. at 24 (D.Ex. G).) Conversely, Fugazy would continuously scream at plaintiff, telling her she was weak and insecure and that people who were "insecure" made him "sick to his stomach." (Kelley Depo. at 108, 118, 119 (P.Ex. 2).) In addition, despite plaintiff's objections, Fugazy would exclude her from meetings in which she should have been involved. (Kelley Depo. at 221-223 (P.Ex. 2).) To underscore his sexist attitude, Fugazy did not support plaintiff when she was requested by

5

GE to run a symposium in California highlighting successful women in the workplace. (Kelley Depo. at 231-32 (P.Ex. 2).) Instead, he berated plaintiff after that forum she directed and spearheaded for not providing enough drinks to the attendees. (Kelley Depo. at 232, 319 (P.Ex. 2).) Mr. Fugazy in his documenting plaintiff's performance makes no mention of this forum or how happy and pleased GE was with plaintiff's efforts and the symposium. (See P.Ex. 14 email (from GE Capital) indicating how pleased GE Capital was with seminar.) Fugazy testified he was less than enthused with Ms. Kelley taking on this women's event. (Fugazy Depo. at 156-60 (P.Ex. 3).) Defendant's brief also makes no mention of the accolades she received from the client.

Despite Fugazy's discriminatory attitude, plaintiff continued to persevere and perform her job in an exemplary fashion. (P.Ex. 15.) Evidence of this good performance abounds and is conveniently ignored by defendant. In November, Mr. Fugazy wrote to plaintiff: "Meg, I want you to know that I think you are doing a great job." (Part of P.Ex. 16).) Other memoranda of praise (collectively P.Ex. 16) include January 9, 2001 ("Good work"), February 18, 2001 ("Looks like Hungary reported. Good Work!"), April 26, 2001 ("Meg: You are doing an excellent job on passport; please keep up the good work"), April 26, 2001 ("Meg: Good work Meg!"), May 22, 2001 ("Good job Meg. Looks like you have $1M of Q4 Opp'y in Japan."), June 14, 2001 ("Meg, good followthrough"), June 28, 2001 ("Meg: Awsome [sic] job! Kudos to you."). (See also "CHRO supplemental affidavit," Complainant's Verified Reply ¶11 dated May 6, 2002 and attachments thereto (P.Ex. 17).)

In May 2001, plaintiff received favorable feedback from others in senior management, including Mr. Scott McNealy, Chief Executive Officer of defendant. (Id.) Mr. McNealy, in awarding plaintiff a stock option, stated that the award was "in recognition of [plaintiff's] contributions to the current and long-term success of Sun..." (See Document No. 0311 (P.Ex. 18).) Then, on or around June 30, 2001, plaintiff's performance review was completed. (P.Ex. 15).) This review included the following statement:

6

> Relative to other employees, you consistently meet and may frequently exceed the requirements of your position. Your performance is what is expected of a well-qualified and experienced person in your position. You may also frequently produce results that are better than required even on the most difficult and complex jobs.

(Id.) Additional areas of strength cited in plaintiff's performance review include: (1) plaintiff's teamwork skills in which her abilities were deemed "substantially greater than" the job requirements; (2) plaintiff's ability to "take responsibility and action to meet deadlines" and; (3) her effectiveness in her key functional area. (Id.)

A simple comparison of plaintiff's review with those of Mr. Kozak and Ms. Powers demonstrates that defendant's posturing and attempt to reflect plaintiff as somehow an inadequate performer is specious. Mr. Fugazy's review of Ms. Kelley (P.Ex. 15), admittedly subjective (Fugazy Depo. at 38-39 (P.Ex. 3)) and never shown nor shared with Ms. Kelley until discovery in this litigation, shows an overall rating on page 1 (i.e., performance against objectives) that *exceeds* either that of Ms. Powers (part of P.Ex. 19) or Mr. Kozak (part of P.Ex. 19). While all three received overall ratings of "2," a line-by-line analysis and comparison shows Ms. Kelley to be on par or better than Ms. Powers or Mr. Kozak in most categories. (Compare Depo. Exs. KK (part of P.Ex. 15), LL and MM (both P.Exs. 19).) At his deposition, Mr. Fugazy could think of no other written review or feedback given to Ms. Kelley except a general "leveling document" applicable to all sales representatives. (Fugazy Depo. at 40 (P.Ex. 3).)

Defendant contends that in June, Mr. Fugazy recommended all three salespersons on his team remain, including Ms. Kelley. Prior to this, Mr. Fugazy had done several "stack rankings." These can be seen at D.Exs. O and P; one is dated April 5, 2001 and it shows both Ms. Powers and Ms. Kelley in the "mid 70%" and was submitted to Mr. Clark, Mr. Fugazy's manager at the time. Mr. Fugazy "forgot" to include Mr. Kozak in this ranking, and the second ranking dated April 9, 2001 includes him *below* Ms. Kelley in the rankings. (Fugazy Depo. at 187-92 (P.Ex. 3).) Another stack ranking (Depo. Ex. PP (D.Ex. W)) was done in July 2001. It, too, shows Mr. Kozak below Ms. Kelley and incorrectly lists Mr. Kozak as a grade "B" salesperson. (Id.) It is unclear when this stacking was created or how it was used.

7

Mr. Fugazy testified he was directed by his new boss in early July 2001, Mr. David Vogelzang, to reduce his salespeople in Stamford by one headcount. (Fugazy Depo. at 35-36, 50, 182 (P.Ex. 3).) Mr. Vogelzang had never met or worked with Ms. Kelley. (Fugazy at 37 (P.Ex. 3).) On or around Tuesday, July 17, 2001, David Vogelzang, defendant's regional manager, met with each of the district managers, including Fugazy, at defendant's Somerset, New Jersey office to solicit feedback on the performance of the sales representatives in that region. (Fugazy Depo. at 306-308 (P.Ex. 3).) During this meeting, a ranking of sales representatives was performed to select employees to be eliminated. (Fugazy Depo. at 306-313 (P.Ex. 3).) Fugazy testified that although he gave feedback on all sales representatives working under him, he could not recall where anyone fell on the decisive ranking created during that meeting. (Fugazy Depo. at 309-310 (P.Ex. 3).) However, Fugazy was aware that plaintiff "typically" ranked above Mr. Kozak throughout plaintiff's employment. (Fugazy Depo. at 36 (P.Ex. 3).) No records have been produced revealing the ranking results of the meeting, and Mr. Fugazy testified it was done on a "whiteboard." (Fugazy Depo. at 304-06, 310 (P.Ex. 3).)

Despite the fact the defendant's CHRO answer (P.Ex. 20, ¶10 at p.5) lists Mr. Fugazy and Mr. Vogelzang as the decision makers in selecting Ms. Kelley for "redeployment," Mr. Fugazy now claims he was not the one doing the selecting. (Fugazy Depo. at 182 (P.Ex. 3).) Even so, on July 19, 2001, in a memo to Mr. Vogelzang, Fugazy confirmed his selection of plaintiff to be the one member of her three person sales team to be eliminated, in direct contrast to his sworn testimony. (Fugazy Depo. at 33, 303 (P.Ex. 3); D.Ex. Y.) In this memo, Fugazy memorializes his discriminatory motive for selecting plaintiff for termination over Ms. Powers[4] and Mr. Kozak, stating that in comparison, Mr. Kozak has a greater long-term future and/or greater "upside potential" than plaintiff. (D.Ex. Y.) In his handwritten notes in which he used techniques from a book "Break all the Rules" to assess the attributes of Ms. Powers, Ms. Kelley and Mr. Kozak, he cites to Ms. Kelley as being, *inter alia*, "mature." (P.Ex. 21 at SUN0997; Fugazy Depo. at 307 (P.Ex. 3).) The

---

[4] Defendant would later under oath claim that Ms. Powers was not selected for termination because "she was a Senior Sales Representative whose job performance was excellent. Therefore the decision of whose position to eliminate was between [Kozak] and [Plaintiff]." (P.Ex. 20 at p.3.)

8

bottom line is that as a result of this meeting, 4 people were selected for termination from Stamford, all elderly and 3 of the 4 being female:

> Margaret ("Meg") Kelley
> Marla McGrail
> Eileen Bianconi
> John Omerso

(Fugazy Depo. at 204-05 (P.Ex. 3); Kelley Depo. at 189-90 (P.Ex. 2).) As will be seen, *infra*, all four were eligible for other jobs within Sun, but only Mr. Omerso was offered a job and in the end was able to remain employed at the Stamford office, making all RIF terminations from that office elderly women. (Kelley Depo. at 143 (P.Ex. 2); Fugazy Depo. at 207 (P.Ex. 3).) In addition, in the age information provided to Ms. Kelley incident to her notification (it was not provided to her until at least July 30 (Kelley Depo. at 265 (P.Ex. 2); P.Exs. 22 and 23), defendant states that as to the sales representatives grades A through E let go, 16 of the 24 (i.e., 75%) were over age 40. (P.Ex. 23 at 0115.) The figures are even worse when limited to those sales representatives in plaintiff's Sales Rep B category, with 11 of 13 sales representatives terminated being age 40 or older (i.e., 85%)! (Id.)

Next, much to plaintiff's surprise, on July 23, 2001, Messrs. Vogelzang and Fugazy informed plaintiff that her position with defendant was being terminated immediately. (P.Ex. 24; Kelley Depo. at 95-96 (P.Ex. 2).) Later plaintiff discovered, contrary to Fugazy's assertions, that she was not to have been told she was being terminated "effective immediately," but rather she should have been told she was to remain an employee with "no change to [her] employment status" until November 18, 2001 at which time she would be terminated if she did not find another position with defendant. (P.Ex. 20 at ¶15; P.Ex. 25; P.Ex. 22); Deborja Depo. at 27 (P.Ex. 5).) Fugazy nevertheless told her she was relieved of all duties immediately and refused to provide plaintiff with any reason for her termination other than "technical expertise" despite her requests for an explanation. (Kelley Depo. at 96 (P.Ex. 2); Fugazy Depo. at 201 (P.Ex. 3).)

9

Consistent with defendant's "Anti-Discrimination and Harassment" policy, plaintiff complained to Fugazy that she had been unlawfully selected for termination. (P.Ex. 20; Kelley Depo. at 118-121 (P.Ex. 2); Deborja Depo. at 18-19 (P.Ex. 5); Fugazy Depo. at 203 (P.Ex. 3).) Plaintiff complained of the "boys' club" atmosphere Fugazy had created at the workplace. (Kelley Depo. at 118-121 (P.Ex. 2); Deborja Depo. at 18-19 (P.Ex. 5); Fugazy Depo. at 203 (P.Ex. 3).) Specifically, plaintiff derisively stated she "should have learned to play hockey," meaning if only she had been one of the "young guys," she would not have been terminated. (Kelley Depo. at 119-121 (P.Ex. 2); Fugazy Depo. at 203 (P.Ex. 3).) She further complained that she, not Kozak, was the better qualified sales representative. (Kelley Depo. at 31-33 (D.Ex. OO).) Fugazy immediately retaliated against plaintiff by intimidating and threatening plaintiff if she complained to others, daring her to "take this further" to "just push" to "just try." (Kelley Depo. at 119-121, 248 (P.Ex. 2); Fugazy Depo. at 203 (P.Ex. 3).) Fugazy even went so far as to unlawfully denigrate plaintiff's stature as an older woman when snickering with a colleague, uttering crass comments regarding plaintiff's age and womanliness. Plaintiff's testimony in this regard is as follows:

   Q. The incident regarding the hand cream?
   A. Right.
   Q. Who was there?
   A. It was [Fugazy] and Jay Seaman. It was when I was..
   Q. Where were you exactly?
   A. At a conference table.
   Q. And where was [Fugazy]?
   A. At the same table.
   Q. And you pulled out some hand cream?
   A. (The witness nodded her head).
   Q. You have to answer audibly?
   A. Yes.
   Q. And who said what exactly?
   A. I was putting hand cream on and I went like this, I said oh, I'm so dry. And one of them, I don't know which one—I was very upset having to go into this meeting, and one of them said something like oh, that's not all that's dry around here or dried up around here. Something like that. And they laughed together.
   Q. What did that mean; do you know?
   A. I felt like it was—that when you get older, you're skin gets dry and you get dry.
   Q. That's what you thought it meant?

A. That I was old and getting dried, yeah.

(Kelley Depo. at 112-113 (P.Ex. 2).)

Plaintiff contacted defendant's Human Resources Department and complained. (Kelley Depo. at 119-121 (P.Ex. 2); Deborja Depo. at 18-19 (P.Ex. 5); Fugazy Depo. at 203 (P.Ex. 3).) Specifically, plaintiff informed defendant's Human Resources personnel of her complaints of favoritism by Fugazy and after complaining, of his threats. (Kelley Depo at 119-121 (P.Ex. 2); Deborja Depo. at 18-19 (P.Ex. 5).) Defendant contends this was not a claim of age or sex discrimination, citing plaintiff's testimony that she did not utter those specific words. However, there is no doubt defendant knew plaintiff was alleging unlawful discrimination and retaliation in a series of emails to defendant's Human Resources Department. Ms. Cheryl Deborja testified she used the complaint procedure in place by defendant when reviewing plaintiff's complaints. (DeBorja Depo. at 11 (P.Ex. 5).) This procedure (P.Ex. 20) applies to complaints of discrimination. Steve Fugazy said he contacted Human Resources immediately upon Ms. Kelley's complaint:

> A. I was instructed by HR based on really a tense interaction not to -- not to have direct contact with Meg.
> Q. Tense, T-E-N-S-E?
> A. Correct.
> Q. When did you get that directive?
> A. Shortly after she was notified. I believe she contacted HR and for the first time made complaints about Steve Fugazy. So it was HR directing me. We contacted them.
> Q. Is that your signature on the last page of Exhibit JJ?
> A. Yes, it is.

(Fugazy Depo. at 176-77 (P.Ex. 3).) Kelly Marazas, Ms. Deborja's boss, knew of the seriousness of the allegations and testified that if a discrimination complaint is filed:

> THE WITNESS: If it came to me via an e-mail or direct in person, I would tell that individual that I would listen to what the complaint is, of course, and tell them that I would like to engage Cheryl DeBorja; that she is responsible for all employee relations investigations, and that I would ask Cheryl to call this individual to get, you know, all the details and to then proceed based on what our policy is at that time or was at that time.
> Q. Whether this one or a different one, whatever it was?
> A. It would be documented that the employee called and that the complaint was handed over to Cheryl DeBorja. And then Cheryl DeBorja would contact the employee; find out, you know,

11

what the complaint was about, get names, try to find out what the employee -- what the objective was here, what the employee hoped to achieve, and, you know, go on from there and also, of course, engage in Sun's legal department. Sun legal and HR work very closely together.
Q. Do you know if those things were done in Meg Kelley's case?
A. Yes, absolutely.
Q. Okay. All of those things that you just mentioned were done?
A. (Nodding head)
Q. Yes?
A. Yes.

(Deborja Depo. at 25-27 (P.Ex. 5).)

Despite plaintiff's complaints of unlawful discrimination and Human Resources' acknowledgment of same, defendant made no attempt to fully investigate, let alone apply corrective measures, as it was obligated to do. (Deborja Depo. at 17, 19, 20, 36, 39-40, 42-43, 46-47, 58, 60-65 (P.Ex. 5); Marazas Depo. at 16-17, 21, 25, 27-29, 33, 38 (P.Ex. 7); compilation of emails (P.Ex. 26).) Kelly Marazas, who at the time in question was the head of defendant's Human Resources Department, testified as follows:

Q. Okay. Did you review the propriety of [Plaintiff's] selection for redeployment?
A. No I did not.
Q. Do you know if Cheryl (Marazas' assistant) did?
A. I can only assume that she did, but I can't say for sure.
Q. Okay. So I take it you didn't look at any commission reports or sales performance of [Plaintiff] vis-à-vis her teammates?
A. In Comparison?
Q. Correct.
A. No
Q. You didn't look at any forced rankings?
A. No.

(Marazas Depo. at 38-39 (P.Ex. 7).)[5]

Despite Ms. Marazas' admission that she did not look into the propriety of plaintiff's selection for termination, she nevertheless provides plaintiff with a rationale for her termination that is in stark contrast to the two different reviews provided by Fugazy. (Kelley Depo. at 101 (P.Ex. 2); D.Ex. Y; P.Ex

---

[5] Ms. Marazas said she deferred everything but the commission payment issue to her subordinate, Ms. Deborja. (Marazas Depo. at 50-52 (P.Ex. 7).) Ms. Deborja, however, said she did no investigation except as to her complaint Mr Fugazy provided a "bad reference" for her. (Deborja Depo. at 24 (P.Ex. 5).)

34.) Plaintiff was told by Ms. Marazas that the criteria for selection for termination of sales representatives were based on: (1) the account the sales representatives were working on, (2) the physical location of the sales representatives with regard to the account, (3) the needs of the account, (4) the performance of the sales representative; and (5) the skills of the sales representatives. (Kelley Depo. at 101 (P.Ex. 2).) This is consistent with a written memorandum circulated by Ms. Marazas incident to the RIF. (P.Ex. 34.) There is no evidence that defendant applied this criteria. (Id.) Indeed, if defendant had applied this criterion, plaintiff would prove to be superior to the other sales representatives in her department. (See "CHRO Supplemental Affidavit" (P.Ex. 17) at ¶11.)

Moreover, documents and rankings such as those performed on April 5, 2001 and April 9, 2001 to which Fugazy cites in his testimony and in a July 19 memorandum (D.Ex. Y) wherein he *after the fact* is trying to justify plaintiff's selection "for redeployment" as reasons for plaintiff's selection for discharge were inconsistent with his characterizations of same and apparently never considered in defendant's deliberations regarding same. (P.Ex. 34); Fugazy Depo. at 305-306, 310, 313-314, 316-317 (P.Ex. 3).) Nor were any figures as to sales quotas achieved by Ms. Kelley, Ms. Powers or Mr. Kozak (Fugazy Depo. at 170-72 (P.Ex. 3).) Then, to add insult to injury, around the time plaintiff was removed from the General Electric account because of the so-called "necessary" RIF, defendant transferred at least three male sales representatives to report to Fugazy and service the General Electric account. (Fugazy Depo. at 31, 32 (P.Ex. 3).)

Defendant's Human Resources Department instructed Fugazy not to have any direct contact with plaintiff because of her complaints. (Fugazy Depo. at 176-177 (P.Ex. 3).) In further contempt and retaliation for plaintiff's complaints, Fugazy instructed his employees to do the same as to any official GE business. (Id.; Kozak Depo. at 61 (P.Ex. 4).) The retaliatory actions of defendant escalated, with Fugazy and defendant's Human Resources Department continuing to act in concert in their campaign to unlawfully oust plaintiff. Indeed, plaintiff's desk was moved to place her in isolation. (Kelley Depo. at 35 [Day 3, redirect] (D.Ex. OO).)

13

After plaintiff complainted to both Fugazy and defendant's Human Resources personnel, plaintiff applied for another sales position within defendant's corporation consistent with her "redeployment" status. (Kelley Depo. at 140 (P.Ex. 2); Fugazy Depo. at 205-206 (P.Ex. 3).) Plaintiff was clearly qualified for the position. (Kelley Depo. at 139-144 (P.Ex. 2); Affidavit of Geoffrey Cooke (P.Ex. 1).) More importantly, it was apparent that the position was to be filled by plaintiff subject only to a recommendation from Fugazy. (Id.; Kelley Depo. at 140-144 (P.Ex. 2); P.Ex. 25).) However, Fugazy not only unlawfully sabotaged plaintiff's employment opportunities with regard to the aforementioned sales positions, but also refused to recommend plaintiff for *any* position as evidenced by the following sworn testimony:

> A. I had applied for a position as a sales person of the services, of the services contracts. And [Mr. Mike McDonough] said, well, all that's really left is for me to call Steve and talk to him. And the next thing I knew [Mr. McDonough] wouldn't return my call and I didn't understand. And so I called [Fugazy] and said [Fugazy], I really need your help on this. I mean please, you know, I want to stay with the company. You know I did a great job. You know I can do this job. And [Fugazy] just started *yelling*, you know, ***no, I don't know you can do that job. You don't have it***

(Kelley Depo. at 140 (P.Ex. 2) (emphasis supplied).)

> Q. So how do you know that [Fugazy] badmouthed you to Mike McDonough?
> A. Because [Fugazy] told me that ***he wasn't going to recommend me for jobs***. That I didn't have— I didn't have it do the job. I said, you know I could do that with my arms and legs tied, [Fugazy]. He said no, I don't. I don't know that you can do that job. He was yelling at me.

(Id. at 141 (emphasis supplied).)

> Q. Did HR tell you that the reason you didn't get the job was because [Fugazy] had said something to Mike McDonough?
> A. No.
> Q. Who did you hear that from?
> A. [Fugazy] [Fugazy] told me that he wasn't going to help me, that I couldn't do the job. That he got a call, he said, I did get a call from him or something and he said, you know – he said, you know, you can't – you don't have to do the job. Or something like that.

(Id. at 143-144.) Fugazy, himself, verifies plaintiff's testimony and states the following:

> A. I think Meg at some point made a comment that she could do that job, you know, with her eyes closed. And I had objected to that, you know, terminology ***where she obviously wasn't familiar with the job in question and in my view incorrect.***

14

Case 3:03-cv-00057-DJS Document 85 Filed 09/02/2005 Page 15 of 20

(Fugazy Depo. at 205-206 (P.Ex. 3) (emphasis supplied).) Not surprisingly, plaintiff did not receive the aforementioned sales position[6] or any position she interviewed for within defendant's company. (Fugazy Depo. at 206 (P.Ex. 3); Depo Ex. BBB (part of P.Ex. 26).)

Finally, defendant unlawfully withheld, and even retroactively removed, plaintiff's earned commission despite her complaints for payment and a clear lack of policy supporting its actions. (D.Ex. II; D.Ex. I; FY '01 Sales Compensation Plan discussed *infra* §VI.) As mentioned above, defendant's policy states in pertinent part that if plaintiff "were to become separated from [defendant], either voluntarily or involuntarily, [plaintiff] shall be paid salary and earned commissions up to [her] termination date." (D.Ex I "Acknowledgement".) Nevertheless, plaintiff, who worked diligently up to her notification on July 23, 2001, was first told, retroactively, she would receive no commissions on any item shipped after July 23, 2001. (P.Ex. 24.) Then plaintiff was told she would receive no commissions on any item shipped after July 1, 2001 (P.Ex. 27.) Instead, plaintiff was told when she eventually got a response as to why the commission payments were being reversed, that she would be paid OTE payments instead of the higher PCR multiples for sales in excess of 100%. (P.Ex. 24.) Eventually she was credited with only $12 million in revenue instead of the $17 million Fugazy had anticipated crediting her prior to notifying plaintiff of her termination. (Fugazy Depo. at 291-295 (P.Ex. 3).) Testimony of defendant's "commission expert" yielded no coherent explanation for why plaintiff was treated this way, nor why her W-2 does not match at least three other year-end payment calculations. (Jhangiani Depo. at 49-61 (P.Ex. 6).) Nor could that witness cite to any provisions applicable to plaintiff in the sales compensation plan to explain the course of action it took *for the first time*, with plaintiff. (Id. at 49-61, 78-79 (P.Ex. 6); P.Exs. 28 and 25.) In fact, defendant's documents indicate plaintiff's position

---

[6] Despite the clear indication that Fugazy did not provide Mr. McDonough with a positive recommendation, as testified to by Fugazy himself, defendant, in an attempt to thwart plaintiff's claims of discrimination and retaliation, provides an affidavit from Mr. McDonough that is inconsistent with Fugazy's testimony. Simply stated, Fugazy testified that "[plaintiff] obviously wasn't familiar with the job in question," but Mr. McDonough in his sworn affidavit states that "Fugazy informed [him] that [Plaintiff] was a good sales representative. " (McDonough Aff (D.Ex. FF).)

15

was not eliminated *until* August 20, 2001, despite the fact she received no commissions post-July 1, 2001. (P.Exs. 29 and 24.)

Upon learning of defendant's conduct, plaintiff demanded payment. Defendant continues, without support, to assert that employees who were "pre-notified" of their impending termination were no longer eligible to receive commissions because they no longer had executed Goal Sheets. (P.Ex. 24.) However, Mr. Kozak testified that although he did not have an executed Goal Sheet, he was still eligible to receive commissions, but it was uncertain when he would be paid those commissions. (Kozak Depo. at 63-65 (P.Ex. 4).) Plaintiff's complaints were to no avail. (Depo. Exs. BBB & FFF (both part of P.Ex. 26); D.Ex. II). Defendant, attempting to skirt the main issue in its brief, addresses only 13 instances of nonpayment to plaintiff between July 1 and July 23 which plaintiff was able to identify from her notes, a mere tip of the iceberg, and justifies nonpayment of any commissions with the insupportable claim it was "policy" that no commissions be paid on items shipped post-July 1, 2001. Despite the fact defendant's payment policy has no such limitation, and applicable law requiring payment of commissions earned precludes a retroactive take-back of commissions, defendant refuses to pay plaintiff what she earned.

## *ARGUMENT*

### I. *THE STANDARD FOR GRANTING SUMMARY JUDGMENT.*

Summary judgment is proper only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). "The burden of demonstrating the absence of a genuine dispute as to a material fact rests with the party seeking summary judgment." Rose v. James River Paper Co., 2 F.Supp.2d 245 (D.Conn. 1998) (citing Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970). In determining whether summary judgment is appropriate, the court resolves all ambiguities and draws all reasonable inferences against the moving

party. Id. (citing McLee v. Chrysler Corp., 109 F.3d 130, 134 (2d Cir. 1997); see also Cifarelli v. Village of Babylon, 93 F.3d 47, 51 (2d Cir. 1996).

> In determining whether the plaintiff has met the de minimis initial burden of showing "circumstances giving rise to an inference of discrimination," the function of the court on a summary judgment motion is to determine whether the "proffered admissible evidence shows circumstances that would be sufficient to permit a rational finder of fact to infer a discriminatory motive. It is not the province of the summary judgment court itself to decide what inferences should be drawn." Chambers v. TRM Copy Centers Corp., 43 F.3d at 38; see also Ramseur v. Chase Manhattan Bank, 865 F.2d at 465; Donahue v. Windsor Locks Board of Fire Commissioners, 834 F.2d at 58.

Cronin v. Aetna Life Ins. Co., 46 F.3d 196, 203-04 (2d Cir. 1995).

In an employment discrimination context where the employer's intent is at issue, special caution should be employed when deciding a motion for summary judgment. See Gallo v. Prudential Residential Servs., Ltd. Partnership, 22 F.3d 1219, 1224 (2d Cir. 1994).

> Although the Second Circuit has approved the use of summary judgment in employment discrimination cases, Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir.), cert. denied, 474 U.S. 829, 106 S.Ct. 91, 88 L.Ed.2d 74 (1985), it has cautioned against granting summary judgment in an employer's favor because intent is often an issue. Gallo v. Prudential Residential Servs., Ltd., 22 F.3d 1219, 1224 (2d Cir. 1994). The Second Circuit has since reaffirmed its limited approach to summary judgment in discrimination cases. See Kerzer v. Kingly Mfg., 156 F.3d 396, 400 (2d Cir. 1998); McLee v. Chrysler Corp., 109 F.3d 130, 135-37 (2d Cir. 1997).

Zarzycki v. United Technologies Corp., 30 F.Supp.2d, 283, 286 (D. Conn. 1998).

## II. *PLAINTIFF'S BURDEN ON HER DISCRIMINATION CLAIMS.*

Ms. Kelley has asserted she was discriminated against as an older female worker. Her claims are thus based upon age and sex. Ms. Kelley relies upon Title VII, the ADEA and Connecticut's discrimination statute, CFEPA. We look to federal law for guidance on interpreting state employment discrimination law, and the analysis is the same under both Board of Education of the City of Norwalk v. Commission On Human Rights and Opportunities, 266 Conn. 492, 832 A.2d 660 (2003); Craine v. Trinity College, 259 Conn. 625 (2002).

> Employment discrimination claims, whether brought pursuant to Connecticut or federal statutes, are analyzed using the burden shifting analysis laid out by the Supreme Court in *McDonnell Douglas Corp. v. Green.* See 411 U.S. 792, 802-804, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)

17

(using burden shifting analysis to examine a Title VII claim); *see also Levy v. Comm'n on Human Rights & Opportunities*, 236 Conn. 96, 107-108, 671 A.2d 349 (1996) (using the *McDonnell Douglas* burden shifting analysis to examine a discrimination claim under Conn. Gen. Stat. § 46a-60).

Jackson v. Health Resources of Rockville, Inc., 357 F.Supp.2d 507, 514 (D.Conn. 2005). Under this scenario, plaintiff must first prove a *prima facie* case of discrimination based upon a protected characteristic under Title VII, in this case, sex. (Id.) The same is true for Ms. Kelley's age discrimination claims, that is she must prove age was a motivating factor for an adverse employment action. Carlton v. Mystic Transp. Inc., 202 F.3d 129, 134 (2d Cir. 2000) (the shifting-burden analysis for determining age discrimination claims under the ADEA is the same as for Title VII).

The initial burden of a *prima facie* case varies slightly depending upon the characteristic and type of discrimination alleged. In general, to prove a *prima facie* case, plaintiff must show:

> [T]hat 1) [she] belonged to a protected class; 2) [she] was qualified for the position [she] held; 3) [she] suffered an adverse employment action; and 4) the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent. *See Terry v. Ashcroft*, 336 F.3d 128, 138 (2d Cir.2003); *see also McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. 1817. This initial burden is not onerous. *See Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).

Jackson, supra, at 514.[7] The burden that plaintiff must meet to establish these elements is de minimis, however, plaintiff must offer more than mere conclusory allegations to withstand a motion for summary judgment. Schwapp v. Avon, 118 F.3d 106, 110 (2d Cir. 1997).

---

[7] Moreover, an employee within the protected age group terminated subject to a RIF who can show that others not in the protected class were treated more favorably, is not required to uncover evidence of discriminatory intent on the part of the employer to make out a prima facie case of discrimination under ADEA. Tanzini v. Marine Midland Bank, N.A., 952 F.Supp. 937 (N.D.N.Y. 1997) Oxman v. WLS-TV, 846 F.2d 448, (7th Cir. 1988) (Implicitly recognizing that the treatment of an employee whose position is eliminated pursuant to a RIF can give rise to an inference of discrimination when he or she is disadvantaged in favor of younger persons) Such a showing is enough to create a reasonable inference under McDonnell Douglas that age was a determining factor in the employer's decision See Massarsky v. General Motors Corp., 706 F.2d 111, 118 & n. 13 (3d Cir.)(same), cert. denied, 464 U.S. 937, 104 S.Ct. 348, 78 L.Ed.2d 314 (1983); see also Coburn v. Pan American World Airways, Inc., 711 F.2d 339, 342-43 (D.C.Cir.) (requiring only that plaintiff show she was "disadvantaged in favor of a younger person"), cert. denied, 464 U.S. 994, 104 S.Ct. 488, 78 L.Ed.2d 683 (1983). Thus, this formulation merely requires an employer that releases a protected employee while simultaneously hiring (or not "bumping") younger employees to fill positions for which the older employee was qualified to explain its actions without forcing the protected employee to uncover that elusive "smoking gun." Id.

Once a *prima facie* case has been demonstrated to exist, a presumption of discrimination arises which defendant must rebut by producing evidence of a legitimate nondiscriminatory reason for the adverse employment decision. See St. Mary's Honor Center, 509 U.S. at 507, 113 S.Ct. 2742. This burden is one of production, not persuasion; it can involve no credibility assessment. See Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 142, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000).

Once the employer produces legitimate, nondiscriminatory reasons for its adverse employment action, the plaintiff must prove, by a preponderance of the evidence, that the employer intentionally discriminated against him. Id. at 143, 120 S.Ct. 2097. However, the "factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the *prima facie* case, suffice to show intentional discrimination" Id. at 147, 120 S.Ct. 2097.

### III.  MS. KELLEY EASILY MEETS THE REQUIREMENTS OF DEMONSTRATING THE EXISTENCE OF DISPUTED MATERIAL FACTS AS TO DISCRIMINATION.

#### A.  *Plaintiff's Prima Facie Case.*

##### 1.  *Plaintiff is a member of a protected class.*

Plaintiff was 50 years old when she was removed from her duties and terminated, clearly within the protected class of 40 years and older contained in ADEA. CFEPA prohibits discrimination on the basis of age and has no bottom threshold limit for protection. Plaintiff is female and clearly protected under the provisions of Title VII and CFEPA.

##### 2.  *Plaintiff was qualified for her position.*

Plaintiff was clearly qualified for the position she held. She had decades of experience in technical sales and, indeed, over 10 years selling technical services and hardware for General Electric. Her formal review reveals she was performing satisfactorily, indeed, achieving the same ranking of a "2" as Ms. Powers and Mr. Kozak and according to the documents and admissions by Mr. Fugazy, consistently ranking ahead of Mr. Kozak, who had no experience in technical sales whatsoever.

19

Defendant itself states that "[I]f Sun did not need to reduce headcount, then Kelley's position would not have been eliminated." (P.Ex. 20 at p.3, ¶10.)

### 3. *Plaintiff suffered an adverse employment action.*

The Second Circuit has defined an "adverse employment action," as referred to in the foregoing standard, as:

> [A] "materially adverse change in the terms and conditions of employment." *Galabya v. New York City Bd. of Educ*, 202 F.3d 636, 640 (2d Cir.2000) (internal quotation marks omitted). To be "materially adverse, a change in working conditions must be more disruptive than a mere inconvenience or an alteration of job responsibilities." *Id.* (internal quotation marks omitted). "Such a change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices ... unique to a particular situation." *Weeks v. New York State (Division of Parole.)* 273 F.3d 76, 85 (2d Cir.2001) (internal quotation marks omitted) [abrogated on other grounds.

Hanson v. Cytec Indus., 2002 WL 519714 (D.Conn. 2002) (P.Ex. 39).)

Here, it is undisputed that Ms. Kelley was removed from her duties immediately upon her July 23, 2001 notification by Mr. Fugazy. While defendant's Human Resources Department and the documents regarding the RIF provided to Ms. Kelley indicate she should not have been immediately removed from her position, and Ms. Kelley complained to Mr. Fugazy and the Human Resources Department, her fate was sealed. (See Retaliation discussion, *infra*.) Her duties were removed, she was isolated, she was not accorded an equal chance to find employment within Sun, she was deprived of her earned commissions, and, ultimately, she was terminated. All of these events qualify as "adverse employment actions."

### 4. *Plaintiff's adverse employment actions occurred under circumstances giving rise to an inference of age and sex discrimination.*

The defendant disputes whether plaintiff met her burden of presenting a *prima facie* case sufficient to oblige it to explain its adverse action. See Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 142, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). Specifically, defendant contends that plaintiff failed to meet the requirement of showing that its adverse employment action "occurred under

20