circumstances give rise to an inference of discrimination." Graham v. Long Island R.R., 230 F.3d 34, 38 (2d Cir.2000). This argument is unavailing. The Second Circuit has characterized the evidence necessary to satisfy this initial burden as "minimal" and "*de minimis,*" see Byrnie v. Town of Cromwell, 243 F.3d 93, 101 (2d Cir.2001); Abdu-Brisson v. Delta Air Lines, Inc., 239 F.3d 456, 467 (2d Cir.2001), and the mere fact that significantly younger males took over the bulk of her duties may give rise to an inference of discrimination. Burger v. New York Institute of Technology, 94 F.3d 830, 834-35 (2d Cir.1996). Moreover, in RIF situations, plaintiff need only show that the employer retained younger employees who continued to perform either work that the plaintiff had performed, or work for which the plaintiff was qualified, after the plaintiff's discharge. Maresco v. Evans Chemetics, Div. of W.R. Grace & Co., 964 F.2d 106 (2d Cir.1992); Oxman v. WLS-TV, 846 F.2d 448, 456 (7th Cir. 1988); Tanzini v. Marine Midland Bank, N.A., 952 F.Supp. 937 (N.D.N.Y 1997).

In addition, because discrimination claims look at how an employee is treated compared to her similarly situated co-workers, it is fair to compare coworkers who competed directly against each other to receive a benefit. Smith v. Xerox Corp., 196 F.3d 358 (2d Cir. 1999). In order for employees to be "similarly situated", they must have been subject to the same standards governing performance evaluation and discipline, and must have engaged in conduct similar to the plaintiffs..." See Norville v. Staten Island Univ. Hosp., 196 F.3d 89, 96 (2d Cir. 1999). A "plaintiff may support an inference of discrimination by demonstrating that similarly situated employees" not within the protected class were treated more "favorably." Id. at 95.

In the case at bar, plaintiff's position was eliminated over those of her younger counterparts to her detriment. (D.Ex. Y; Kelley Depo. at 119-121 (P.Ex. 2).) Moreover, despite the known complaints of discrimination, Fugazy proceeded with a plan, shortly after plaintiff's first complaint to distribute plaintiff's duties to the significantly younger employees on plaintiff's sales team who were retained. (Fugazy Depo. at 113, 146,147, 289, 294 (P.Ex. 3); Kozak Depo. at 67 (P.Ex. 4).) In addition, Mr. Kozak who was subject to the same standards governing performance evaluations and discipline was

"favored" by Fugazy. (D.Ex. Y; Thomas Depo. at 24 (D.Ex. G).) Mr. Kozak was taken to hockey games by Fugazy to meet with defendant's clients. (Fugazy Depo. at 115-116 (P.Ex. 3); Kozak Depo. at 9 (P.Ex. 4); Kelley Depo. at 251 (P.Ex. 2).) To the contrary plaintiff was excluded from participating in such developmental activities. (Kelley Depo. at 251 (P.Ex. 2).) Furthermore, plaintiff who spearheaded a massive conference regarding women in the workforce was scorned for not providing drinks to the conference attendees. (Kelley Depo. at 232, 319 (P.Ex. 2).)

Further examples of his discriminatory agenda are exhibited in, *inter alia*, his favoritism toward hiring young male sales representatives. (Thomas Depo. at 24 (D.Ex. G).) For instance, soon after plaintiff was hired and assigned to Fugazy's team, he hired a young male, Jamie Magnum, to report to him and work on the General Electric account (Fugazy Depo. at 29-30 (P.Ex. 3).) Mr. Magnum was known by Fugazy to be a former college hockey player and hockey enthusiast just as he was. (Fugazy Depo. at 234 (P.Ex. 3).) Then, months after plaintiff was hired, Fugazy hired Mr. Kozak, who, also like Fugazy, was a former college hockey player and hockey enthusiast, but unlike plaintiff had little to no experience within defendant's sales industry, let alone the General Electric account to which he was assigned. (Fugazy Depo. at 29-30 (P.Ex. 3); Kozak Offer Letter (P.Ex. 30); Fugazy Depo. at 115-116 (P.Ex. 3); Kozak Depo. at 17, 18 (P.Ex. 4); Kelley Depo. at 110-251 (P.Ex. 2); Fugazy Depo. at 109, 181 (P.Ex. 3).) In fact, Mr. Kozak testified that a significant portion of his sales experience involved selling tickets for the New Jersey Devils. (Kozak Depo. at 12-14 (P.Ex. 4).) Not surprisingly, after three months of independently working on the GE account, Mr. Fugazy had Mr. Kozak combine his sales goals with plaintiff and Ms. Powers so he could gain experience on the account. (Fugazy Depo. at 113 (P.Ex. 3); D.Ex. K; P.Exs. 12, 31 and 32.) This obscured actual sales results of Mr. Kozak, who, prior to this April intermingling, had managed to sell but $250,000 of product. (P.Ex. 32.)

Defendant's own papers demonstrate that the number of Sun sales representatives let go was disproportionately older, with 16 of the 24 sales representatives let go being over age 40. (P.Ex. 23.) The numbers for "Sales Rep B," the position held by plaintiff, shows 9 out of 11 let go were over 40. (Id.)

22

Finally, the only people let go in the Sun Stamford office were 3 women over age 40, one of whom was Ms. Kelley. Fugazy, who was in his early 40s, with no prior supervisory experience, manifested his sexist and ageist views in his hiring practices. (Kelley Depo. at 113 (P.Ex. 2); D.Ex. Y.)

Accordingly, while the mere fact that significantly younger employees were retained over plaintiff will suffice for the required inference of discrimination at the *prima facie* stage, this inference of discrimination is highlighted here where it is abundantly clear that defendant also favored similarly situated employees outside plaintiff's limited class of "Sales Rep B" reporting to Mr. Fugazy.

**B.**    ***Defendant's Reason For Plaintiff's Termination Is Subject To Ample Evidence Of Pretext.***

**1.**    ***Inference of discrimination from defendant's ageist & sexist comments.***

Defendant attempts to conceal from this Court the discriminatory animus reflected in its ageist and sexist comments. Specifically, defendant tries to brush aside its unlawful animus toward plaintiff by dismissing as a mere "stray remark" a reference to her stature as an older woman in the workplace that is past her prime. However, as in any case, when the undisputed facts are capable of supporting two competing inferences, such conflicts must be resolved by the factfinder and not by the court on summary judgment. Shepard v. Slater Steels Corp., 168 F.3d 998, 1010 (7th Cir. 1999) (evaluating defendant's alleged behavior requires "one to weigh the tone and nuances of his words and deeds and a host of other intangibles that the page of a deposition or an affidavit simply do not reveal"). Moreover, this Court has repeatedly held that ageist and sexist comments made in connection with an adverse employment action are indicative of an unlawful motive giving rise to genuine issues of material fact. Chertkova v. Connecticut Gen. Life Ins. Co., 92 F.3d 81, 91 (2d Cir.1996) (an inference of discrimination may arise from "actions or remarks made by decisionmakers that could be viewed as reflecting a discriminatory animus"); Hayes v. Compass Group USA, Inc., 343 F.Supp.2d 112 (D. Conn. 2004) (verbal comments that employees were "old school" constituted evidence of discriminatory motivate); Flaherty v. Metromail Corporation, 293 F.Supp.2d 355 (S.D.N.Y. 2003)(comments that employee was "old and

grandmotherly" and an "old bag" constituted evidence of both age and sex discrimination in employment discrimination case); Jorenby v. Datex-Ohmeda, Inc., 2002 WL 1859915 (W.D. Wis. 2002) (P.Ex. 40) ("all dried up" comment cited as evidence of sex discrimination). In addition, when determining whether a comment is a probative statement that evidences an intent to discriminate or whether it is a non-probative stray remark, a court should consider the following factors: (1) who made the remark, i.e., a decisionmaker, a supervisor, or a low-level co-worker; (2) when the remark was made in relation to the employment decision at issue; (3) the content of the remark, i.e., whether a reasonable juror could view the remark as discriminatory; and (4) the context in which the remark was made, i.e., whether it was related to the decision making process. Schreiber v. Worldco,LLC, 324 F.Supp.2d 512 (S.D.N.Y.2004).

In Schreiber, the court held a comment made by defendant's human resources manager *around the time of plaintiffs' termination* about the need to offer more by way of compensation in order to attract young college graduates to its company than it had to offer "older people" to be suggestive of an unlawful age based motive for plaintiffs' termination when placed into its proper context. The Schreiber Court in denying defendant's motion for summary judgment went on to reason that because this remark was made by defendant's human resource manager who had control over personnel matters related to plaintiffs and who explicitly referenced age in the context of a discussion regarding compensation to be evidence of discrimination to be heard by a factfinder. Id. 521.

In the instant case, around the time Fugazy decided to terminate plaintiff, plaintiff was called into a meeting with Fugazy and Jay Seaman, defendant's district manager. (Kelley Depo. at 106, 112, 113 (P.Ex. 2).; Fugazy Depo. at 93 (P.Ex. 3).) The purpose of this meeting was to permanently transfer plaintiff's account material over to Fugazy. (Kelley Depo. at 113 (P.Ex. 2).) During this meeting as plaintiff was passing hand cream lotion over her hands she commented that her hands were "so dry." (Kelley Depo. at 113 (P.Ex. 2).) Exhibiting his disdain for older women, Fugazy crudely referring to plaintiff's female anatomy replied with a snicker that her hands were "not the only thing dried up around

here." (Kelley Depo. at 113 (P.Ex. 2).) Despite plaintiff being upset, Fugazy and Mr. Seaman laughed together at plaintiff's expense. (Kelley Depo. at 113 (P.Ex. 2).) Clearly then, Fugazy's sexist-ageist comments, made around the time of plaintiff's termination are indicative of a discriminatory animus.

In addition, when plaintiff complained to Mr. Fugazy that she "should have learned to play hockey," an obvious reference to the two young males Mr. Fugazy had just hired to work for him, it was clear Mr. Fugazy knew just what plaintiff was referring to. His response was a clear threat to her challenging him to bring a legal action. (Kelley Depo. at 119-121, 248 (P.Ex. 2); Fugazy Depo. at 203 (P.Ex. 3).)

Accordingly, an inference of discrimination may arise from defendant's actions and remarks and require submission to a fact-finder to resolve such a claim.

### 2. *There exists an additional inference of discrimination from defendant's use of age based criterion for plaintiff's termination.*

Defendant's use of "upside potential" criterion in selecting Mr. Kozak to remain over plaintiff (D.Ex. Y) is evidence of an impermissible age bias which played a role in the decision to terminate plaintiff. Schanzer v. United Technologies Corp., 120 F.Supp.2d 200, 209-10 (D. Conn. 2000) (Arterton, J.). It is apparent from his July 19, 2001 memo that he is, after the fact, attempting to justify selection of Ms. Kelley. As one saw, in selecting Ms. Kelley, no notes were kept of the July 17, 2001 clandestine meeting, and what notes have been revealed show Mr. Fugazy regarded plaintiff as "mature." (P.Ex. 21 at SUN 0997.) In any event, he relies in his memorandum on stock rankings, a review of these rankings and Mr. Fugazy's own admission reveal Ms. Kelley was *always* ranked higher than Mr. Kozak. Also, Mr. Fugazy admits he looked at no sales figures/results in making his selection and it is clear he did not use the criterion set forth by defendant's Human Resources Department. Instead, he relied upon his view that Mr. Kozak had "greater upside potential to benefit Sun." (D.Ex. Y.)

In Schanzer, plaintiffs, both aged 53, charged defendant with age discrimination after they were selected for layoff by means of a "paired comparison" ranking process that purported to measure and

compare, among other criteria, the individual's "future potential" with other employees in that individuals group. In denying defendant's Motion for Judgment as a Matter of Law and upholding the jury's verdict finding unlawful age discrimination the Court reasoned that defendant's use of "future potential" as an "express unquantified criterion" along with evidence, such as exist in this case, that newer and younger employees who were retained were exempt from certain rankings and comparison processes because they were too new to be proof that defendant's explanation is pretext. Id. at 211.

Similarly, in Shannon v. Fireman's Fund Insurance Company, 156 F.Supp.2d 279, 293 (S.D.N.Y. 2001) the use of "future potential" as a criterion to be considered in deciding which employees to retain in a reduction in force was properly relied upon by a jury to infer pretext for unlawful discrimination. Id. 293. In Shannon, plaintiff a 62-year-old underwriter was selected for termination over other significantly younger underwriters in response to defendant's decision to reduce its workforce. In denying defendant's Motion for Judgment as a Matter of Law and upholding the jury's verdict finding unlawful age discrimination the Court reasoned that defendant's use of "future potential" could well be considered by a jury as a surrogate, or at the very least a means, to employ impermissible age bias in plaintiff's termination. The Shannon Court went on to state that use of the "future potential" criteria along with evidence showing that defendant retained a less qualified applicant over plaintiff to be probative of whether defendant's proffered reason for its action was pretextual. Specifically, the Court pointed to defendant's retention of a younger underwriter who despite having less time on the job than plaintiff and no evidence of superior skills than plaintiff was retained. Id. 290.

In the case at bar, Fugazy in a memo to his superior outlining the reasons he had selected plaintiff for termination over her younger counterparts states conclusively that Mr. Kozak has greater "upside potential" to benefit defendant. Mr. Kozak who at the time of plaintiff's termination was not only approximately 20 years younger than plaintiff also had considerably less experience than plaintiff Plaintiff had almost twenty years of relevant sales experience while Mr. Kozak had less than a handful of years of applicable experience. In fact, a great portion of Mr. Kozak's experience came from his time

26

spent selling tickets for the New Jersey Devils, a far cry from plaintiff's prior decade of experience specifically with one of defendant's accounts. In addition, defendant admits that Mr. Kozak consistently fell below plaintiff in rankings. Indeed, he was even exempt from a performance ranking that defendant ostensibly relied upon in comparing plaintiff with Mr. Kozak.

Accordingly, defendant's use of an age biased criteria in selecting plaintiff for termination while retaining a younger less qualified employee is evidence that defendant's reason for plaintiff's termination is pretextual.

### 3.    *Defendant's legitimate, nondiscriminatory reason is demonstrably false.*

Defendant's purported legitimate, nondiscriminatory reason for terminating plaintiff's employment, its RIF, is demonstrably false. Defendant inconsistently states that plaintiff was selected as she was a far poorer performer than those retained. As we have seen, this is not supported by plaintiff's review when compared to those retained, nor is it supported by any other contemporaneous ranking. Plaintiff's sales figures, despite Kozak's equal sharing of revenue with Powers and Kelley as of April 2001, were below Kelley's *at the time of her selection.* (Compare P.Ex. 13 at SUN00116 to P.Ex. 33) showing plaintiff had exceeded the others in goal attainment; see also Fugazy Depo. at 170-72 (P.Ex. 3) (explaining he did not compare these sales figures in making his decision).) Defendant claims that had it not been for the need to reduce headcount, then plaintiff "would not have been eliminated." (P.Ex. 20 at p.3, ¶10.) However, this explanation is proven to be untrue by defendant's shift of personnel to Mr. Fugazy after plaintiff's termination. "By definition, when the employer reduces his work force he hires no one to replace the one he lets go". See Carlton v. Mystic Transp., Inc., 202 F.3d 129, 136 (2d Cir. 2000) (citing Oxman v. WLS-TV, 846 F.2d 448, 453 (7th Cir. 1988). See also Windam v. Time Warner, Inc. 275 F.3d 179, 188-189 (2d Cir. 2001).

In Carlton, plaintiff claimed and properly laid out a prima facie case for age discrimination. In its defense, defendant stated that plaintiff's discharge occurred as part of a company-wide reduction-in-force in which plaintiff's age did not play a factor. In finding reason to believe defendant's reason for

plaintiff's discharge to be pretextual, the Appeals Court reversed the lower court's granting of summary judgment. The Second Circuit explained that "in spite of the company's purported need to downsize," three months later it hired a younger employee to fill plaintiff's position. Id. at 136. In addition, the court found "inadequate" defendant's explanation that a newly acquired account warranted the hiring of another employee where it did "not consider rehiring [Plaintiff] for the position." Id. See 29 U.S.C. § 621(a)(1).

Similarly, in Windam v. Time Warner, Inc., 275 F.3d 179 (2d Cir. 2001), the Second Circuit reversed the lower court's decision granting defendant's motion for summary judgment where genuine issues of material fact existed as to whether defendant's reason for plaintiffs termination was pretextual and its true reason was discrimination. In Windam, plaintiffs properly asserted their prima facie case for discrimination. Defendant in turn offered as a defense its "reduction" in "workload" which necessitated plaintiff's termination. In finding a question of material fact as to whether defendant's reason for plaintiffs termination was pretextual the court simply looked to the evidence which suggested that defendant was in fact "understaffed" and that its workload may have even increased at the time of plaintiff's termination. Id. at 189.

Here, plaintiff was allegedly terminated because of a "need to reduce headcount." (P Ex. 20.) Plaintiff's position in particular was eliminated because defendant decided there were too many sales representatives working on the General Electric account. (Id.) Inconsistently, however, around the time plaintiff was removed from the General Electric account because of the so-called RIF, defendant transferred at least three male sales representatives to report to Fugazy and service the General Electric account. (Fugazy Depo. pp. 31, 32 (P.Ex. 3).)

Accordingly, where defendant replaced plaintiff's position with three male sales representatives around the time of her selection for termination, the RIF cannot be the reason for plaintiff's termination As such, where plaintiff has properly established her prima facie case of discrimination and shown

defendant's legitimate nondiscriminatory reason for her termination to be false, summary judgment must be denied.

### 4. *Evidence of pretext in defendant's varying justifications for plaintiff's termination.*

Numerous courts have stated that "a plaintiff may establish pretext and thereby successfully oppose summary judgment by demonstrat[ing] weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate, non-discriminatory reason for its action." Cruse v. G&J USA Publ'g, 96 F.Supp.2d 320, 329 (S.D.N.Y.2000); See Norville v. Staten Island Univ. Hosp., 196 F.3d 89, 97-98 (2d. Cir. 1999) (court recognized that varying justifications for an employee's termination are generally enough to suggest pretext and "the job of reconciling [such variations] belongs to the factfinder and is not appropriate for resolution as a matter of law"); EEOC v. Ethan Allen, Inc., 44 F.3d 116, 120 (2d Cir.1994)(finding evidence of pretext where employer first stated that it had ignored company guidelines in terminating the plaintiff, and then later stated that it had acted in accordance with those guidelines).

In Dais v. Lane Bryant, Inc., 168 F.Supp.2d 62 (S.D.N.Y. 2001), the Court found genuine issues of material fact existed as to whether defendant's proffered reasons for terminating plaintiff's employment based on his leadership skills, recruitment, organizational skills and cleanliness were pretext for race discrimination, precluding summary judgment. In reaching its decision the Dais Court pointed to plaintiff's prior performance evaluations that conflicted with defendant's argument. Specifically, plaintiff's performance evaluation stated that plaintiff was "above expectations" with regards to his recruiting efforts and that he "meets expectations" in other areas defendant terminated plaintiff for being weak. Id. at 74. See also Shannon v. Fireman's Fund Insur. Co., 156 F.Supp.2d 279 (S.D.N.Y. 2001) (employer's disregard or misjudgment of a plaintiff's job qualifications may undermine the credibility of an employer's stated justification for an employment decision).

In the instant case, plaintiff was told by Ms. Marazas that the criteria for selection for termination of sales representatives were based on: (1) the account the sales representatives were working on, (2) the physical location of the sales representatives with regard to the account, (3) the needs of the account, (4) the performance of the sales representative; and (5) the skills of the sales representatives. (Kelley Depo. at 101 (P.Ex. 2); P.Ex. 34.) There is no evidence that defendant applied this criteria. (Id.) Moreover, if defendant had applied this criterion, which according to Mr. Fugazy (D.Ex. Y) he admittedly did not, plaintiff would have proven to be superior to the other sales representatives in her department. (See "Supplemental CHRO Affidavit" (P.Ex. 17).) Inconsistently, defendant states that plaintiff's inferior teamwork and leadership skills lent to her selection for termination. (D.Ex. Y.) This assertion is demonstrably false where in her final performance review dated three weeks prior to her selection for termination plaintiff consistently ranked above "job requirement[s]" with respect to teamwork. (Depo. Exs. JJ and KK (both P.Ex. 15).) Furthermore, her review overall rates her *higher* than both Mr. Kozak and Ms. Powers. Defendant also noted that plaintiff "is a conscientious and very hardworking individual [who] tries to elicit the best contribution from her teammates" which would clearly endorses her leadership skills. (Id.) Moreover, documents and rankings such as those performed on April 5, 2001 and April 9, 2001 to which defendant cites as reasons for plaintiff's selection for discharge were never considered in defendant's deliberations regarding same and the decision lies in stark contrast to those rankings as does Mr. Fugazy's characterization of them in D.Ex. Y which declines to mention plaintiff was consistently ranked higher than Mr. Kozak. (P.Ex. 34; Fugazy Depo. at 305-306; 310, 313-314, 316-317 (P.Ex. 3).)

Accordingly, plaintiff has identified numerous inconsistencies and contradictions in defendant's justifications for her termination, and thereby has established genuine issues of material fact warranting the denial of summary judgment.

## 5.    *Inference of discrimination from failure to investigate.*

The failure of respondent to investigate supports an additional basis for a finding of liability.

"[A]n employer's investigation of a sexual harassment complaint is not a gratuitous or optional

undertaking; under federal law, an employer's failure to investigate allows a jury to impose liability on

the employer. Malik v. Carrier Corp., 202 F.3d 97, 105 (2d Cir. 2000). In Snell v. Suffolk County, 782

F.2d 1094 (2d Cir. 1986), the Court of Appeals affirmed a finding of employer liability for

discrimination as it had a duty to take reasonable steps to deal with and eliminate the harassment once

placed on notice.

## IV.    *GENUINE ISSUES OF MATERIAL FACT EXIST AS TO PLAINTIFF'S CLAIMS OF UNLAWFUL RETALIATION.*

Plaintiff has properly stated a claim for retaliation in violation of Title VII, ADEA and CFEPA. To

establish a prima facie case of retaliation under Title VII[8], the plaintiff must show that: (1) she was

engaged in an activity protected by Title VII; (2) defendant was aware that the plaintiff engaged in the

protected activity; (3) the plaintiff suffered a disadvantageous employment action; and (4) a casual

relation exists between the protected activity and the employment action. See Reed v. A.W. Lawrence &

Co., 95 F.3d 1170, 1178 (2nd Cir. 1996). If plaintiff carries this initial burden, the burden of production

shifts to the defendant to offer evidence of a legitimate, non-retaliatory justification for its action.

Cosgrove v. Sears, Roebuck & Co., 9 F.3d 1033, 1039 (2d Cir.1993). If the defendant introduces such

evidence, the plaintiff is afforded the opportunity to prove that the alleged justification is merely a

pretext for retaliation. Rexach v. University of Connecticut Department of Dining Services, 313

F.Supp.2d 100 (D.Conn2004) (Kravits,J)

[8] As noted, plaintiff also brings a retaliation claim under the ADEA and the Connecticut Fair Employment Practices Act. The four-part standard for proving retaliation under the ADEA is the same as Title VII. See Wannamaker v. Columbian Rope Co., 108 F.3d 462, 465 (2d Cir. 1997). Similarly, it is the same under CFEPA, as we look to federal law for guidance on interpreting state employment discrimination law, and the analysis is the same under both. Craine v. Trinity College, 259 Conn. 625 (2002).

In order for the plaintiff to establish the first element, that she was engaged in a protected activity, she need only show that she was acting under a good faith belief that the activity was covered by the statute. Cosgrove, 9 F.3d at 1039 (citing Sumner v. United States Postal Service, 899 F.2d 203, 209 (2d Cir.1990)). While the protected activity usually takes the form of filing a formal complaint or a lawsuit, making an internal complaint regarding sexual harassment is also covered by the statute. Id. at 1040. Establishing that the employer knew or should have known about the incident satisfies the second element. Id. at 1039 The third element is satisfied if the claimant can show that the employer's conduct "affected terms, privileges, duration, or conditions of employment." Dortz, 904 F.Supp. at 156 (quoting Vergara v. Bentsen, 868 F.Supp. 581, 591 (S.D.N.Y.1994)). While the result is often the employee's discharge, less severe events can also be sufficient. Id. Finally, the fourth element can be established "by showing that the protected activity was closely followed by adverse treatment." Id. at 157.

### A.     *Plaintiff's Evidence Establishes A Prima Facie Case For Retaliation.*

#### 1.     *Plaintiff was engaged in protected activity.*

In order for plaintiff to establish the first element, that she was engaged in a protected activity, she need only show that she was acting under a good faith belief that the activity was covered by the statute. Cosgrove v. Sears, Roebuck and Co., 9 F.3d 1033, 1040 (2d Cir. 1993) (citing Sumner v United States Postal Service, 899 F.2d 203, 209 (2d. Cir. 1990)). While the protected activity usually takes the form of filing a formal complaint or a lawsuit, making an internal complaint regarding sexual discrimination is also covered by the statute. Id. at 1040.

Both Title VII and the ADEA (and thus CFEPA as noted in fn.8, supra) prohibit employers from taking adverse employment actions because an employee has opposed any practice made unlawful by Title VII or ADEA, or made a charge or participated in an investigation, proceeding, hearing or litigation. See 704(a) of Title VII; ADEA, 29 U.S.C. §623(d) This language is designed "to protect a wide range of activity in addition to the filing of a formal complaint." Grant v. Hazelett Strip-Casting Corp., 880 F.2d 1564, 1569 (2d Cir. 1989) (interpreting ADEA) See also Sumner v. United States Postal Service, 899 F.2d 203, 209 (2d

Cir. 1990) (noting the anti-retaliation provisions of Title VII apply to "informal protests of discriminatory employment practices, including making complaints to management...[and] writing critical letters to customers...."). In general, "[t]he term "protected activity" refers to action taken to protest or oppose statutorily prohibited discrimination." Cruz v. Coach Stores, Inc., 202 F.3d 560, 566 (2d Cir. 2000). While it does not protect violence (Id.), it protects a variety of nondescript practices. See, e.g., Grant, supra (refusing to destroy an incriminating memorandum created by management); EEOC v. Zellerbach Corp., 720 F.2d 1008, 1014 (9th Cir. 1983) (plaintiff's letter to defendant's customer stating an opposition to customer's decision to give an award to another employee who plaintiff perceived as a racist was protected activity); McMenemy v. City of Rochester, 241 F.3d 279, 285 (2d Cir. 2001) (plaintiff's report of actions by third party with no employment relationship to either defendant of plaintiff was protected); EEOC v. Ohio Edison, 7 F.3d 541, 543-44 (6th Cir. 1993) (employee's representative's complaint to employer about plaintiff's treatment is protected activity where adverse employment action is later taken against plaintiff); EEOC v. Kallir, Philips, Ross, Inc., 401 F.Supp. 66 (S.D.N.Y. 1975), aff'd, 559 F.2d 1203 (2d Cir.), cert. denied, 434 U.S. 920 (1977) (obtaining written job description from customer for use by agency); Miller v. Washington Workplace, Inc., 298 F.Supp.2d 364, 377 (E.D. Vir. 2004) (requesting a copy of employer's sexual harassment policy is protected activity); Stahl v. Bd. Of Commissioners of Wyandotte County, 244 F.Supp.2d, 1181, 1190 (D.Kan. 2003) (female police officer's statement to superiors that their physical fitness test was not "female friendly" could be construed as protected activity); Van Horn v. Specialized Support Services, Inc., 241 F.Supp.2d 994, 1013 (S.D. Iowa 2003) (plaintiff engaged in protected activity by slapping her client who grabbed her breast).

Here, defendant argues that Ms. Kelley failed to complain about sex or age discrimination. Defendant does so by relying upon a series of questions at her deposition asking exactly why she did not use the words "age" or "sex discrimination" in her memoranda. (See Kelley Depo. at 285 ("Based on this email, you're asking me if – you're asking me why I did not mention age or sex?") (P.Ex. 2).) Defendant built upon this premise and asserts plaintiff did not complain at all to defendant of such unlawful discrimination.

It is clear, as evidenced by Human Resources' reaction and Mr. Fugazy's reaction to Ms. Kelley's claim of favoritism toward his new young male "hockey players" that plaintiff was complaining of unlawful discrimination. Mr. Fugazy immediately contacted Human Resources, which instructed him to cease all conduct. Human Resources said it would undertake (but did not do) an investigation. Plaintiff repeatedly asked for rankings and an objective and lawful basis for her decision. When the retaliation began, plaintiff wrote to Human Resources repeatedly and in one letter writes:

> I have been humiliated in front of my fellow employees, been threatened by S. Fugazy, he has displayed anger towards me immediately after telling me there was no hope for me to stay with SUN. He has treated [me] with disrespect, anger and a total lack of compassion. I was told my positions were eliminated without any consistent reason. S. Fugazy has retaliated by not giving me a good reference and prohibiting my chances of staying with SUN. I have expressed these concerns to you in the past and to my knowledge nothing has been done to date.

(Depo. Ex. FFF (part of P.Ex. 26).) Defendant's Human Resources Department acknowledged knowing of Mr. Fugazy's threats, and plaintiff's "hockey" comment. It knew plaintiff's protest of her selection for termination and of her continued protest over defendant's "retaliation." It is clear that any Human Resources Department would understand that plaintiff was referring to illegal and unlawful conduct under Title VII and ADEA. The failure to use the word "discrimination" does not obviate the protection accorded Ms. Kelley's protests. "An employee is not required to use legal terms or buzz words when opposing discrimination. The court will find [protected] activity if the employee's comments, when read in their totality, oppose discrimination." Wirtz v. Kansas Farm Bureau Services, Inc., 274 F.Supp. 1198, 1212 (D.Kansas 2003). Indeed, "the courts have set a relatively low bar for a plaintiff responding to a summary judgment motion to show that he engaged in protected opposition to discrimination." Id.

This Court has held far less precise complaints to management to constitute protected activity. For example, in Truskoski v. ESPN, Inc., 823 F.Supp. 1007 (D.Conn. 1993) (PCD), this Court found that a secretary's complaints of demotion pursuant to a company policy that applied to secretaries, all of whom happened to be female, on the grounds it was "unfair" to be protected activity. In so holding, the court noted:

> While it cannot be said to have been crystal clear to each in [defendant's] chain of command to whom [plaintiff] spoke... that she was asserting gender bias, it did not require too much thought to realize that while her complaints were substantially self-focused, her complaint had definite

overtones of gender bias and discrimination. To oppose a policy or practice and benefit by the protection of Title VII, plaintiff had to have believed she was confronted by sex discrimination. Thus it should not have been a total surprise when shortly after her termination a discrimination claim was filed with CHRO.

823 F.Supp. at 1012. Thus, the court in Truskoski found "plaintiff's complaints, though informal, were recognizable as complaints of gender bias and constitute protected activity." Id. at 1013.

Here, there is no doubt plaintiff was alleging favoritism toward the young male hockey players her supervisor had hired and that she was protesting a policy or practice that resulted in 3 females over the age of 40 being terminated at the defendant's Stamford office.

### 2. *Defendant knew or should have known that plaintiff was engaged in protected activity.*

It is clear from the reaction of Mr. Fugazy who threatened plaintiff to dare to "take [her complaint] further" and the knowledge of the defendant's Human Resources Department of the underlying nature of plaintiff's complaints (i.e., the hockey comment, unfair selection, threats, retaliation) that defendant knew or should have known plaintiff was engaged in protected activity. The numerous emails by plaintiff (Depo. Exs. ZZ, AAA, BBB, CCC, DDD, EEE. FFF. GGG, HHH (all P.Ex. 35)) and the fact she traveled to New Jersey to meet with defendant's Human Resources Department (Kelley Depo. at 157-61 (P.Ex. 2); Deborja Depo. at 14 (P.Ex. 5); Marazas Depo. at 83-86 (P.Ex. 7)) shortly after her selection for "redeployment" all support the charge that defendant knew or should have known of the protected activity, as they clearly were participants

### 3. *Defendant's retaliatory conduct affected plaintiff's employment.*

First and foremost, at the time of plaintiff's receiving notice of her selection for "redeployment," July 23, 2001, it was clear that she was not to be removed from her duties. Assuming for the sake of argument that Mr. Fugazy made a mistake, both he and defendant's Human Resources Department were made aware of that mistake at the time plaintiff first started lodging her complaints, later that day. (See P.Ex. 25.) At this time, Human Resources and Mr. Fugazy spoke, and, as Mr. Fugazy testified, in a

"tense" conversation he was directed to have no further contact with Ms. Kelley. (Fugazy Depo at 176-77 (P.Ex. 3).) Thereafter, as recited in the "Facts" section of this brief:

(a) Ms. Kelley was never reinstated to her job, inconsistent with the RIF papers;
(b) Mr. Fugazy instructed all of her coworkers not to talk to Ms. Kelley about GE business;
(c) Ms. Kelley's desk was relocated to an isolated area in defendant's offices;
(d) Ms. Kelley was threatened by Mr. Fugazy;
(e) Ms. Kelley's attempts to find other employment within Sun were frustrated by Mr. Fugazy's unwillingness to give her a favorable recommendation;
(f) Ms. Kelley was harassed and yelled at by Mr. Fugazy;
(g) Ms. Kelley's complaints were not adequately investigated by defendant's Human Resources Department;
(h) Commissions Ms. Kelley had earned between July 1 and July 23, 2001 were not credited to her, without explanation and inconsistent with defendant's agreement (i.e., goals sheet);
(i) Commissions earned on business booked prior to July 1, 2001 and not shipped until after July 1, 2001 were not credited to Ms. Kelley, without explanation and inconsistent with defendant's agreement (i.e., goals sheet);
(j) A job Ms. Kelley had been told was hers subject to Mr. Fugazy's recommendation was given to a male; and
(k) Ms. Kelley was terminated.

Any *one* of these activities would support a finding of unlawful retaliatory conduct. See, e.g., Quinn v. Green Tree Credit Corporation, 159 F.3d 759, 769 (2d Cir. 1998) (termination); Preda v. Nissho Iwai American Corp., 128 F.3d 789, 791-92 (2d Cir. 1997) (job duties and responsibilities reduced); Davis v. Emery Worldwide Corp., 267 F.Supp.2d 109, 126 (D.Maine 2003) (holding plaintiff's commission check for four months); EEOC v. Wyeth, 302 F.Supp.2d 1041, 1070 (N.D. Iowa 2004) (supervisor's participation and acquiescence in ostracizing and isolating plaintiff).

### 4.    *Plaintiff's protected activity is causally related to her adverse treatment.*

The fourth and final element of a retaliation claim is satisfied "by showing that the protected activity was *closely* followed by adverse treatment" Dortz v. City of New York, 904 F.Supp. 127, 156-157 (S.D.N.Y. 1995) (emphasis added). Defendants' only contention, however, in relation to this element of plaintiff's *prima facie* showing of retaliation is based on an argument that plaintiff's termination predated her complaints. This is incorrect. As noted by the admission by Human Resources, plaintiff's position was not eliminated until August 20, 2001. (P.Ex. 29.) In addition, plaintiff was

merely selected for "redeployment," and defendant's own papers state she had until November 2001 to find another position at Sun. (P.Ex. 22.) The frustration of her job search efforts and plaintiff's ultimate termination all occurred well after her initial complaint on July 23, 2001. Finally, the remaining retaliatory acts listed in the previous section *all also* occurred *after* July 23, 2001, and are not addressed at all by defendant.

Accordingly, the fourth and final element of plaintiff's retaliation claim is satisfied for the reason that defendant and the decision makers in her termination, failure to be paid commissions, and other adverse actions noted, were aware that plaintiff had engaged in a protected activity. Cifra v. Gen. Electric Co., 252 F.3d 205, 217 (2d Cir. 2001) (plaintiff's termination 20 days after defendant employer learned of protected activity provided issue of material fact defeating summary judgment on retaliation claim); Burford v. McDonald's Corporation, 2004 WL 1392426 (D.Conn. 2004) (P.Ex. 41) (employer aware of complaint, insofar as plaintiff made them both to management and through defendant employer's regular complaint channels).

Accordingly, there are material issues of fact to be determined by a fact finder in connection with the fourth and final element of the retaliation claim. Plaintiff has produced ample evidence of positive performance and of ill-treatment in close temporal proximity of her complaints. This, together with the fact that the primary decisionmakers as to plaintiff's treatment and termination were aware of plaintiff's complaints, support liability. LaFond v. General Physics Services Corp. 50 F.3d 165, 174-75 (2nd Cir. 1995) ("unless the employer has come forward with evidence of a dispositive non-retaliatory reason as to which there is no genuine issue and which no rational trier of fact could reject, the conflict between the plaintiff's evidence establishing a prima facie case and the employer's evidence of a [non-retaliatory] reason reflects a question of fact to be resolved by the fact finder after trial" (internal quotations omitted)); see also Back v. Hastings On Hudson Union Free School District, 365 F.3d 107, 125 (2nd Cir. 2004)(derogatory comments stereotyping women followed by adverse action support a conclusion of pretext.) For these reasons defendant's motion as to this count should be denied.

V.    *PLAINTIFF'S STATE LAW CLAIMS ARE TIMELY FILED.*

Plaintiff timely filed administrative charges of sex discrimination and age discrimination with the Connecticut Commission on Human Rights and Opportunities ("CHRO") and the Equal Employment Opportunity Commission ("EEOC") on February 15, 2002. Plaintiff was not removed from her position "officially" until August 20, 2001. The CHRO erroneously dismissed the complaint, finding it untimely filed, stating it was not clear in the original complaint (filed by predecessor counsel) what transpired on August 20, 2001. Plaintiff filed a request for reconsideration[9] pointing out the CHRO error, and as no decision was made by the CHRO within 90 days as was statutorily required, plaintiff subsequently requested and obtained a release of jurisdiction allowing plaintiff to file her state action against defendant. This release of jurisdiction was issued by the CHRO on November 18, 2002. Plaintiff also received a Right to Sue letter from the EEOC dated November 25, 2002. (See P.Ex. 37.) Defendant's claim of "untimeliness" has no merit.

VI.    *GENUINE ISSUES OF MATERIAL FACT EXIST AS TO PLAINTIFF'S WAGE CLAIM PURSUANT TO C.G.S. §31-72*

Defendant argues that plaintiff was paid in accordance with the compensation agreement existing between it and plaintiff. Defendant argues that plaintiff's wage claim must fail because plaintiff was "paid in full." Defendant's own tracking system for commissions is a nightmare, but a review of key documents, as well as defendant's admissions, quickly demonstrates plaintiff was not paid all sums due her.

First, the controlling contract document according to defendant's commission report is the goal sheet. (Jhangina Depo. at 41-42 (P.Ex. 6).) As we saw, the goal sheet unequivocally provides plaintiff would be paid "salary and earned commissions up to [her] termination date." (P.Ex. 23, "Acknowledgement.") Defendant tries to confuse this court by pointing to allegedly limiting language in the FY01 plan at issue. (FY01 Commission Plan §1 (D.Ex. A).) As noted in the "Facts" section of this

---

[9] See Plaintiff's Motion for Reconsideration filed with the CHRO, incorporated herein by reference (P.Ex. 36).

brief, payment is made to sales representatives differently depending upon the type of sale. Section 17 of the FY01 plan shows the difference in commission payments for direct and indirect sales. Passport sales, the bulk of what plaintiff sold, is controlled by §22 and has no "shipment" limitations as urged by defendant. Moreover, §§26 entitled "Separations, Terminations and Transfers Settlement Process" would seem to control and it is not even mentioned by defendant. It states in pertinent part:

> For direct transactions, an employee separated from Sun either voluntarily or involuntarily (including unpaid personal leaves of absence), shall be paid salary and **earned** commissions as defined in Section 17-DODAH) up to his or her termination date. **The participant shall have no right to payment of any incentive compensation for products or services invoiced and paid subsequent to the termination date for any reason.** For products or services invoiced before the termination date, but where payment is not received until after termination, the participant will be paid 50% of the commission. Outstanding advances, chargebacks and draws will be deducted from the total earned commission, base salary and vacation due at the time of separation. The employee agrees to this deduction when he or she signs the Goal Sheet. PSR, MAP, and ***Passport credit for Representative terminating from Sun will be determined per the Playout Policy outlined in Section 27 of the DODAHs.***

(P.Ex. 11 at SUN00317 (emphasis in original).) The Playout Policy, §27 for employees such as plaintiff who was on "redeployment" until terminated, is in accord with the foregoing requirement of payment through termination (i.e., November 18, 2001) and it states:

> For participants leaving the Company, accounts will be assumed by new participants ***on the effective date of termination.***

(P.Ex. 11 at SUN00321 (emphasis supplied).)

According to defendant's own documents, as of August 20, 2001, plaintiff was due some $58,000 in commissions through FY'01. (P.Ex. 13 at SUN00121.) It is clear this figure does ***not*** include items sold by plaintiff and booked and shipped after July 1, 2001 or in FY'02. Defendant admits, contrary to the first notification to plaintiff indicating she would be paid OTE and not commission from July 23 onward (P.Ex. 24), it later decided ***not*** to pay plaintiff on items shipped between July 1, 2001. (P.Ex. 27.) This led to the reversal of the 13 items plaintiff cites to. However, plaintiff was not credited with many, many more sales up to her termination date of November 18, 2001. She was simply not paid any commissions for sales shipped after July 1, 2001. (Jhangiana Depo. at 50 (P.Ex. 6).)

39

Taking at face value defendant's own calculation that as of August 20, 2001 plaintiff was due $58,000, it is clear she was never even paid this full sum. After August 20, 2001, according to defendant, plaintiff was paid only a little over $45,000 in commissions. (SUN1150-51 produced by defendant pursuant to order of court on plaintiff's Motion to Compel (P.Ex. 38).) The balance of the items in the "commission" column are claimed, with items from other undiscernable categories of payments, to comprise OTE payments from July 1, 2001 of $53,466.56. (Jhangiana Affidavit (D.Ex. KK) at ¶6.)

It is undisputed these rules were not followed and that plaintiff was retroactively deprived of post-July 1, 2001 commissions and paid only OTE from July 1, 2001 forward through November 18, 2001. Defendant's argument that Kelley did not have a new FY-02 signed goal sheet is specious, as defendant did not provide her with one to sign and, in any event, Mr. Kozak testified he was accumulating FY'02 commissions without such a signed goal sheet (Kozak Depo. at 63-65 (P.Ex. 4).)

Connecticut General Statutes § 31-72 provides:

"When any employer fails to pay an employee wages in accordance with the provisions of sections 31-71a to 31-71i, inclusive, or fails to compensate an employee in accordance with section 31-76k ... such employee ... may recover, in a civil action, twice the full amount of such wages, with costs and such reasonable attorneys fees as may be allowed by the court, and any agreement between him and his employer for payment of wages other than as specified in said sections shall be no defense to such action."

The compensation at issue is clearly considered wages as the Statute defines wages as "compensation for labor or services rendered by an employee, whether the amount is determined on a time, task, piece, commission *or other basis of calculation* ..." C.G.S. §31-71a(3) (emphasis added). Moreover, defendant had an obligation to pay plaintiff her wages in full not later than the business day next succeeding the date of such discharge. C.G.S. §31-71c.

The requirements for establishing a claim pursuant to C.G.S. §31-72 are not burdensome. In fact, a party seeking damages for violation of C.G.S. §31-72 must only afford a basis for a reasonable estimate by a trier, court or jury, of the amount of that party's loss. Schoonmaker v. Lawrence Brunoli,

40

Inc., 265 Conn. 210, 828 A.2d 64 (2003); see also Mahoney v. Augenstern, 1998 WL 764465 (Conn.Super 1998) (P.Ex. 42) (plaintiff's motion for summary judgment on a §31-72 count was granted where "all that exists to oppose summary judgment is the defendant's legal argument and the unsworn assertions of the defendant and his counsel that he does not owe $2,559.20 in back wages to the plaintiff. These are not sufficient to beat summary judgment.")

Here, defendant clearly failed to make payment to plaintiff on commissions consistent with policy or her expectations. In fact, defendant admitted its placement of plaintiff to OTE was not done until September 2001 and was the first time it had ever done this. (Jhangiana Depo. at 78-79 (P.Ex. 6).) Accordingly, summary judgment is inappropriate on plaintiff's claim pursuant to Connecticut General Statutes §31-72.

## VII.    *GENUINE ISSUES OF MATERIAL FACT EXIST AS TO PLAINTIFF'S CLAIM OF UNJUST ENRICHMENT.*

Defendant seeks to have it both ways on the wage claims. It contends there can be no wage claim as no contract for Fiscal Year 2002 was signed by plaintiff and thus her plan expired July 1, 2001, *prior* to her notification on July 23, 2001 of "redeployment." Thus, argues defendant, it had no contractual obligation to pay her commissions.

In defense of plaintiff's claims of unjust enrichment, defendant argues the opposite, that a compensation agreement existed, citing to the allegedly expired Fiscal Year 2001 plan. (Defendant's Memo at 42.) While plaintiff alleges her agreement mandated she be paid, she alternatively alleges, in light of defendant's argument of no agreement being in place, that defendant, in keeping and failing to pay her earned commission through her termination date, was unjustly enriched. As there is no dispute her commissions were not paid beyond July 1, 2001, this claim must survive until defendant's arguments as to the lack of an enforceable agreement for Fiscal Year 2002 is determined.

The elements of unjust enrichment are well established. Plaintiffs seeking recovery for unjust enrichment must prove "(1) that the defendants were benefited, (2) that the defendants unjustly did not

pay the plaintiffs for the benefit, and (3) that the failure of payment was to the plaintiffs' detriment." Bolmer v. Kocet, 6 Conn.App. 595, 612-23 (1986). Drawing every inference in favor of plaintiff, it is clear that she has adequately plead and supported a claim for unjust enrichment. It is undisputed that defendant benefited from the work plaintiff performed, as she was in sales and each sale she made was to the benefit of defendant. The fact that defendant failed to pay plaintiff her proper commissions legitimately earned satisfies the second element, that defendant unjustly did not pay plaintiff for the benefit. Finally, it cannot be argued that such a failure to pay plaintiff was not to her detriment, as it has been over two years and plaintiff has not received the wages owed to her. There are, at the very least, questions of fact as to the amounts owed to plaintiff which preclude summary judgment.

### *CONCLUSION*

For all of the foregoing reasons, plaintiff respectfully requests that defendant's Motion for Summary Judgment be denied in its entirety.

By _____
Scott R. Lucas (ct00517)
*Attorneys for Plaintiff*
MARTIN, LUCAS & CHIOFFI, LLP
177 Broad Street
Stamford, CT 06901
Phone: (203) 973-5200
Fax: (203) 973-5250
slucas@mlc-law.com

### *CERTIFICATE OF SERVICE*

This is to certify that on this 30th day of August, 2005, a copy of the foregoing was mailed, first

class, postage prepaid, to:


Marc L. Zaken, Esq.
John G. Stretton, Esq.
Edwards & Angell, LLC
Three Stamford Plaza
301 Tresser Boulevard, 13th Floor
Stamford, CT 06901
Phone: (203) 975-7505
Fax: (203) 975-7180
mzaken@EdwardsAngell.com
jstretton@EdwardsAngell.com

Scott R. Lucas