## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| **MARGARET MARY KELLEY,** | : | **CIVIL ACTION NO.** |
| | : | **3:03 CV 57 (CFD)** |
| **Plaintiff,** | : | |
| | : | |
| **V.** | : | |
| | : | |
| **SUN MICROSYSTEMS, INC.,** | : | |
| | : | **AUGUST 30, 2005** |
| **Defendant.** | : | |

### PLAINTIFF'S LOCAL RULE 56(a)2 STATEMENT

Pursuant to Local Rule 56(a)2, Plaintiff Margaret Mary Kelley submits the following statement in support of her Opposition to Defendant's Motion for Summary Judgment:

1.   Plaintiff was hired on September 18, 2000 by Sun Microsystems as a Sales Representative B at a base salary of $52,000.00 annualized with an on-target commission earnings goal of $78,000.00. *Offer Letter (Exhibit C), Deposition of A. Jhangiani at 17 (Exhibit U), Deposition of Plaintiff at 40, 203 (Exhibit B), Complaint, ¶ 6.*

   ***RESPONSE:*** Admitted, except that plaintiff was recruited into her position, and the person who ultimately decided to hire her was Bruce Likly, a member of defendant's management team. (Kelley Depo. at 27-28 (P.Ex. 2).[1])

2.   Plaintiff was stationed in Sun Microsystems' Stamford, Connecticut office and was assigned to service the G.E. account. *Deposition of Plaintiff at 40 (Exhibit B).*

   ***RESPONSE:*** Admitted.

3.   In her position as a sales representative with Sun Microsystems, Plaintiff was assigned to sell to portions of the GE Capital account and to report on international sales, also known as passport reporting. *Deposition of Plaintiff at 40, 43-44 (Exhibit B).*

   ***RESPONSE:*** Admitted, except that plaintiff also made international sales as part of her passport business. (Kelley Depo. at 44-45 (P.Ex. 2).)

---

[1] "D.Ex ___" shall refer to defendant's Index of Exhibits Volumes 1 and 2 submitted with its Motion for Summary Judgment "P.Ex ___" shall refer to plaintiff's Appendix of Exhibits submitted herewith.

4.      Kristen Powers, a member of the Stamford, Connecticut sales team that serviced to the G.E. account, was promoted to Sales Representative B on September 25, 2000. *Affidavit of S. Fugazy, ¶ 4 (Exhibit F), Deposition of S. Fugazy at 44-45 (Exhibit D); Deposition of Plaintiff at 38, 126 (Exhibit B).*

***RESPONSE:*** Admitted, except that Ms. Powers, a younger employee, was subordinate to

plaintiff, who was the senior account leader/executive of her team, which included Ms. Powers. (Fugazy

Depo. at 103 (P.Ex. 3); Kozak Depo. at 36 (P.Ex. 4).)

5.      On January 2, 2001, Mr. Fugazy hired Michael Kozak as a Sales Representative A to service the G.E. account from the Stamford, Connecticut office. *Deposition of M. Kozak at 34 (Exhibit H); Deposition of S. Fugazy at 85 (Exhibit D).*

***RESPONSE:*** Admitted, except Michael Kozak, as a Sales Representative A, was far younger

than plaintiff, less experienced than plaintiff, compensated less than plaintiff, was not required to reach

and/or sustain as high a revenue and/or sales goal as plaintiff, and was subordinate to plaintiff. (D.Ex.

A; Fugazy Depo. at 86, 103 (P.Ex. 3); Kozak Depo. at 36 (P.Ex. 4; Offer Letter of Michael Kozak (P.Ex.

30).)

6.      On or about February 1, 2001, Mr. Fugazy documented in a memo dated February 1, 2001 to Plaintiff his concerns "regarding a trend of miscommunication" between Plaintiff and the other members of the G.E. team as well as his concern that Plaintiff had "missed or been late for several meetings" between Plaintiff and the other members of the G.E. team. *Deposition of Plaintiff at 67-68 (Exhibit B); Disciplinary Memo dated February 1, 2001 (Exhibit L).*

***RESPONSE:*** Denied as stated. Due to a lack of communication, certain meetings were either held or

tentatively scheduled without plaintiff's knowledge. (Kelley Depo. at 69, 71 (P.Ex. 2).)

7.      The April 5, 2001 stack ranking prepared by Mr. Fugazy ranks Plaintiff in the mid-seventy percentile, below Ms. Powers. *April 5th Stack Ranking (Exhibit O)*

***RESPONSE:*** Denied. The April 5, 2001 stack ranking prepared by Mr. Fugazy does not rank

plaintiff below Ms. Powers. (P.Ex. 31.) In addition, the April 5, 2001 stack ranking is irrelevant to the

extent it is used to justify defendant's unlawful termination of plaintiff where such ranking was not

utilized in any way in defendant's selection of plaintiff for termination. (P.Ex. 34); Fugazy Depo. at 305-

306; 310, 313-314, 316-317 (P.Ex. 3); P.Ex. 20 at 3-4.)

8.    The April 9, 2001 stack ranking prepared by Mr. Fugazy ranks Plaintiff in the mid-seventy percentile, below Ms. Powers. *April 9th Stack Ranking (Exhibit P).*

**RESPONSE:**  Denied.  The April 9, 2001 stack ranking prepared by Mr. Fugazy does not rank plaintiff below Ms. Powers. In fact, given the ambiguity of the April 5, 2001 stack ranking and April 9, 2001 stack ranking, it is possible that plaintiff was ranked above Ms. Powers, as they were both ranked without specification in the mid-70 percentile.  (P.Exs. 9 and 31.)  In addition, the April 5, 2001 and April 9, 2001 stack rankings are irrelevant to the extent they are used to justify the unlawful termination of plaintiff where such rankings were not utilized in any way in defendant's selection of plaintiff for termination.  (P.Ex. 34; Fugazy Depo. at 305-306; 310, 313-314, 316-317 (P.Ex. 3).)

9.    The April 9, 2001 stack ranking incorporated the results from the April "Performance Criteria Tool – Individual Contributors" evaluation tool prepared by Mr. Fugazy. *April 9th Stack Ranking (Exhibit P); April Performance Criteria Tool – Individual Contributors for Plaintiff (Exhibit N); April Performance Criteria Tool – Individual Contributors for M. Kozak (Exhibit Q); Affidavit of S. Fugazy, ¶ 6 (Exhibit F).*

**RESPONSE:**  Denied as stated.  The April 9, 2001 stack ranking prepared by Mr. Fugazy does not rank plaintiff below Ms. Powers. In fact, given the ambiguity of the April 5, 2001 stack ranking and April 9, 2001 stack ranking, it is possible that plaintiff was ranked above Ms. Powers, as they were both ranked without specification in the mid-70 percentile.  (P.Exs. 9 and 31.) In addition, the April 5, 2001 and April 9, 2001 stack rankings are irrelevant to the extent they are used to justify the unlawful termination of plaintiff where such rankings were not utilized in any way in defendant's selection of plaintiff for termination.  (P.Ex. 34; Fugazy Depo. at 305-306; 310, 313-314, 316-317 (P.Ex. 3).) Finally, Plaintiff lacks knowledge sufficient to form a belief as to whether or not and to what degree, if at all, the April 9, 2001 stack ranking incorporates the results form the April "Performance Criteria Tool – Individual Contributors."

10.    In the April 9, 2001 stack ranking, Ms. Powers received a more favorable rating than Plaintiff in all three categories addressed by the April 9, 2001 stack ranking, namely, the "Achievements/Results Against Goals" category, the "Functional/Technical Contribution" category and the "Competencies" category. *April 9th Stack Ranking (Exhibit P)*

**RESPONSE:**  Denied as stated.  The April 9, 2001 stack ranking prepared by Mr. Fugazy itself does not contain an indicator or any identifier as to what a "favorable rating" is.  Moreover, the April 5, 2001 stack ranking prepared by Mr. Fugazy clearly does not rank plaintiff below Ms. Powers. In fact, given the ambiguity of the April 5, 2001 stack ranking and April 9, 2001 stack ranking, it is possible that plaintiff was ranked above Ms. Powers, as they were both ranked without specification in the mid-70 percentile.  (P.Ex. 9 and 31.)  In addition, the April 5, 2001 and April 9, 2001 stack rankings are irrelevant to the extent they are used to justify the unlawful termination of plaintiff where such rankings were not utilized in any way in defendant's selection of plaintiff for termination.  (P. Ex. 34; Fugazy Depo. at 305-306; 310, 313-314, 316-317 (P.Ex. 3).)

11.    In the April 9, 2001 stack ranking, Mr. Kozak received a more favorable rating than Plaintiff in two out of the three categories addressed by the April 9, 2001 stack ranking, namely, the "Functional/Technical Contribution" category and the "Competencies" category.  *April 9th Stack Ranking (Exhibit P); April Performance Criteria Tool – Individual Contributors for Plaintiff (Exhibit N), April Performance Criteria Tool – Individual Contributors for M. Kozak (Exhibit Q).*

**RESPONSE:**  Denied as stated.  The April 9, 2001 stack ranking prepared by Mr. Fugazy does not contain any indicator or any identifier as to what a "favorable rating" is or would be in relation to the categories named by defendant. (P. Ex. 9.)  In addition, the April 9, 2001 stack ranking is irrelevant to the extent it is used to justify the unlawful termination of plaintiff where such rankings was not utilized in any way in defendant's selection of plaintiff for termination.  (P.Ex. 34); Fugazy Depo. at 305-306; 310, 313-314, 316-317 (P.Ex. 3).)  Moreover, defendant admits that Mr. Kozak ranked below plaintiff. (Fugazy Depo. at 36 (P.Ex. 3).) Finally, Mr. Kozak, as a Sales Representative A, was compensated far less than plaintiff, was not required to reach and/or sustain as high of a revenue goal as plaintiff, and was subordinate to plaintiff.  (D.Ex. A; Fugazy Depo. at 103 (P.Ex. 3).)

12.    At the end of April 2001, Plaintiff completed a self-evaluation form called an "AFO STAR Process Skills Assessment." *Deposition of Plaintiff at 181-182 (Exhibit B); Plaintiff's AFO STAR Process Skills Assessment (Exhibit R)*

**_RESPONSE:_**    Denied.    The self-evaluation form called an "AFO STAR Process Skills Assessment" was executed by plaintiff prior to her commencing work with defendant, and not "completed" at the end of April 2001 as defendant purports. (Kelley Depo. at 179-181 (P.Ex. 2); Depo. Ex. R (part of P.Ex. 16).)

13.    Plaintiff ranked 33rd out of 37 sales representatives in the regional stack ranking dated May 4, 2001. *Regional Stack Ranking (Exhibit S)*

**_RESPONSE:_**    Denied as stated.    The regional stack ranking dated May 4, 2001 is irrelevant to the extent it is used to justify the unlawful termination of plaintiff where such ranking was not utilized in any way in defendant's selection of plaintiff for termination. (P.Ex. 34 Fugazy Depo. at 305-306; 310, 313-314, 316-317 (P.Ex. 3).) Moreover, defendant admits that Mr. Kozak ranked below plaintiff. (Fugazy Depo. at 36 (P.Ex. 3).) Finally, Mr. Kozak is not even ranked on this so-called "regional stack ranking," thereby underscoring its inapplicability insofar as it is used as a measurement or indicator of who from plaintiff's sales team was to be eliminated. (Depo. Ex. R (part of P.Ex. 16).)

14.    The July 2001 stack ranking prepared by Mr. Fugazy ranks each of the three Stamford sales representatives, Ms. Powers, Mr. Kozak and Plaintiff, in the middle seventy percentile, with Plaintiff ranked in the bottom half of the ranked employees. *July Initial Performance Rating Spreadsheet (Exhibit W)*.

**_RESPONSE:_**    Denied.    The "Initial Performance Ratings Spreadsheet" does not rank plaintiff in the bottom half of the ranked employees. (D.Ex. W.) Also, the "Initial Performance Ratings Spreadsheet" is irrelevant to the extent it is used to justify the unlawful termination of plaintiff where such ratings were not utilized in any way in defendant's selection of plaintiff for termination. (P.Ex. 34; Fugazy Depo. at 305-306; 310, 313-314, 316-317 (P.Ex. 3).) Moreover, defendant admits that Mr. Kozak ranked below Plaintiff. (Fugazy Depo. at 36 (P.Ex. 3).)

15.    On or about Tuesday, July 17, 2001, David Vogelzang, the new regional manager for FY02, met with each of the district managers, including Mr. Fugazy, at Sun Microsystems' Somerset, New Jersey office to discuss the performance of the sales representatives in that region in light of the company-wide reduction in force. *Deposition of S. Fugazy at 306 - 308 (Exhibit D).*

***RESPONSE:*** Denied as stated. According to the pages cited by defendant, Fugazy testified that

Dave Vogelzang presided over a meeting in which he was merely soliciting feedback from managers as

to sales representatives. (Fugazy Depo. at 306-308 (P.Ex. 3).) There was no discussion of a company-

wide reduction in force. (Id.)

16.    Plaintiff's name appeared near the bottom of the regional stack ranking created during the reduction in force regional meeting held in Somerset, New Jersey on or about Tuesday, July 17, 2001. *Deposition of S. Fugazy at 310 (Exhibit D).*

***RESPONSE:*** Denied as stated. According to the deposition testimony of Mr. Fugazy, he could

not "visualize" the ranking in question. (Fugazy Depo. at 310 (P.Ex. 3).) In fact, he could not definitively

recall whether Plaintiff was above or below the members of her sales team. (Id.)

17.    Mr. Fugazy prepared a memo dated July 19, 2001 identifying the basis for the decision to terminate Plaintiff in connection with the reduction in force. *Reduction in Force Memo dated July 19, 2001 (Exhibit Y); Email correspondence dated July 18, 2001 (Exhibit X); Deposition of S. Fugazy at 184, 314-315 (Exhibit D).*

***RESPONSE:*** Denied as stated. Defendant applies several policies, each inconsistent with one

another when terminating plaintiff. (D.Ex. Y; P.Exs. 34, 15 and 19; Depo. Ex. MM (part of P.Ex. 19);

Kelley Depo. at 91, 95, 101-102, 105 (P.Ex. 2).) In an attempt to legitimize the unlawful termination of

plaintiff, defendant, ***after*** plaintiff's termination, created a memo dated July 19, 2001 in which it

applied another inconsistent criterion for plaintiff's termination. In addition, the memo prepared by Mr.

Fugazy dated July 19, 2001 demonstrates defendant's discriminatory motive in terminating plaintiff.

(P.Ex. 34; D.Ex. Y.)

18.    On Monday, July 23, 2001, Plaintiff was informed by Mr. Fugazy, her direct supervisor, and Mr. Vogelzang, the new regional manager, that Sun Microsystems was undergoing a reduction in force and that she had been selected for termination. *Deposition of Plaintiff at 93-94 (Exhibit B); Deposition of S. Fugazy at 197-198 (Exhibit D); Complaint, ¶ 11.*

**_RESPONSE:_**  Admitted, except that plaintiff was also told that she was only pre-notified of her possible redeployment and that Fugazy was incorrect. (P.Ex. 27.)  In addition, defendant's Human Resource Department informed plaintiff that she had been "unassigned," or no longer holding her current sales position, as early as July 1, 2001, contrary to Mr. Fugazy's testimony. (Id.)

19.    Prior to receiving notification of the reduction in force, Plaintiff had received memos from Sun Microsystems asking employees "to reduce expenses." *Deposition of Plaintiff at 91-94 (Exhibit B).*

**_RESPONSE:_**  Admitted, except that plaintiff had no notice that her position was in jeopardy. In fact, she was surprised to have been selected, as she had been performing very well. (Kelley Depo. at 95 (P.Ex. 2); Depo. Ex. KK (part of P.Ex. 15).)

20.    Plaintiff has no knowledge or evidence of any discriminatory statements pertaining to age or sex made to Plaintiff. *Deposition of Plaintiff at 78.*

**_RESPONSE:_**  Denied. Plaintiff has knowledge and evidence of discriminatory statements made to her pertaining to age and sex. Mr. Fugazy and another member of management made inappropriate vulgar comments and overtures directly to plaintiff regarding older women. (Kelley Depo. at 113 (P.Ex. 2).)  In fact, Mr. Fugazy stated his ageist and sexist attitude when unlawfully selecting plaintiff for termination, citing a younger male's long-term and/or "upward potential" as grounds for his retention over plaintiff. (D.Ex. Y.)

21.    Plaintiff filed a charge of discrimination regarding her termination from Sun Microsystems with the Connecticut Commission on Human Rights and Opportunities on February 15, 2002. *CHRO Notice of Final Agency Action (Exhibit II).*

**_RESPONSE:_**    Denied as stated. Plaintiff timely filed administrative charges of sex discrimination and age discrimination with the Connecticut Commission on Human Rights and Opportunities ("CHRO") and the Equal Employment Opportunity Commission ("EEOC") on February 15, 2002. The CHRO erroneously dismissed the complaint, finding it untimely filed. Plaintiff filed a

request for reconsideration, and as no decision was made by the CHRO within 90 days, plaintiff subsequently requested and obtained a release of jurisdiction, allowing plaintiff to file her state action against defendant. This release of jurisdiction was issued by the CHRO on November 18, 2002. Plaintiff also received a Right to Sue letter from the EEOC dated November 25, 2002. (See P.Ex. 37.)

22.    The offer letter, signed by Plaintiff on September 6, 2000, instructed Plaintiff to refer to the Sales Compensation Plan for additional information concerning her assigned on-target earnings goal of $78,000.00 annualized. *Offer Letter (Exhibit C).*

**RESPONSE:** Admitted, except that material elements of plaintiff's offer letter, namely, her compensation where shifted and/or altered without notice to plaintiff. In addition, defendant provided no explanation for theses modifications and/or withholdings. (See Goal Sheet (D.Ex. I).)

23.    Sun Microsystems' fiscal year runs from July 1 through June 30. *Deposition of Plaintiff, at 40-41 (Exhibit B); Deposition of A. Jhangiani at 5 (Exhibit U).*

**RESPONSE:** Admitted, except plaintiff lacks knowledge sufficient to form a belief as to the exact dates spanning defendant's fiscal year.

24.    Section 1 of the FY01 Sales Compensation Plan provides that "No incentive compensation payments will be made to anyone covered by this Plan until a fully executed copy of the Goal Sheet is signed by the participant, two levels of management and the Area controller." *FY01 Americas Sales Compensation Plan, Section 1 (Exhibit A); Deposition of A. Jhangiani at 48-53, 64 (Exhibit U).*

**RESPONSE:** Denied. Plaintiff and other members of her sales team received incentive compensation payments despite not having a fully-executed copy of a goal sheet. (Kelley Depo. at 37-40 (P.Ex. 3); Goal Sheet (D.Ex. I); P.Ex. 13, Kozak Depo. at 63-65 (P.Ex. 4).)

25.    During FY01, Plaintiff executed her first Goal Sheet on October 17, 2000, which was superceded by the Goal Sheet she executed on January 25, 2001, which was superceded by the Goal Sheet she executed on May 18, 2001. *Re-Goaling Forms (Exhibit I); Deposition of Plaintiff at 40 (Exhibit B).*

**RESPONSE:** Admitted, except plaintiff lacks knowledge sufficient to form a belief as to whether subsequent Goal Sheets superseded prior Goal Sheets. In addition, the Goal Sheets identified by defendant inexplicably reduced plaintiff's annual salary contrary to her offer letter. (D.Exs. C and I.)

8

26.    Each Goal Sheet executed by Plaintiff provided that "In order to receive commission dollars on an account or territory, the account or territory must be included in the Goaling and Coverage Tool and a copy of the account(s)/territory must be attached. Passport must be goaled by account and all buying location must be identified." *Re-Goaling Forms (Exhibit I), Deposition of A. Jhangiani at 48-50 (Exhibit U).*

**RESPONSE:**   Admitted, except that plaintiff and other members of her sales team received

commission payments despite not having a properly-executed copy of a Goal Sheet.  (Kelley Depo. at

37-40 (P Ex. 2); Goal Sheet (D.Ex. I); P.Ex. 13; Kozak Depo. at 63-65 (P.Ex. 4).) Moreover, plaintiff's

admission is limited only to the extent that the document speaks for itself.

27.    Each Goal Sheet executed by Plaintiff contained the following acknowledgement: "ACKNOWLEDGEMENT  I have received, read and understand the Sun Microsystems Inc. (Sun), Americas United States Fiscal Year 2001 Sales Compensation Plan (PLAN) and all appendices . . . All payments are based on this PLAN . . . ." *Re-Goaling Forms (Exhibit I).*

**RESPONSE:**   Admitted, to the extent that the writing speaks for itself.

28.    July 1, 2001 marked the beginning of fiscal year 2002 ("FY02") and the effective date of the FY02 Sales Compensation Plan. *FY'02 Americas Sales Compensation Plan, Section 1 (Exhibit BB); Deposition of Plaintiff at 40-41 (Exhibit B); Deposition of A. Jhangiani at 5 (Exhibit U).*

**RESPONSE:**   Admitted, to the extent that the writing speaks for itself.

29.    Section 1 of the FY02 Sales Compensation Plan provides that "No incentive compensation payments will be made to anyone covered by this Plan until a fully executed copy of the Goal Sheet is signed by the participant, two levels of management and the Area controller." *FY'02 Americas Sales Compensation Plan, Section 1 (Exhibit BB)*

**RESPONSE:**   Denied  Plaintiff and other members of her sales team received incentive

compensation payments despite not having a fully-executed copy of a Goal Sheet.  (Kelley Depo. at 37-

40 (P.Ex. 2); Goal Sheet (D.Ex. I); P.Ex. 13; Kozak Depo. at 63-65 (P.Ex. 4).)

30.    Plaintiff did not sign a Goal Sheet for FY02 due to the reduction in force. *Deposition of Plaintiff at 163, 237 (Exhibit B).*

**RESPONSE:**   Denied  Plaintiff, along with other members of her sales team, did not sign a Goal

Sheet for FY02. Nevertheless, certain individuals on plaintiff's sales team (i.e., Michael Kozak)

continued to be compensated pursuant to a set goal that was "collectively" known to some of the sales

representatives  (Kozak Depo. at 63-65 (P.Ex. 4).)

31.    Plaintiff was paid full on-target earnings for the period of July 1, 2001 through November 18, 2001, the notification period. *Affidavit of A. Jhangiani, ¶ 5 (Exhibit LL); Deposition of S. Fugazy at 141 (Exhibit D), Payment Summary (Exhibit CC); Deposition of Plaintiff at 161-162 (Exhibit B).*

**RESPONSE:**  Denied.  Plaintiff was "pre-notified" of her selection for termination on July 23,

2001  (P.Ex. 20 at 5.)  Prior to this date, however, plaintiff, along with other members of her sales team,

did not sign a Goal Sheets at the time of FY02.  Nevertheless, certain individuals on plaintiff's sales team

(i.e., Michael Kozak) continued to be compensated pursuant to a set goal that was "collectively" known

to some of the sales representatives.  (Kozak Depo. at 63-65 (P.Ex. 4).)

32.    In October of 2001, Plaintiff sent an email to Sun Microsystems identifying thirteen transactions she believed she should have received commission payments on. *Email Correspondence dated November 6, 2001 (Exhibit JJ), Deposition of Plaintiff at 268-269 (Exhibit B).*

**RESPONSE:**  Admitted, to the extent that the writing speaks for itself.

33.    The thirteen transactions identified by Plaintiff are all direct sale transactions. *Affidavit of A. Jhangiani, ¶ 8 (Exhibit LL).*

**RESPONSE:**  Admitted, except plaintiff lacks knowledge sufficient to form a belief as to

whether the 13 transactions were all "direct" sale transactions.  Nevertheless, plaintiff is entitled to her

commissions/compensation associated with these transactions.

34.    The shipping date for each of the thirteen transactions identified by Plaintiff is post July 1, 2001. *Affidavit of A. Jhangiani, ¶ 8 (Exhibit LL); Deposition of Plaintiff at 275-276 (Exhibit B).*

**RESPONSE:**  Admitted, except plaintiff lacks knowledge sufficient to form a belief as to

whether the 13 transactions were all "direct" sale transactions.  In addition, even if the shipping date for

each transaction is after July 1, 2001, plaintiff is still entitled to her commissions/compensation

associated with these transactions.  Moreover, plaintiff was "pre-notified" of her selection for

termination on July 23, 2001.  (P.Ex. 20 at 5.)  Prior to this date, however, plaintiff, along with other

members of her sales team, did not sign a Goal Sheet for FY02, yet certain individuals on plaintiff's

sales team (i.e., Michael Kozak) continued to be compensated pursuant to a set goal that was

"collectively" known to some of the sales representatives.  (Kozak Depo. at 63-65 (P.Ex. 4).)

35.    The customer payment date for each of the thirteen transactions identified by Plaintiff is post July 1, 2001. *Affidavit of A. Jhangiani, ¶ 8 (Exhibit LL)*.

**_RESPONSE:_**    Admitted, except plaintiff lacks knowledge sufficient to form a belief as to whether the "customer payment date" for each of the 13 transactions was identified after July 1, 2001. In addition, even if the "customer payment date" for each transaction is after July 1, 2001, plaintiff is still entitled to her commissions/compensation associated with these transactions. Moreover, plaintiff was "pre-notified" of her selection for termination on July 23, 2001. (P.Ex. 20.) Prior to this date, however, plaintiff, along with other members of her sales team, did not sign a Goal Sheet for FY02, yet certain individuals on plaintiff's sales team (i.e., Michael Kozak) continued to be compensated pursuant to a set goal that was "collectively" known to some of the sales representatives. (Kozak Depo. at 63-65 (P.Ex. 4).)

36.    Section 17 of the Sales Compensation Plan provides that: "Commission is earned on direct business and considered due and payable to any participant in the commission plan upon revenue recognition and receipt by Sun of full payment for all commissionable products. Direct purchase commissions are advanced 50% of net value to Sun at the time of shipment and the remaining 50% of commissions is paid upon receipt by Sun of payment for all authorized products." *FY'01 GSO Americas Sales Compensation Plan, Section 17, Commissionable Products & Commission Policy (Exhibit A)*.

**_RESPONSE:_**    Admitted, to the extent that the writing speaks for itself. In addition, plaintiff is entitled to all her commissions associated with her sales, as well as those commissions denied her and split amongst the other employees on her sales team. Finally, each and every Goal Sheet issued to and/or executed by plaintiff unequivocally states that if plaintiff "were to become separated from [defendant], either voluntarily or involuntarily, [plaintiff] shall be paid salary and earned commissions up to [her] termination date." (D.Ex. I.)

37.    Plaintiff never informed Defendant that she believed she was the subject of discrimination based on her age or based on her sex prior to November 18, 2001, her last official day of employment with Defendant. *Deposition of Plaintiff at 150-151, 156, 248-249, 302-303 (Exhibit B)*.

**_RESPONSE:_** Denied. Here, defendant argues that Ms. Kelley failed to complain about sex or age discrimination. Defendant does so by relying upon a series of questions at her deposition asking exactly why

she did not use the words "age" or "sex discrimination" in her memoranda (See Kelley Depo. at 285 ("Based on this email, you're asking me if – you're asking me why I did not mention age or sex?") (P.Ex. 2) ) Defendant built upon this premise and asserts plaintiff did not complain at all to defendant of such unlawful discrimination.

It is clear, as evidenced by Human Resources' reaction and Mr. Fugazy's reaction to Ms. Kelley's claim of favoritism toward his new young male "hockey players" that plaintiff was complaining of unlawful discrimination. Mr. Fugazy immediately contacted Human Resources, which instructed him to cease all conduct. Human Resources said it would undertake (but did not do) an investigation. Plaintiff repeatedly asked for rankings and an objective and lawful basis for her decision. When the retaliation began, plaintiff wrote to Human Resources repeatedly and in one letter writes:

> I have been humiliated in front of my fellow employees, been threatened by S. Fugazy, he has displayed anger towards me immediately after telling me there was no hope for me to stay with SUN. He has treated [me] with disrespect, anger and a total lack of compassion. I was told my positions were eliminated without any consistent reason. S. Fugazy has retaliated by not giving me a good reference and prohibiting my chances of staying with SUN. I have expressed these concerns to you in the past and to my knowledge nothing has been done to date.

(Depo. Ex. FFF (part of P.Ex. 26).)

38.    The acts of retaliation Plaintiff relies upon to support her claims of retaliation, Counts Four through Six of Plaintiff's Second Amended Complaint, all occurred after Plaintiff was pre-notified of her termination on July 23, 2001. *Continued Deposition of Plaintiff at 5-9 (Exhibit OO).*

**_RESPONSE:_** Denied. Admitted that the retaliation began upon plaintiff's July 23, 2001 complaint to Human Resources and Mr. Fugazy and continued through her termination on November 18, 2001. However, plaintiff was selected for pre-notification of ***potential*** termination, and the retaliatory acts, while including termination as opposed to redeployment, include many more adverse employment activities. For examples, see Plaintiff's Memorandum in Opposition to Defendant's Motion for Summary Judgment, §IV(A)(3).

### MATERIAL FACTS WHICH PRECLUDE
### DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

1.      Defendant Sun is a corporation with an office in Stamford, Connecticut and is in the business of, *inter alia*, selling hardware, software and consulting services. Ms. Kelley is an experienced salesperson in the technology arena. Prior to becoming employed with defendant, Ms. Kelley worked for over 14 years with IBM (and its predecessors in interest) selling hardware and software products, first to Chase Manhattan Bank and then exclusively to General Electric. (Kelley Depo. at 33-35 (P.Ex. 2); plaintiff's resume (P.Ex. 8.))

2       Ms. Kelley was recruited for a sales position with defendant and interviewed with a District Sales Manager located in Stamford, Connecticut responsible for selling defendant's services and products to General Electric. (Id. at 21, 27-28 (P.Ex. 2).) It was this manager, Bruce Likely, who made the decision to interview plaintiff. (Id. at 28 (P.Ex. 2); Fugazy Depo. at 45-46 (P.Ex. 3).) At the time of this interview, Mr. Likly had two sales representatives reporting to him at Stamford, Mr. Steve Fugazy and Kristen Powers. Ms. Kelley interviewed with Mr. Likly. (Kelley Depo. at 31 (P.Ex. 2); Fugazy at 45-46 (P.Ex. 3).) Thereafter, Mr. Likly was promoted and Mr. Fugazy took over Mr. Likly's role. (Kelley Depo. at 29-30 (P.Ex. 2); Fugazy Depo. at 48 (P.Ex. 3).) Mr. Fugazy then promoted Ms. Powers to "Sales Rep B"[2] and extended the offer to Ms. Kelley to also become Sales Rep B servicing the General Electric account. (Kelley Depo. at 27-30 (P.Ex. 2); D.Ex. C.) While Mr. Fugazy communicated the offer, he was not sure if Mr. Likly had made the hiring decision. (Fugazy Depo. at 48-49 (P.Ex. 3); Kelley Depo. at 63 (P.Ex. 2).)

3.      Ms. Kelley began her employment with defendant on September 18, 2000. (Kelley Depo at 40 (P.Ex. 2).) Plaintiff's immediate sales team was comprised of Kristen Powers, the 33-year-old

---

[2] Sales representatives are classified by letter from A to E depending upon characteristics of the assignment and the skill/experience level of the employee. Sales Representative A represents the lowest alphabetically-ranked employee, and Sales Representative E represents the highest ranked employee. See FY'01 Americas Sales Compensation Plan, Section 1 (D.Ex. A).

Sales Representative B, and herself. She reported to Mr. Fugazy, who prior to this never held a position supervising anyone. (Fugazy Depo. at 29 (P.Ex. 3).). Ms. Kelley was responsible for sales to GE Capital and GE Supply (Kelley Depo. at 43 (P.Ex. 2); Fugazy Depo. at 82 (P.Ex. 3), and also in charge of all international sales to GE, referred to as "Passport" sales (Fugazy Depo. at 121 (P.Ex. 3); Kelley Depo. at 43 (P.Ex. 2); P.Ex. 9. Her duties included generating sales, communicating defendant's strategy and product information to certain accounts, reporting her findings to management and developing client relationships. (Kelley Depo. at 43-45 (P.Ex. 2); Fugazy Depo. at 96 (P.Ex. 3).)

     4.     Ms. Kelley's compensation was comprised of salary, commission, benefits and a car allowance. (Kelley Depo. at 36-39 (P.Ex. 2); D.Ex. C; P.Ex. 10.) She received a salary of $52,000, and commission based upon a "PCR" or personal commission rate. (P.Ex. 10; Fugazy Depo. at 57-62 (P.Ex. 3).) This rate was calculated as the potential commission she could earn if she reached 100% of her assigned goal, divided by the monetary goal assigned, and was a figure determined by Fugazy. (D.Exs. A and C; P.Ex. 10); Fugazy Depo. at 57-62, 65 (P.Ex. 3).) In Ms. Kelley's case, she could earn commissions of $78,000 if she reached her goal. Her $52,000 salary and $78,000 commission, when combined, equal a figure known as "OTE," or "on target earnings." (Fugazy Depo. at 61 (P.Ex. 3); Jhangiani Depo. at 26-27 (P.Ex. 6).) Sales achieved in excess of the assigned goal resulted in application of an "acceleration" or a multiple up to 3 times the PCR and commission earnings potential well in excess of the $78,000 "OTE" rate. (Fugazy Depo. at 62 (P.Ex. 3); (P.Ex. 10); Jhangiana Depo. at 26-27 (P.Ex. 6).)

     5.     Tracking revenue earned was very complicated at Sun. Domestic sales were tracked directly by a service, indirect sales (through a reseller) were tracked through a process called "PCR," and Passport (i.e., international) sales were tracked through its own process. (Fugazy Depo. at 52 (P.Ex. 3).) Sales figures for Passport could be delayed for up to 3 months from the date of sale. (Fugazy Depo. at 53, 123-24 (P.Ex. 3); Kelley Depo. at 55-56 (P.Ex. 2).) Commissions were "earned" at different times

depending upon the type of sale (e.g., direct, indirect, or Passport). (Fugazy Depo. at 53, 123-24; FY01 Sales Compensation Plan §17 (direct and indirect sales) and §22 (Passport sales) (P.Ex. 11).)

6.     Each sales representative's selling responsibilities were outlined in documents defendant identifies as "Goal Sheets." (Kelley Depo. at 190-204 (P.Ex. 3); D.Ex. I.) Goal Sheets identify both the territories and/or accounts assigned to each sales representative, as well as the annual sales revenue goal that the sales representative must attain in order to achieve his or her commissions. (Kelley Depo. at 40, 50 (P.Ex. 2); Fugazy Depo. at 89 (P.Ex. 3); FY'01 Sales Compensation Plan, Sections 1 & 11 (D.Ex. A).) Though Goal Sheets were individually assigned, plaintiff and Ms. Powers initially shared a combined goal. (Kelley Depo. at 37-38 (P.Ex. 2); P.Ex. 12.) The goal sheets provided they could be changed "upon notice" by defendant, and they were periodically changed by Mr. Fugazy for his team as he added new members. (Fugazy Depo. at 89 (P.Ex. 3).) The Goal Sheets signed by Ms. Kelley were the "contract" that controlled her compensation and unequivocally stated that: "If I were to become separated from Sun, either voluntarily or involuntarily, I shall be paid salary and earned commissions up to my termination date." (Jhangiana Depo. at 41-42 (P.Ex. 6); D.Ex. I "Acknowledgement".)

7.     Shortly after becoming District Sales Manager, Fugazy began hiring young males to his team. Specifically, he hired Jamie Magnum, who was in his early 30s, and a former hockey player/enthusiast like Mr. Fugazy. (Fugazy Depo. at 30, 90, 93, 234-35 (P.Ex. 3); Kozak Depo. at 36-37 (P.Ex. 4).) Mr. Magnum worked in Virginia, not in the Stamford office. (Kozak Depo. at 36-37 (P.Ex. 4).) Thereafter, Mr. Fugazy interviewed and then hired Mr. Kozak, also in his early 30s, and a hockey player, to work as a "Sales Rep A" on the GE account in Stamford. (Fugazy Depo. at 85 (P.Ex. 3); Kozak Depo. at 33-34 (P.Ex. 4).) Mr. Kozak had absolutely no technical sales experience, and his primary prior employment was selling tickets, community programs and corporate partnerships for the New Jersey Devils hockey franchise. (Kozak Depo. at 12-17 (P.Ex. 4).) At one time, Mr. Kozak had pursued a professional hockey career. (Kozak Depo. at 9 (P.Ex. 4).)

15

8.      Ms. Kelley, due to her experience and expertise with General Electric, was appointed the Senior Leader of the sales team in Stamford. (Kelley Depo. at 27-28 (P.Ex. 2); Fugazy Depo. at 96, 103 (P.Ex. 3); Kozak Depo. at 36 (P.Ex. 4).) As the senior account executive on the GE team, she "set the bar" in terms of business planning and organization. (D.Ex. J.) Ms. Kelley hit the ground running. She was accorded a "recoverable draw" the first few months, but by the end of the fourth month of her employment (end of the calendar year), she had achieved 107.78% of her assigned sales goal. (P.Ex. 13 SUN0095.) At this juncture, Mr. Kozak had not yet been hired, and Ms. Kelley and Ms. Powers were still sharing revenue credit on an equal basis.

9.      Defendant would have this Court believe plaintiff was a poor or inadequate performer. In support of this contention, defendant cites to a single memorandum created on February 1, 2001 by Mr. Fugazy, a memorandum indicative of Mr. Fugazy's unwillingness to accord to plaintiff the latitudes he accorded to Mr. Kozak and to Ms. Powers. (Kelley Depo. at 67-74 (P.Ex. 2); D.Ex. L.) This memorandum admonishes plaintiff's attendance issues only. It fails to accord plaintiff the professional attitude she deserved, and is indicative to Mr. Fugazy's overall contempt for plaintiff as a professional older woman.

10.     There are other examples. Mr. Kozak would attend hockey games with Mr. Fugazy to associate "Koz," as Fugazy affectionately called Mr. Kozak, with defendant's clients and other member of defendant's management team. (Fugazy Depo. at 115-116 (P.Ex. 3); Kozak Depo. at 9 (P.Ex. 4); Kelley Depo. at 251 (P.Ex. 2).) In fact, another female subordinate of Fugazy testified that he "favored" Mr. Kozak over plaintiff. (Thomas Depo. at 24 (D.Ex. G).) Conversely, Fugazy would continuously scream at plaintiff, telling her she was weak and insecure and that people who were "insecure" made him "sick to his stomach." (Kelley Depo. at 108, 118, 119 (P.Ex. 2).)

11.     In addition, despite plaintiff's objections, Fugazy would exclude her from meetings in which she should have been involved. (Kelley Depo. at 221-223 (P.Ex. 2).) To underscore his sexist attitude, Fugazy did not support plaintiff when she was requested by GE to run a symposium in

California highlighting successful women in the workplace. (Kelley Depo. at 231-32 (P.Ex. 2).) Instead, he berated plaintiff after that forum she directed and spearheaded for not providing enough drinks to the attendees. (Kelley Depo. at 232, 319 (P.Ex. 2).) Mr. Fugazy in his documenting plaintiff's performance makes no mention of this forum or how happy and pleased GE was with plaintiff's efforts and the symposium. (See P.Ex. 14 email (from GE Capital) indicating how pleased GE Capital was with seminar.) Fugazy testified he was less than enthused with Ms. Kelley taking on this women's event (Fugazy Depo. at 156-60 (P.Ex. 3).) Defendant's brief also makes no mention of the accolades she received from the client.

12.    Despite Fugazy's discriminatory attitude, plaintiff continued to persevere and perform her job in an exemplary fashion. (P.Ex. 15.) Evidence of this good performance abounds and is conveniently ignored by defendant. In November, Mr. Fugazy wrote to plaintiff: "Meg, I want you to know that I think you are doing a great job." (Part of P.Ex. 16).) Other memoranda of praise (collectively P.Ex. 16) include January 9, 2001 ("Good work"), February 18, 2001 ("Looks like Hungary reported. Good Work!"), April 26, 2001 ("Meg: You are doing an excellent job on passport; please keep up the good work"), April 26, 2001 ("Meg: Good work Meg!"), May 22, 2001 ("Good job Meg. Looks like you have $1M of Q4 Opp'y in Japan."), June 14, 2001 ("Meg, good followthrough"), June 28, 2001 ("Meg: Awsome [sic] job! Kudos to you."). (See also "CHRO supplemental affidavit," Complainant's Verified Reply ¶11 dated May 6, 2002 and attachments thereto (P.Ex. 17).)

13.    In May 2001, plaintiff received favorable feedback from others in senior management, including Mr. Scott McNealy, Chief Executive Officer of defendant. (Id.) Mr. McNealy, in awarding plaintiff a stock option, stated that the award was "in recognition of [plaintiff's] contributions to the current and long-term success of Sun..." (See Document No. 0311 (P.Ex. 18).) Then, on or around June 30, 2001, plaintiff's performance review was completed. (P.Ex. 15.) This review included the following statement:

Relative to other employees, you consistently meet and may frequently exceed the requirements of your position. Your performance is what is expected of a well-qualified and experienced person in your position. You may also frequently produce results that are better than required even on the most difficult and complex jobs.

(Id.) Additional areas of strength cited in plaintiff's performance review include: (1) plaintiff's teamwork skills in which her abilities were deemed "substantially greater than" the job requirements; (2) plaintiff's ability to "take responsibility and action to meet deadlines" and; (3) her effectiveness in her key functional area. (Id.)

14.     A simple comparison of plaintiff's review with those of Mr. Kozak and Ms. Powers demonstrates that defendant's posturing and attempt to reflect plaintiff as somehow an inadequate performer is specious. Mr. Fugazy's review of Ms. Kelley (P.Ex. 15), admittedly subjective (Fugazy Depo. at 38-39 (P.Ex. 3)) and never shown nor shared with Ms. Kelley until discovery in this litigation, shows an overall rating on page 1 (i.e., performance against objectives) that *exceeds* either that of Ms. Powers (part of P.Ex. 19) or Mr. Kozak (part of P.Ex. 19). While all three received overall ratings of "2," a line-by-line analysis and comparison shows Ms. Kelley to be on par or better than Ms. Powers or Mr. Kozak in most categories. (Compare Depo. Exs. KK (part of P.Ex. 15), LL and MM (both P.Exs. 19).) At his deposition, Mr. Fugazy could think of no other written review or feedback given to Ms. Kelley except a general "leveling document" applicable to all sales representatives. (Fugazy Depo. at 40 (P.Ex. 3).)

15.     Defendant contends that in June, Mr. Fugazy recommended all three salespersons on his team remain, including Ms. Kelley. Prior to this, Mr. Fugazy had done several "stack rankings." These can be seen at D.Exs. O and P; one is dated April 5, 2001 and it shows both Ms. Powers and Ms. Kelley in the "mid 70%" and was submitted to Mr. Clark, Mr. Fugazy's manager at the time. Mr. Fugazy "forgot" to include Mr. Kozak in this ranking, and the second ranking dated April 9, 2001 includes him *below* Ms. Kelley in the rankings. (Fugazy Depo. at 187-92 (P.Ex. 3).) Another stack ranking (Depo. Ex. PP (D.Ex. W)) was done in July 2001. It, too, shows Mr. Kozak below Ms. Kelley and incorrectly lists

18

Mr. Kozak as a grade "B" salesperson. (Id.) It is unclear when this stacking was created or how it was used.

16.    Mr. Fugazy testified he was directed by his new boss in early July 2001, Mr. David Vogelzang, to reduce his salespeople in Stamford by one headcount. (Fugazy Depo. at 35-36, 50, 182 (P.Ex. 3).) Mr. Vogelzang had never met or worked with Ms. Kelley. (Fugazy at 37 (P.Ex. 3).) On or around Tuesday, July 17, 2001, David Vogelzang, defendant's regional manager, met with each of the district managers, including Fugazy, at defendant's Somerset, New Jersey office to solicit feedback on the performance of the sales representatives in that region. (Fugazy Depo. at 306-308 (P.Ex. 3).) During this meeting, a ranking of sales representatives was performed to select employees to be eliminated. (Fugazy Depo. at 306-313 (P.Ex. 3).) Fugazy testified that although he gave feedback on all sales representatives working under him, he could not recall where anyone fell on the decisive ranking created during that meeting. (Fugazy Depo. at 309-310 (P.Ex. 3).) However, Fugazy was aware that plaintiff "typically" ranked above Mr. Kozak throughout plaintiff's employment. (Fugazy Depo. at 36 (P.Ex. 3).) No records have been produced revealing the ranking results of the meeting, and Mr. Fugazy testified it was done on a "whiteboard." (Fugazy Depo. at 304-06, 310 (P.Ex. 3).)

17.    Despite the fact the defendant's CHRO answer (P.Ex. 20, ¶10 at p.5) lists Mr. Fugazy and Mr. Vogelzang as the decision makers in selecting Ms. Kelley for "redeployment," Mr. Fugazy now claims he was not the one doing the selecting. (Fugazy Depo. at 182 (P.Ex. 3).) Even so, on July 19, 2001, in a memo to Mr. Vogelzang, Fugazy confirmed his selection of plaintiff to be the one member of her three person sales team to be eliminated, in direct contrast to his sworn testimony (Fugazy Depo. at 33, 303 (P.Ex. 3); D.Ex. Y.) In this memo, Fugazy memorializes his discriminatory motive for selecting plaintiff for termination over Ms. Powers[3] and Mr. Kozak, stating that in comparison, Mr. Kozak has a greater long-term future and/or greater "upside potential" than plaintiff. (D.Ex. Y.)

_____

[3] Defendant would later under oath claim that Ms. Powers was not selected for termination because "she was a Senior Sales Representative whose job performance was excellent. Therefore the decision of whose position to eliminate was between [Kozak] and [Plaintiff]." (P.Ex. 20 at p.3.)

18.    In his handwritten notes in which he used techniques from a book "Break all the Rules" to assess the attributes of Ms. Powers, Ms. Kelley and Mr. Kozak, he cites to Ms. Kelley as being, *inter alia*, "mature." (P.Ex. 21 at SUN0997; Fugazy Depo. at 307 (P.Ex. 3).)

19.    The bottom line is that as a result of this meeting, 4 people were selected for termination from Stamford, all elderly and 3 of the 4 being female:

Margaret ("Meg") Kelley
Marla McGrail
Eileen Bianconi
John Omerso

20.    (Fugazy Depo. at 204-05 (P.Ex. 3); Kelley Depo. at 189-90 (P.Ex. 2).) As will be seen, *infra*, all four were eligible for other jobs within Sun, but only Mr. Omerso was offered a job and in the end was able to remain employed at the Stamford office, making all RIF terminations from that office elderly women. (Kelley Depo. at 143 (P.Ex. 2); Fugazy Depo. at 207 (P.Ex. 3).)

21.    In addition, in the age information provided to Ms. Kelley incident to her notification (it was not provided to her until at least July 30 (Kelley Depo. at 265 (P.Ex. 2); P.Exs. 22 and 23), defendant states that as to the sales representatives grades A through E let go, 16 of the 24 (i.e., 75%) were over age 40. (P.Ex. 23 at 0115.) The figures are even worse when limited to those sales representatives in plaintiff's Sales Rep B category, with 11 of 13 sales representatives terminated being age 40 or older (i.e., 85%)! (Id.)

22.    Next, much to plaintiff's surprise, on July 23, 2001, Messrs. Vogelzang and Fugazy informed plaintiff that her position with defendant was being terminated immediately. (P.Ex. 24; Kelley Depo. at 95-96 (P.Ex. 2).) Later plaintiff discovered, contrary to Fugazy's assertions, that she was not to have been told she was being terminated "effective immediately," but rather she should have been told she was to remain an employee with "no change to [her] employment status" until November 18, 2001 at which time she would be terminated if she did not find another position with defendant. (P.Ex. 20 at ¶15; P.Ex. 25; P.Ex. 22); Deborja Depo. at 27 (P.Ex. 5).) Fugazy nevertheless told her she was relieved

of all duties immediately and refused to provide plaintiff with any reason for her termination other than "technical expertise" despite her requests for an explanation. (Kelley Depo. at 96 (P.Ex. 2); Fugazy Depo. at 201 (P.Ex. 3).)

23. Consistent with defendant's "Anti-Discrimination and Harassment" policy, plaintiff complained to Fugazy that she had been unlawfully selected for termination. (P.Ex. 20; Kelley Depo. at 118-121 (P.Ex. 2); Deborja Depo. at 18-19 (P.Ex. 5); Fugazy Depo. at 203 (P.Ex. 3).) Plaintiff complained of the "boys' club" atmosphere Fugazy had created at the workplace. (Kelley Depo. at 118-121 (P.Ex. 2); Deborja Depo. at 18-19 (P.Ex. 5); Fugazy Depo. at 203 (P.Ex. 3).) Specifically, plaintiff derisively stated she "should have learned to play hockey," meaning if only she had been one of the "young guys," she would not have been terminated. (Kelley Depo. at 119-121 (P.Ex. 2); Fugazy Depo. at 203 (P.Ex. 3).) She further complained that she, not Kozak, was the better qualified sales representative. (Kelley Depo. at 31-33 (D.Ex. OO).)

24. Fugazy immediately retaliated against plaintiff by intimidating and threatening plaintiff if she complained to others, daring her to "take this further" to "just push" to "just try." (Kelley Depo. at 119-121, 248 (P.Ex. 2); Fugazy Depo. at 203 (P.Ex. 3).) Fugazy even went so far as to unlawfully denigrate plaintiff's stature as an older woman when snickering with a colleague, uttering crass comments regarding plaintiff's age and womanliness. (Kelley Depo. at 112-113 (P.Ex. 2).)

25. Plaintiff contacted defendant's Human Resources Department and complained. (Kelley Depo. at 119-121 (P.Ex. 2); Deborja Depo. at 18-19 (P.Ex. 5); Fugazy Depo. at 203 (P.Ex. 3).) Specifically, plaintiff informed defendant's Human Resources personnel of her complaints of favoritism by Fugazy and after complaining, of his threats. (Kelley Depo. at 119-121 (P.Ex. 2); Deborja Depo. at 18-19 (P.Ex. 5).) Defendant contends this was not a claim of age or sex discrimination, citing plaintiff's testimony that she did not utter those specific words. However, there is no doubt defendant knew plaintiff was alleging unlawful discrimination and retaliation in a series of emails to defendant's Human Resources Department. Ms. Cheryl Deborja testified she used the complaint procedure in place by

defendant when reviewing plaintiff's complaints. (DeBorja Depo. at 11 (P.Ex. 5).) This procedure (P.Ex. 20) applies to complaints of discrimination. Steve Fugazy said he contacted Human Resources immediately upon Ms. Kelley's complaint. (Fugazy Depo. at 176-77 (P.Ex. 3).) Kelly Marazas, Ms. Deborja's boss, knew of the seriousness of the allegations and so testified. (Deborja Depo. at 25-27 (P.Ex. 5).)

26     Despite plaintiff's complaints of unlawful discrimination and Human Resources' acknowledgment of same, defendant made no attempt to fully investigate, let alone apply corrective measures, as it was obligated to do. (Deborja Depo. at 17, 19, 20, 36, 39-40, 42-43, 46-47, 58, 60-65 (P.Ex. 5); Marazas Depo. at 16-17, 21, 25, 27-29, 33, 38 (P.Ex. 7); compilation of emails (P.Ex. 26).) Kelly Marazas, who at the time in question was the head of defendant's Human Resources Department, so testified. (Marazas Depo. at 38-39 (P.Ex. 7).)[4]

27     Despite Ms. Marazas' admission that she did not look into the propriety of plaintiff's selection for termination, she nevertheless provides plaintiff with a rationale for her termination that is in stark contrast to the two different reviews provided by Fugazy. (Kelley Depo. at 101 (P.Ex. 2); D.Ex. Y; P.Ex. 34.) Plaintiff was told by Ms. Marazas that the criteria for selection for termination of sales representatives were based on: (1) the account the sales representatives were working on, (2) the physical location of the sales representatives with regard to the account, (3) the needs of the account, (4) the performance of the sales representative; and (5) the skills of the sales representatives. (Kelley Depo. at 101 (P.Ex. 2).) This is consistent with a written memorandum circulated by Ms. Marazas incident to the RIF. ( P.Ex. 34.) There is no evidence that defendant applied this criteria. (Id.) Indeed, if defendant had applied this criterion, plaintiff would prove to be superior to the other sales representatives in her department. (See "CHRO Supplemental Affidavit" (P.Ex. 17) at ¶11.)

---

[4] Ms. Marazas said she deferred everything but the commission payment issue to her subordinate, Ms. Deborja (Marazas Depo. at 50-52 (P.Ex. 7).) Ms. Deborja, however, said she did no investigation except as to her complaint Mr Fugazy provided a "bad reference" for her. (Deborja Depo at 24 (P Ex. 5).)

28.    Moreover, documents and rankings such as those performed on April 5, 2001 and April 9, 2001 to which Fugazy cites in his testimony and in a July 19 memorandum (D.Ex. Y) wherein he *after the fact* is trying to justify plaintiff's selection "for redeployment" as reasons for plaintiff's selection for discharge were inconsistent with his characterizations of same and apparently never considered in defendant's deliberations regarding same. ( P Ex. 34); Fugazy Depo. at 305-306, 310, 313-314, 316-317 (P.Ex. 3).) Nor were any figures as to sales quotas achieved by Ms. Kelley, Ms. Powers or Mr Kozak. (Fugazy Depo. at 170-72 (P Ex. 3).)

29.    Then, to add insult to injury, around the time plaintiff was removed from the General Electric account because of the so-called "necessary" RIF, defendant transferred at least three male sales representatives to report to Fugazy and service the General Electric account. (Fugazy Depo. at 31, 32 (P.Ex. 3).)

30.    Defendant's Human Resources Department instructed Fugazy not to have any direct contact with plaintiff because of her complaints. (Fugazy Depo. at 176-177 (P.Ex. 3).) In further contempt and retaliation for plaintiff's complaints, Fugazy instructed his employees to do the same as to any official GE business. (Id.; Kozak Depo. at 61 (P.Ex. 4).) The retaliatory actions of defendant escalated, with Fugazy and defendant's Human Resources Department continuing to act in concert in their campaign to unlawfully oust plaintiff. Indeed, plaintiff's desk was moved to place her in isolation. (Kelley Depo. at 35 [Day 3, redirect] (D.Ex. OO).)

31.    After plaintiff complained to both Fugazy and defendant's Human Resources personnel, plaintiff applied for another sales position within defendant's corporation consistent with her "redeployment" status. (Kelley Depo. at 140 (P.Ex. 2); Fugazy Depo. at 205-206 (P.Ex. 3).) Plaintiff was clearly qualified for the position. (Kelley Depo. at 139-144 (P.Ex. 2); Affidavit of Geoffrey Cooke (P Ex. 1).) More importantly, it was apparent that the position was to be filled by plaintiff subject only to a recommendation from Fugazy. (Id.; Kelley Depo. at 140-144 (P.Ex. 2); P.Ex. 25).) However, Fugazy not only unlawfully sabotaged plaintiff's employment opportunities with regard to the aforementioned

sales positions, but also refused to recommend plaintiff for *any* position. (Kelley Depo. at 140-141, 143-144 (P.Ex. 2); Fugazy Depo. at 205-206 (P.Ex. 3).)

32.    Not surprisingly, plaintiff did not receive the aforementioned sales position[5] or any position she interviewed for within defendant's company. (Fugazy Depo. at 206 (P.Ex. 3); Depo Ex. BBB (part of P.Ex. 26).)

33.    Finally, defendant unlawfully withheld, and even retroactively removed, plaintiff's earned commission despite her complaints for payment and a clear lack of policy supporting its actions. (D.Ex. II; D Ex. I; FY '01 Sales Compensation Plan discussed *infra* §VI.)

34.    As mentioned above, defendant's policy states in pertinent part that if plaintiff "were to become separated from [defendant], either voluntarily or involuntarily, [plaintiff] shall be paid salary and earned commissions up to [her] termination date." (D.Ex. I "Acknowledgement".) Nevertheless, plaintiff, who worked diligently up to her notification on July 23, 2001, was first told, retroactively, she would receive no commissions on any item shipped after July 23, 2001. (P.Ex. 24.) Then plaintiff was told she would receive no commissions on any item shipped after July 1, 2001 (P.Ex. 27.) Instead, plaintiff was told when she eventually got a response as to why the commission payments were being reversed, that she would be paid OTE payments instead of the higher PCR multiples for sales in excess of 100%. (P.Ex. 24.)

35.    Eventually she was credited with only $12 million in revenue instead of the $17 million Fugazy had anticipated crediting her prior to notifying plaintiff of her termination. (Fugazy Depo. at 291-295 (P.Ex. 3).)

36.    Testimony of defendant's "commission expert" yielded no coherent explanation for why plaintiff was treated this way, nor why her W-2 does not match at least three other year-end payment

---

[5] Despite the clear indication that Fugazy did not provide Mr. McDonough with a positive recommendation, as testified to by Fugazy himself, defendant, in an attempt to thwart plaintiff's claims of discrimination and retaliation, provides an affidavit from Mr. McDonough that is inconsistent with Fugazy's testimony. Simply stated, Fugazy testified that "[plaintiff] obviously wasn't familiar with the job in question," but Mr. McDonough in his sworn affidavit states that "Fugazy informed [him] that [Plaintiff] was a good sales representative...". (McDonough Aff. (D.Ex. FF).)

calculations. (Jhangiani Depo. at 49-61 (P.Ex. 6).) Nor could that witness cite to any provisions applicable to plaintiff in the sales compensation plan to explain the course of action it took *for the first time*, with plaintiff. (Id. at 49-61, 78-79 (P.Ex. 6); P.Exs. 28 and 25.) In fact, defendant's documents indicate plaintiff's position was not eliminated *until* August 20, 2001, despite the fact she received no commissions post-July 1, 2001. (P.Exs. 29 and 24.)

37.    Upon learning of defendant's conduct, plaintiff demanded payment. Defendant continues, without support, to assert that employees who were "pre-notified" of their impending termination were no longer eligible to receive commissions because they no longer had executed Goal Sheets. (P.Ex. 24.) However, Mr. Kozak testified that although he did not have an executed Goal Sheet, he was still eligible to receive commissions, but it was uncertain when he would be paid those commissions. (Kozak Depo. at 63-65 (P.Ex. 4).)

38.    Plaintiff's complaints were to no avail. (Depo. Exs. BBB & FFF (both part of P.Ex. 26); D.Ex. II). Defendant, attempting to skirt the main issue in its brief, addresses only 13 instances of nonpayment to plaintiff between July 1 and July 23 which plaintiff was able to identify from her notes, a mere tip of the iceberg, and justifies nonpayment of any commissions with the insupportable claim it was "policy" that no commissions be paid on items shipped post-July 1, 2001. Despite the fact defendant's payment policy has no such limitation, and applicable law requiring payment of commissions earned precludes a retroactive take-back of commissions, defendant refuses to pay plaintiff what she earned.

By _____

Scott R. Lucas (ct00517)
*Attorney for Plaintiff*
MARTIN, LUCAS & CHIOFFI, LLP
177 Broad Street
Stamford, CT 06901
Phone: (203) 973-5200
Fax: (203) 973-5250
slucas@mlc-law.com

### CERTIFICATE OF SERVICE

This is to certify that on this 30th day of August, 2005, a copy of the foregoing was mailed, first

class, postage prepaid, to:


Marc L. Zaken, Esq.
John G. Stretton, Esq.
Edwards & Angell, LLC
Three Stamford Plaza
301 Tresser Boulevard, 13th Floor
Stamford, CT 06901
Phone: (203) 975-7505
Fax: (203) 975-7180
mzaken@EdwardsAngell.com
jstretton@EdwardsAngell.com

Scott R. Lucas