UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

MARGARET MARY KELLEY,               :
                                    :
        Plaintiff,                  :
                                    :
v.                                  :      No. 3:03CV00057(DJS)
                                    :
SUN MICROSYSTEMS, INC.,             :
                                    :
        Defendant.                  :

## MEMORANDUM OF DECISION AND ORDER

The Plaintiff, Margaret Mary Kelley ("Kelley"), brings this action against the Defendant, Sun Microsystems, Inc. ("Sun"), alleging that Sun discriminated and retaliated against her on the basis of her sex and age in violation of Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991, 42 U.S.C. §§ 2000e et seq. (First and Fourth Counts), the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621 et seq. (Second and Fifth Counts), and the Connecticut Fair Employment Practices Act ("CFEPA"), Conn. Gen. Stat. §§ 46a-60 et seq. (Third and Sixth Counts). Kelley also alleges that Sun has violated Connecticut's wage collection statute, Conn. Gen. Stat. § 31-72 (Seventh Count), and that Sun, by failing to properly compensate Kelley, was unjustly enriched to Kelley's detriment (Eighth Count). Now pending is Sun's motion for summary judgment **(dkt. # 74)**. For the reasons stated herein, Sun's motion for summary judgment **(dkt. # 74) is GRANTED in part** and **DENIED in part**.

# I. FACTS

On September 18, 2000, Sun, a technology company that is in the business of, inter alia, selling hardware, software, and consulting services, hired Kelley as a "Sales Representative B"[1] in its Stamford, Connecticut office.  Kelley was fifty years old when Sun hired her.  Prior to her employment with Sun, Kelley worked for more than fourteen years with IBM (or its predecessors in interest) selling hardware and software products.

Bruce Likly ("Likly") was the manager at Sun who interviewed Kelley.  At the time of Kelley's interview, Likly had two sales representatives at the Stamford office who reported to him, Steven Fugazy ("Fugazy") and Kristen Powers ("Powers").  Subsequent to Kelley's interview, Likly was promoted and Fugazy assumed Likly's former position.  After taking on his new role, Fugazy then promoted Powers to "Sales Representative B" and extended the offer to Kelley to work at Sun.

When she began her employment with Sun, Kelley's immediate sales team comprised of Kelley and Powers, who was thirty-three years old at the time.  Kelley's team reported to Fugazy.  At Sun, Kelley tended to sales for certain General Electric ("GE") accounts.  Specifically, Kelley was responsible for sales to GE

---

[1] Sales representatives at Sun are classified by letters ranging from "A" to "E," with "A" representing the lowest ranked classification and "E" representing the highest ranked classification.  A sales representative's classification depends upon the characteristics of her assignment, and her skill and experience level.

-2-

Capital and GE Supply.  In addition, Kelley was responsible for international sales to GE, known as "Passport" sales.  Kelley's duties at Sun included generating sales, communicating Sun's strategy and product information to certain accounts, reporting her findings to management, and developing client relationships.

Each sales representative's selling responsibilities were outlined in documents known as "Goal Sheets."  Goal Sheets identify the territories and accounts assigned to sales representatives.  Goal Sheets also set forth the sales revenue goals for sales representatives, which affects their compensation.  With regard to Kelley's compensation, Sun provided a salary, a commission based on sales, benefits, and a car allowance.  Kelley received an annual salary of $52,000.00 and a commission based upon her "personal commission rate."  This rate was calculated by dividing the potential commission she could earn if she reached 100% the revenue sales goal assigned to her by Fugazy.  In Kelley's case, she could earn, if she reached her goal, an annual commission totaling $78,000.00.  Her combined salary and commission constituted a figure known as "on target earnings," which for Kelley totaled $130,000.00.  Any sales achieved in excess of Kelley's goal resulted in Kelley receiving earnings beyond the $78,000.00 rate.

Although Sun individually assigns Goal Sheets, Kelley and Powers initially shared a combined sales goal, and they shared

-3-

revenue credit on an equal basis.  Nevertheless, when Kelley
began working at Sun, Fugazy informed her that she would be the
Senior Account Executive on his GE team.  (See dkt. # 77, Ex. J.)
Fugazy expected Kelley, as the Senior Account Executive, to "lead
by example" and "set the bar" for business planning and
organization.  (See id.)

On January 2, 2001, Fugazy hired Michael Kozak ("Kozak"),
who was in his early 30s, as a "Sales Representative A" for Sun's
GE team in Stamford, thus giving Sun three sales representatives
servicing the GE account from the Stamford office.[2]  When Kozak
began working at Sun, he did not immediately combine his sales
goal and revenue credit with Kelley and Powers.  He initially
worked on his own toward achieving his individual sales goal.  On
April 2, 2001, however, Kozak began sharing his sales goal and
revenue credit with Kelley and Powers.  Kelley notes that, prior
to being hired by Fugazy, Kozak had no technical sales
experience.  Kelley also points out that Fugazy is a hockey
player and enthusiast, and that Kozak is also a hockey player and
enthusiast.

Sun claims that, after her employment began, Kelley had
"performance issues" with regard to her work.  Sun alleges that
Kelley had either missed, or arrived late to, scheduled meetings.

---

[2]Kelley further notes that Fugazy hired Jamie Magnum ("Magnum"), who was
in his 30s, to work at a Sun office located in Virginia, and that Magnum was a
hockey player and enthusiast.

To support this allegation, Sun points to a memorandum from
Fugazy to Kelley, dated February 1, 2001, in which Fugazy
expressed his concerns about Kelley's alleged "tardiness" and
"inconsistent communication" to her teammates.  (See id., Ex. L.)
Sun also claims that Kelley's industry knowledge was not always
sufficient, pointing to Kelley's deposition testimony in which
she recalled an incident where Fugazy expressed surprise that
Kelley was not familiar with a particular piece of industry
knowledge.  (See id., Ex. B, Kelley Dep. at 65:7-14.)

In April of 2001, Fugazy rated the performance of the sales
representatives under his supervision, providing a "stack rank"
for those sales representatives.  (See id., Ex. P.)  In Fugazy's
report, Kelley, Powers, and Kozak were all placed in the middle
70% with regard to their performance.  (See id.)  This report
also contained Fugazy's scoring of these sales representatives
for the categories of "Achieve-Results" (which apparently means
"Achievements/Results Against Goals"), "Fct-Tech Cont" (which
apparently means "Functional/Technical Contribution"), and
"Competencies (cum)" (which apparently was a cumulative score).
According the Sun, these scores were on a scale of "1" to "5,"
with a "5" representing a problem area and a "1" representing a
strength.  For "Achieve-Results," Kelley received a "3," while
Powers received a "2" and Kozak received a "4."  For "Fct-Tech
Cont," Kelley received a "4," while Powers received a "3" and

Kozak received a "3." For "Competencies (cum)," Kelley received a cumulative score of "22," while Powers and Kozak each received cumulative scores of "15."[3] Based upon Fugazy's scores, Sun's regional director ranked the sales representatives in his region, and Kelley ranked 33rd out of 37 sales representatives.

For her part, Kelley performed a self-assessment, in which she filled out a "Skills Assessment" form wherein she ranked her skills in a variety of categories. (See id., Ex. R.) Sun points out that, in the "Market Knowledge," "Technical Proficiency," and "Consultative Selling" categories, Kelley's self assessment appears to be the same as Fugazy's assessment of Kelley. Nevertheless, there are other categories in which Fugazy seems to have scored Kelley lower than she scored herself.[4]

Sun states that in July 2001, its district managers were again asked to rank the sales representatives. In that ranking, Kelley, Powers, and Kozak all received a "Initial Rating" of "2." According to Sun, although all three ranked in the middle 70%,

---

[3]According to Sun, a score for the "Competencies (cum)" category was based upon a combination of six subcategories as seen in the "Performance Criteria Tool-Individual Contributors" evaluations done by Fugazy. (See dkt. # 77, Ex. N.) Those six subcategories were also scored on the "1" to "5" scale used in Fugazy's "stack ranking."

[4]In its Rule 56(a)(1) statement, Sun states Kelley completed the self-assessment "at the end of April 2001" (see dkt. # 75 ¶ 12), which Kelley denies in her Rule 56(a)(2) statement, stating that the self-assessment "was executed by [Kelley] prior to her commencing work with [Sun], and not 'completed' at the end of April 2001 . . . ." (see dkt. # 86 ¶ 12). It is not clear when Kelley filled out the self-assessment. The self-assessment has two dates written upon it, "4/30/01" and "5/15/00." (See dkt. # 77, Ex. R.) In addition, Kelley has testified that neither date is the "correct" one, and that she is not sure when she completed the self-assessment. (See dkt. # 85, Ex. 2, Kelley Depo. at 179-81.)

-6-

Kelley was in the "bottom half" of the ranked employees.

According to Sun, 2001 "was a difficult year for many industries, especially the technology industry."  Sun contends that, as a result of the difficulties it was facing, it was forced to implement a company-wide reduction in force ("RIF"). Sun states that it wished to reduce its workforce by nine percent.  Fugazy apparently participated in an "RIF meeting" with his regional manager to discuss the performance of his sales representatives.  During that meeting, Fugazy provided his feedback on the sales representatives, a "regional stack ranking" was made of the sales representatives, and Kelley's name apparently fell near the bottom of the list.

Soon thereafter, Fugazy was notified that Kelley would be terminated, and he was asked to "memorialize" the reasons supporting the decision to terminate Kelley's employment.  Fugazy wrote a memorandum, dated July 19, 2001, which stated the following:

> Given Sun's requirement to reduce headcount, in addition to the geographic coverage demands of GE, I believe it is appropriate to reduce Stamford's headcount by one. . . .
>
> Kelley fell in the bottom half of my SR's [sic] throughout the year. . . .
>
> Although Mike Kozak is also in the bottom half of our sales stack rankings, his learning curve has been noticeably more rapid during his 6 months at Sun.
>
> [Kelley] has failed to gain professional respect of her sales and & [sic] systems peers.  This was due to her

> sub-standard Industry/product Knowledge coupled with
> what was at times "erratic behavior". [sic] . . .
> [Kelley] has made progress on the above shortcomings,
> but this progress has been slow.
>
> In contrast, Mike Kozak has rapidly gained
> product/industry knowledge during his first six months
> with Sun. . . .
>
> It is my judgment that [Kozak] has clearly demonstrated
> greater upside potential to benefit Sun.

(Id., Ex. Y.)

On July 23, 2001, Kelley was notified that she had been selected for termination. According to Kelley, she was told that she was being terminated immediately. Kelley maintains that she discovered afterward that her termination was not immediate; rather, there would be no change to her employment status until November 18, 2001, at which time she would be terminated if she did not find another position with Sun.

Kelley claims that, subsequent to the July 23, 2001 notification, she complained to Fugazy that she was wrongfully selected for termination. According to Kelley, she told Fugazy that he had created a "boys' club" atmosphere at the workplace. Kelley alleges that she made complaints specifically regarding Fugazy's alleged biased towards "young guys," especially those who play hockey. Kelley further alleges that she told Fugazy that she was a better qualified sales representative than Kozak.

Kelley maintains that, in response to her complaints, Fugazy immediately retaliated against her by intimidating and

-8-

threatening her if she complained to others, daring her to "take this further," to "just push," and "just try."  Kelley also maintains that Fugazy denigrated her status as an older woman when he once saw Kelley applying hand cream.

Kelley then apparently went to Sun's Human Resources Department ("HR"), where she made complaints of Fugazy's alleged favoritism and his threats.  Sun asserts that Kelley's complaints to HR were not age or sex discrimination complaints; Kelley responds that Sun undoubtedly knew she was alleging unlawful discrimination, as Sun's HR representative used Sun's procedure for complaints of discrimination, and instructed Fugazy not to have direct contact with Kelley.  Kelley maintains that, despite her complaints to HR, Sun made no attempt to fully investigate the situation.  Rather, Kelley claims that the head of HR provided Kelley with a rationale for Kelley's termination that was in contrast to the rationale provided by Fugazy.

Kelley alleges that, after HR instructed Fugazy to not have direct contact with Kelley, he further retaliated against her by instructing those employees under his supervision that they were not to have any contact with Kelley with regard to any official GE business.  Additionally, Kelley claims that her desk was moved "to place her in isolation."  Furthermore, after the July 23, 2001 notification, Kelley was permitted to search for other positions within Sun; however, according to Kelley, Fugazy

"sabotaged" her employment opportunities and refused to recommend her for any position within Sun.  Finally, Kelley claims that Sun unlawfully withheld, and retroactively removed, her earned commission, despite her complaints for payment.  As a result of not obtaining a new position at Sun, Kelley's employment with Sun officially terminated on November 18, 2001.

## II. DISCUSSION

Kelley alleges that Sun discriminated and retaliated against her on the basis of her sex and age in violation of Title VII, the ADEA, and CFEPA.  Kelley also alleges that Sun has violated Connecticut's wage collection statute and that Sun, by failing to properly compensate Kelley, was unjustly enriched to Kelley's detriment.  Sun maintains that all of Kelley's claims fail as a matter of law.

### A. SUMMARY JUDGMENT STANDARD

A motion for summary judgment may be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).

Summary judgment is appropriate if, after discovery, the nonmoving party "has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has

the burden of proof." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986). "The burden is on the moving party 'to demonstrate the absence of any material factual issue genuinely in dispute.'" <u>Am. Int'l Group, Inc. v. London Am. Int'l Corp.</u>, 664 F.2d 348, 351 (2d Cir. 1981) (quoting <u>Heyman v. Commerce & Indus. Ins. Co.</u>, 524 F.2d 1317, 1319-20 (2d Cir. 1975)).

A dispute concerning a material fact is genuine "'if evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" <u>Aldrich v. Randolph Cent. Sch. Dist.</u>, 963 F.2d 520, 523 (2d Cir. 1992) (quoting <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986)). The Court must view all inferences and ambiguities in a light most favorable to the nonmoving party. <u>See</u> <u>Bryant v. Maffucci</u>, 923 F.2d 979, 982 (2d Cir. 1991). "Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper." <u>Id.</u>

## B. SEX DISCRIMINATION

Kelley has brought her sex discrimination claims pursuant to Title VII and CFEPA. Title VII of the Civil Rights Act of 1964 directs that it is "unlawful for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of the individual's race, color, religion, sex or national origin." 42 U.S.C. § 2000e-2(a)(1). Kelley alleges that she was discriminated against because of her sex.

-11-

Title VII discrimination claims are analyzed using the
familiar burden-shifting framework set forth by the Supreme Court
in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973).  The
Second Circuit has described the applicable legal standard for
the evaluation of Title VII claims as follows:

> At the outset, a plaintiff can avoid dismissal by
> presenting the "minimal" prima facie case defined by
> the Supreme Court in <u>McDonnell Douglas</u>. This requires
> no evidence of discrimination.  It is satisfied by a
> showing of membership in a protected class,
> qualification for the position, an adverse employment
> action, and preference for a person not of the
> protected class. . . .  By making out this "minimal"
> prima facie case, even without evidence of
> discrimination, the plaintiff creates a presumption
> that the employer unlawfully discriminated, . . . and
> thus places the burden of production on the employer to
> proffer a nondiscriminatory reason for its action.
> . . .
>     On the other hand, once the employer articulates a
> non-discriminatory reason for its actions, . . . the
> presumption completely drops out of the picture. . . .
> The ultimate burden of persuading the trier of fact
> that the defendant intentionally discriminated . . .
> remains at all times with the plaintiff. . . .  Thus,
> once the employer has proffered its nondiscriminatory
> reason, the employer will be entitled to summary
> judgment (or to the overturning of a plaintiff's
> verdict) unless the plaintiff can point to evidence
> that reasonably supports a finding of prohibited
> discrimination.

<u>James v. N. Y. Racing Ass'n</u>, 233 F.3d 149, 153-54 (2d Cir. 2000)
(internal quotations marks and citations omitted).

With regard to Kelley's <u>prima</u> <u>facie</u> case, there is no
dispute that Kelley is in a protected class, she was qualified
for her position, she suffered an adverse employment action
(i.e., her termination), and that a preference for a person not

-12-

of the protected class was shown.  Sun, however, argues that,
because Kozak was a "Sales Representative A" and Kelley was a
"Sales Representative B," they were not "similarly situated" for
Title VII purposes.  Thus, according to Sun, any comparison
between Kozak and Kelley is insufficient to support Kelley's
prima facie case.

     Sun is correct when it states that Kelley must show that she
was treated differently from "similarly situated" men.  See
Shumway v. United Parcel Serv., Inc., 118 F.3d 60, 64 (2d Cir.
1997) ("To establish the fourth element of a prima facie [Title
VII] case, [a plaintiff] must show that she was treated
differently from 'similarly situated' males.")  Nevertheless, the
court finds fault with Sun's argument.  "When considering whether
a plaintiff has raised an inference of discrimination by showing
that she was subjected to disparate treatment, we have said that
the plaintiff must show she was 'similarly situated in all
material respects' to the individuals with whom she seeks to
compare herself."  Graham v. Long Island R.R., 230 F.3d 34, 39
(2d Cir. 2000).  "[T]o satisfy [the] 'all material respects'
standard for being similarly situated, a plaintiff must show that
her co-employees were subject to the same performance evaluation
and discipline standards."  Id. at 40.

     Here, although they had different titles, both Kelley and
Kozak shared their sales goals and revenue credits, indicating

that their jobs were, in essence, the same.  In addition, Kelley and Kozak, both under Fugazy's supervision, were ranked against each other.  Indeed, Sun consistently makes the argument that the decision to retain Kozak instead of Kelley was based upon their performance, which would mean that Kelley and Kozak were competing for the same job.  It is Sun that treated Kelley and Kozak as "similarly situated" employees.  Therefore, the court finds that Kelley has met the minimal burden of establishing a prima facie case.  See Williams v. R.H. Donnelley, Corp., 368 F.3d 123, 126 (2d Cir. 2004) ("[a] plaintiff's burden of establishing a prima facie case is de minimis").

The burden then shifts to Sun to articulate a legitimate, non-discriminatory reason for the adverse employment action. "This burden is one of production, not persuasion; it can involve no credibility assessment."  Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 142 (2000) (internal quotation marks omitted).  Sun has articulated such a reason, i.e., its RIF.

Because Sun has articulated non-discriminatory reasons for its conduct, "the McDonnell Douglas framework--with its presumptions and burdens--disappear[s], . . . and the sole remaining issue [is] discrimination vel non . . . ."  Id. at 142-43 (internal citations and quotation marks omitted).  That is, Kelley now must point to evidence that reasonably supports a finding of prohibited discrimination, i.e., that Sun's proffered

non-discriminatory reasons are merely pretext for wrongful
discrimination.

The court believes that Kelley has provided evidence to
demonstrate pretext and preclude summary judgment.  The court
does not doubt that Sun could have had legitimate business
reasons for implementing its RIF.  Nevertheless, whether Sun had
legitimate reasons for an RIF is not dispositive here.  The
question is whether Kelley was selected for termination during
the RIF based upon information that was the result of wrongful
discrimination.

The court believes that a reasonable finder of fact could
conclude that Fugazy's conduct constituted sex discrimination.
It appears that Fugazy's performance rankings for Kelley and
Kozak were roughly the same, i.e., in the middle 70%, yet Kelley,
not Kozak, was selected for termination.  Sun asserts that it is
irrelevant whether Kelley considered herself a "top performer" or
whether she met her sales goals.  According to Sun, what is
relevant is that Fugazy did not consider Kelley a "top
performer."  The court agrees that Kelley's perception of herself
as a "top performer" is not particularly relevant, as an employee
could delude herself with regard to her own performance.  But
Fugazy's perception of Kelley (which, as Sun points out, is
relevant) can nevertheless be based upon discriminatory feelings.
In the court's view, a reasonable jury could find it relevant

-15-

that Kelley appears to have met her sales goals, or exceeded her targeted revenue sales goals, yet was selected for termination over a man whose "stack ranking" was in the same percentile as hers.

In addition, Kelley has submitted deposition testimony that a jury may find relevant to her sex discrimination claims. For example, Kelley has testified about incidents where Fugazy yelled and screamed at her, telling Kelley that her insecurity "made him sick to the stomach." (See dkt. # 85, Ex. 2, Kelley Depo. at 108, 118-19.) There is also deposition testimony from Denise Thomas ("Thomas"), a Sun employee who had some contact with Fugazy, indicating that Fugazy treated certain female Sun employees in a condescending or unprofessional manner. Although Thomas testified that she did not believe that Fugazy favored men over women, she did testify that: (1) she had seen Fugazy raise his voice to Kelley; (2) Kelley had told Thomas that Fugazy belittled her and treated her unfairly and rudely; (3) Fugazy at times treated Thomas in an "unprofessional manner"; (4) Fugazy was "condescending" towards another female Sun employee named Jackie Davis. (See dkt. # 77, Ex. G, Thomas Depo. at 22-24.)

Furthermore, a reasonable finder of fact could conclude that the remark made during the incident involving hand cream shows discriminatory animus. According to Kelley, the incident went as follows:

-16-

```
Q.    This incident regarding the hand cream?
A.    Right.
Q.    Who was there?
A.    It was Steve Fugazy and Jay Seaman. . . .
Q.    Where were you exactly?
A.    At a conference table.
Q.    And where was Steve Fugazy?
A.    At the same table.
Q.    And where was Jay Seaman?
A.    At the same table.
Q.    And you pulled out some hand cream?
A.    (The witness nodded her head).
Q.    You have to answer audibly?
A.    Yes.
Q.    And who said what exactly?
A.    I was putting hand cream on and I went like this, I
      said oh, I'm so dry.  And one of them, I don't know
      which one-I was very upset having to go into this
      meeting, and one of them said something like oh, that's
      not all that's dry around here or dried up around here.
      Something like that.  And they laughed together.
```

(Dkt. # 85, Ex. 2, Kelley Depo. at 112:10-113:6.)

In the court's view, a jury could find that this remark, and the subsequent laughter, demonstrate a discriminatory atmosphere towards women.  Additionally, the court believes that the remark and the laughter constitute more than "stray remarks," as described by the Second Circuit.  By describing remarks as "stray," the Second Circuit's purpose "was to recognize that all comments pertaining to a protected class are not equally probative of discrimination and to explain in generalized terms why the evidence in the particular case was not sufficient." Tomassi v. Insignia Fin. Group, Inc., 478 F.3d 111, 115-16 (2d Cir. 2006).  Thus, "remarks made by someone other than the person who made the decision adversely affecting the plaintiff may have

little tendency to show that the decision-maker was motivated by the discriminatory sentiment expressed in the remark." Id. at 115.  On the other hand, "[t]he more a remark evinces a discriminatory state of mind, and the closer the remark's relation to the allegedly discriminatory behavior, the more probative that remark will be." Id.  Here there is evidence that Fugazy, who was Kelley's supervisor, was involved with a comment that potentially evidences a discriminatory state of mind with regard to sex.  Kelley asserts that this incident occurred around the time of her termination.  The court finds that this incident, coupled with the other evidence submitted by Kelley, precludes summary judgment.  Consequently, with regard to Kelley's Title VII sex discrimination claim, Sun's motion for summary judgment **(dkt. # 74)** is **DENIED**.

Kelley also brings a CFEPA sex discrimination claim.  CFEPA directs that "[i]t shall be a discriminatory practice in violation of this section[] [f]or an employer[] . . . to discharge from employment any individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment because of the individual's . . . sex . . . ."  Conn. Gen. Stat. § 46a-60(a)(1).  "The Connecticut Supreme Court looks to federal precedent when interpreting and enforcing the CFEPA." Williams v. Quebecor World Infiniti Graphics, 456 F. Supp. 2d 372, 383 (D. Conn. 2006) (citing Levy

-18-

v. Comm'n of Human Rights and Opportunities, 236 Conn. 96, 103
(1996) ("Although this case is based solely on Connecticut law,
we review federal precedent concerning employment discrimination
for guidance in enforcing our own anti-discrimination
statutes.")); see Vasquez v. Claire's Accessories, Inc., 392 F.
Supp. 2d 342, 349 (D. Conn. 2005) ("CFEPA claims are analyzed in
the same manner as Title VII employment discrimination claims.").

      Because Kelley's CFEPA sex discrimination claim is analyzed
in the same manner as her Title VII sex discrimination claim, the
court need not go into further detail here.  The court has
already analyzed Kelley's Title VII sex discrimination claim and
found that it survives summary judgment.  Therefore, Kelley's
CFEPA sex discrimination claim also survives summary judgment.
Consequently, with regard to Kelley's CFEPA sex discrimination
claim, Sun's motion for summary judgment **(dkt. # 74)** is **DENIED**.[5]

                       C. AGE DISCRIMINATION

      The ADEA provides that "[i]t shall be unlawful for an
employer . . . to discharge or otherwise discriminate against any

---

[5]The court is not convinced by Sun's argument that Kelley's state law
discrimination claims are time-barred.  Kelley was required to file a
complaint with the Connecticut Commission on Human Rights and Opportunities
("CHRO") within 180 days of the alleged discriminatory action.  Conn. Gen.
Stat. § 46(a)-82(f).  Kelley's CHRO complaint was filed on February 15, 2002;
thus, the alleged discriminatory action must have occurred on or after August
19, 2001.  Both parties have represented that Kelley's "official" termination
occurred on November 18, 2001.  Although some of the conduct in this case may
have occurred prior to August 19, 2007, Kelley is not barred "from using the
prior acts as background evidence to support a timely claim."  Nat'l R.R.
Passenger Corp. v. Morgan, 536 U.S. 101, 102 (2002); see United Techs. Corp.
v. Comm'n on Human Rights & Opportunities, 72 Conn. App. 212, 230 (2002)
(applying Morgan).

                              -19-

individual with respect to his compensation, terms, conditions,
or privileges of employment, because of such individual's age."
29 U.S.C. § 623(a)(1).  The ADEA's prohibition against
discrimination based on age protects employees who are at least
forty years of age.  29 U.S.C. § 631(a).

The Second Circuit analyzes ADEA claims by using the burden-
shifting framework for Title VII claims set forth in McDonnell
Douglas.  See Abdu-Brisson v. Delta Air Lines, Inc., 239 F.3d
456, 466 (2d Cir. 2001).  "First, a plaintiff must establish a
prima facie case of age discrimination."  Schnabel v. Abramson,
232 F.3d 83, 87 (2d Cir. 2000).  "To establish a prima facie case
of age discrimination, a plaintiff must show four things: (1)
[s]he is a member of the protected class; (2) [s]he is qualified
for her position; (3) [s]he has suffered an adverse employment
action; and (4) the circumstances surrounding that action give
rise to an inference of age discrimination."  Abdu-Brisson, 239
F.3d at 466 (footnote omitted).  "The burden of establishing a
prima facie case is not a heavy one.  One might characterize it
as minimal."  Carlton v. Mystic Transp., Inc., 202 F.3d 129, 134
(2d Cir. 2000).  Once the plaintiff has established a prima facie
case of age discrimination, "the employer is required to offer a
legitimate, nondiscriminatory business rationale for its
actions."  Schnabel, 232 F.3d at 87.  If, however, the employer
articulates such a legitimate, nondiscriminatory business

rationale, "the plaintiff has the burden of proving that [her] age was the real reason for [her] discharge." Id. That is, "the final burden rests on the plaintiff to prove not only that the proffered nondiscriminatory reason was pretextual but also that the defendant discriminated against the plaintiff." Slattery v. Swiss Reinsurance Am. Corp., 248 F.3d 87, 91 (2d Cir. 2001); see also Reeves, 530 U.S. at 143.

The court finds that the analysis of Kelley's age discrimination claims is substantially similar to the analysis of Kelley's sex discrimination claims. Kelley has established a prima facie case under the ADEA. There is no dispute that Kelley was a member of the protected class, that she was qualified for her position, and that she suffered an adverse employment action. The circumstances surrounding the adverse employment action taken towards Kelley give rise to an inference of age discrimination because Kelley was terminated while younger employees were retained. The burden then shifts to Sun, and Sun's legitimate, non-discriminatory reason for the adverse employment action is the same, i.e., its RIF.

For many of the reasons described in the court's analysis of Kelley's sex discrimination claims, the court finds that Kelley may be able to meet her burden of showing that Sun's reason for her termination was pretextual and that she was discriminated against her because of her age. The court need not restate all

the facts in detail again.  Fugazy recommended that, even though
they were in the bottom half of his sales stack rankings, Kelley
be terminated over Kozak, noting that Kozak had more "upside
potential."  "An employer's subjective evaluations 'are not
adequate [justification] by themselves because they may mask
prohibited prejudice.'"  Williams, 456 F. Supp. 2d at 384
(quoting Sweeney v. Research Found. of St. Univ. of N.Y., 711
F.2d 1179, 1185 (2d Cir. 1983)).

Furthermore, it is the role of the jury to determine what
Fugazy may have meant by using a phrase such as "upside
potential."  A reasonable finder of fact could conclude that this
phrase indicates Fugazy's preference for a younger worker (Kozak)
over an older worker (Kelley).  Also, the remark and laughter
during the incident involving hand cream, in addition to
potentially demonstrating discriminatory animus with regard to
sex, could potentially demonstrate discriminatory animus with
regard to age.  Regardless of what was intended by these
comments, "evidence of remarks by employer reflecting
discriminatory motive [i]s sufficient to 'raise[] a triable issue
as to whether the articulated reasons for [the employer's
conduct] were pretextual.'"  Holtz v. Rockefeller and Co., Inc.,
258 F.3d 62, 78 (2d Cir. 2001) (quoting Owens v. New York City
Hous. Auth., 934 F.2d 405, 410 (2d Cir. 1991); see Williams, 456
F. Supp. 2d at 384-85.  Consequently, with regard to Kelley's age

-22-

discrimination claims brought pursuant to the ADEA and CFEPA,[6]
Sun's motion for summary judgment **(dkt. # 74)** is **DENIED.**

### D. RETALIATION

Title VII, the ADEA, and CFEPA prohibit retaliation against
employees who exercise rights protected by those statutes. See 42
U.S.C. § 2000e-3(a); 29 U.S.C. § 623(d); Conn. Gen. Stat. § 46a-
60(4).  Title VII and ADEA retaliation claims both use the
McDonnell Douglas burden-shifting framework.  See Wanamaker v.
Columbian Rope Co., 108 F.3d 462, 465 (2d Cir. 1997).  CFEPA
retaliation claims are analyzed in the same manner as Title VII
and ADEA retaliation claims.  See Brittell v. Dep't of
Correction, 247 Conn. 148, 164 (1998); Webster v. Pomperaug Reg'l
Sch. Dist. 15, No. 3:04CV1265(DJS), 2007 WL 987539, at *17 (D.
Conn. March 30, 2007).

"The court's first step is to determine whether the
plaintiff established a prima facie case of retaliation."  Id.
"The plaintiff's burden at this stage is slight–[s]he may
establish a prima facie case with de minimis evidence."  Id.  "In
order to establish a prima facie case of retaliation, [a
plaintiff] must show that: (1) she engaged in a protected
activity; (2) her employer was aware of this activity; (3) the
employer took adverse employment action against her; and (4) a

---

[6]CFEPA age discrimination claims, like CFEPA sex discrimination claims,
look to federal precedent for interpretation and enforcement.  See Williams,
456 F. Supp. 2d at 383.

causal connection exists between the alleged adverse action and
the protected activity." Schiano v. Quality Payroll Sys., Inc.,
445 F.3d 597, 608 (2d Cir. 2006); see Kessler v. Westchester
County Dep't of Soc. Servs., 461 F.3d 199, 205-06 (2d Cir. 2006).
Next, if a plaintiff establishes a prima facie case, "[t]he
burden then must shift to the [defendant] to articulate some
legitimate, nondiscriminatory reason for the [adverse employment
action]." McDonnell Douglas, 411 U.S. at 802.   Finally, if the
defendant does articulate a legitimate, nondiscriminatory reason
for the adverse employment action, "[t]he plaintiff then has the
opportunity to prove 'by a preponderance of the evidence that the
legitimate reasons offered by the defendant were not its true
reasons, but were a pretext . . . .'" Back v. Hastings On Hudson
Union Free Sch. Dist., 365 F.3d 107, 123 (2d Cir. 2004) (quoting
Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253
(1981)); see McDonnell Douglas, 411 U.S. at 804.  Sun claims that
Kelley has not satisfied her prima facie retaliation case,
arguing that: (1) Kelley did not engage in protected activity of
which Sun was aware; (2) Kelley did not suffer an adverse
employment action; and (3) there is no causal connection between
the alleged adverse action and the protected activity.

To participate in a "protected activity," Kelley did not
have to file of formal charges of discrimination because
"protected activity" includes "informal protests of

discriminatory employment practices, including making complaints
to management, writing critical letters to customers, protesting
against discrimination by industry or by society in general, and
expressing support of co-workers who have filed formal charges."
Sumner v. U.S. Postal Service, 899 F.2d 203, 209 (2d Cir. 1990).
"As to the 'protected activity' element of a Title VII or ADEA
retaliation claim, the plaintiff need only 'have had a good
faith, reasonable belief that [s]he was opposing an employment
practice made unlawful by Title VII [or the ADEA].'" Kessler,
461 F.3d at 210 (quoting McMenemy v. City of Rochester, 241 F.3d
279, 285 (2d Cir. 2001)).  Sun does not argue that complaints to
Fugazy or HR could not constitute "protected activities," nor
does Sun question Kelley's belief that she was opposing conduct
prohibited by Title VII or the ADEA.

     Sun does maintain, however, that, because Kelley's
complaints did not specifically reference sex or age
discrimination, Sun was not aware that Kelley's complaints were
about sex and age discrimination.  As Sun points out, "implicit
in the requirement that the employer have been aware of the
protected activity is the requirement that it understood, or
could reasonably have understood, that the plaintiff's opposition
was directed at conduct prohibited by Title VII [or the ADEA]."
Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp., 136 F.3d 276,
292 (2d Cir. 1998).  On the other hand, as Kelley points out,

"[a]n employee is not required to use legal terms or buzzwords when opposing discrimination." <u>Wirtz v. Kansas Farm Bureau Servs., Inc.</u>, 274 F. Supp. 2d 1198, 1212 (D. Kan. 2003).  Here, HR was aware of Kelley's complaints about Fugazy yelling at her, and an HR representative testified that Kelley overheard Fugazy telling another co-worker that "you need to play hockey," which Kelley took to mean that "she had to play hockey to get ahead at Sun." (<u>See</u> dkt. # 85, Ex. 5, DeBorja Depo. at 15, 18-20.)  HR was also aware of Kelley's complaint that Fugazy was preventing her from getting other positions at Sun.  (<u>See id.</u> at 20.) Furthermore, Fugazy testified to the following:

> A.  I was instructed by HR based on really a tense interaction not to-not to have any direct contact with Meg [Kelley].
> Q.  Tense, T-E-N-S-E?
> A.  Correct.
> Q.  When did you get that directive?
> A.  Shortly after she was notified.  I believe she contacted HR and for the first time made complaints about Steve Fugazy.  So it was HR directing me.

(<u>Id.</u>, Ex. 3, Fugazy Depo. at 176:21-177:5.)  Based on the foregoing, the court believes there is a genuine issue of material fact with respect to whether the Sun may have understood that Kelley's grievances concerned discrimination.

Sun next argues that Kelley did not suffer an adverse employment action, which Sun defines as a "materially adverse change in the compensation, terms, conditions, or privileges of employment."  It is true that, in the Second Circuit,

"[e]mployment actions that have been deemed sufficiently
disadvantageous to constitute an adverse employment action
include a termination of employment, a demotion evidenced by a
decrease in wage or salary, a less distinguished title, a
material loss of benefits, significantly diminished material
responsibilities, or other indices . . . unique to a particular
situation." Kessler, 461 F.3d at 207 (internal quotation marks
omitted).

Nevertheless, with regard to retaliation claims, the Supreme
Court has set forth a more lenient standard. "[A] plaintiff must
show that a reasonable employee would have found the challenged
action materially adverse, which in this context means it well
might have dissuaded a reasonable worker from making or
supporting a charge of discrimination." Burlington N. and Santa
Fe Ry. Co. v. White, 126 S. Ct. 2405, 2415 (2006) (internal
quotation marks omitted). Thus, "the means by which an employer
can retaliate against an employee are not limited to altering his
compensation, terms, conditions, or privileges of employment
. . . ." Kessler, 461 F.3d at 208; see White, 126 S. Ct. at
2412-13. That is, with regard to adverse employment actions,
retaliation claims have a "more relaxed standard" than
substantive anti-discrimination claims, and are not limited to
conduct that affects the terms and conditions of employment, such
as hiring, firing, change in benefits, or reassignment. See

-27-

Douglas v. City of Waterbury, 494 F. Supp. 2d 112, 124 (D. Conn. 2007); Gomez v. Laidlaw Transit, Inc., 455 F. Supp. 2d 81, 89 (D. Conn. 2006); Perugini v. Stryker Orthopaedics, No. 305CV1289 MRK, 2007 WL 601454, at *10 (D. Conn. Feb. 22, 2007). Again, the plaintiff must show that his employer's actions well might have dissuaded a reasonable worker from making or supporting a charge of discrimination. See White, 126 S. Ct. at 2415.

In light of the above, the court concludes that Kelley has adequately alleged adverse employment actions for the purposes of her retaliation claims. Even if the court were to consider only Sun's examples of the alleged retaliatory conduct (i.e., Sun's failure to investigate Kelley's claims or respond to her questions; Fugazy's instructions to Sun employees to not discuss Sun's accounts with Kelley; Fugazy's alleged "berating" of Kelley when she asked for a favorable job recommendation), the court would still conclude that summary judgment is inappropriate because these actions well might have dissuaded a reasonable worker from making or supporting a charge of discrimination. In addition, Kelley has submitted a number of other incidents, up to and including her termination in November 2001, that could constitute "adverse employment actions" in support of her retaliation claims.

Furthermore, the court rejects Sun's argument that the alleged retaliatory conduct occurred after Kelley was "pre-

-28-

notified" of termination.  As the Second Circuit has held,
"[e]ven employees who have been notified that they will be
terminated retain the protections of the ADEA [and Title VII]."
<u>Wanamaker</u>, 108 F.3d at 465.  "Generally, the ADEA, like Title
VII, protects individuals from actions injurious to current
employment or the ability to *secure future* employment."  <u>Id.</u> at
466 (emphasis in original).  "The terminated employee . . . may
have tangible *future* employment objectives, for which [s]he must
maintain a wholesome reputation.  Thus, plaintiffs may be able to
state a claim for retaliation, even though they are no longer
employed by the defendant company, if, for example, the company
'blacklists' the former employee, . . . wrongfully refuses to
write a recommendation to prospective employers, . . . or sullies
the plaintiff's reputation . . . ."  <u>Id.</u> at 466 (emphasis in
original) (internal citations omitted).  Kelley has testified
that Fugazy wrongfully refused to recommend her for another
position at Sun.  Although Fugazy might deny this, it is for the
jury, not the court, to determine who is more credible here.

     Sun next argues that there is no causal connection between
the alleged adverse action and the protected activity.
Specifically, Sun notes that each of the retaliatory actions
cited by Kelley occurred after Kelley had been informed of the
RIF.  According to Sun, "the fact that the decision to eliminate
Kelley predated the alleged retaliatory conduct attributed to Sun

. . . by [Kelley] destroys any causal continuum [Kelley] may attempt to create in support of her retaliation claim." The court finds this argument to be flawed. There is no dispute that, although Kelley had been notified of the RIF during her July 23, 2001 meeting with her supervisors, she had the opportunity to obtain another position at Sun. There is also no dispute that Kelley's employment with Sun officially terminated on November 18, 2001, not July 23, 2001. Kelley expressly alleges that, after the July 23, 2001 notification, Fugazy intentionally hindered her efforts to obtain another position at Sun. In the court's view, the "causal continuum" was not broken because Sun afforded Kelley the opportunity to seek another position with Sun. Consequently, with regard to Kelley's retaliation claims brought pursuant to Title VII, the ADEA and CFEPA, Sun's motion for summary judgment **(dkt. # 74)** is **DENIED**.

### E. UNPAID WAGES

Kelley claims that Sun violated Connecticut's wage collection statute by failing to pay her for commissions she earned at Sun. Connecticut's wage collection statute reads as follows: "When any employer fails to pay an employee wages in accordance with the provisions of sections 31-71a to 31-71i, inclusive, . . . such employee or labor organization may recover, in a civil action, twice the full amount of such wages . . . ." Conn. Gen. Stat. § 31-72. "Wages" are defined as "compensation

for labor or services rendered by an employee, whether the amount is determined on a time, task, piece, commission or other basis of calculation . . . ." Conn. Gen. Stat. § 31-71a(3). "[T]he wage statute[], as a whole, do[es] not provide substantive rights regarding how a wage is earned; rather, [it] provide[s] remedial protections for those cases in which the employer-employee wage agreement is violated." Mytych v. May Dept. Stores Co., 260 Conn. 152, 162 (2002).

Kelley has identified thirteen transactions for which she believes she is owed commission payments.[7] From the parties submissions, the court can discern the following: (1) all of the "Order Dates" for these transactions occurred between June 17, 2001 and July 13, 2001; (2) all of the "Ship Dates" for these transactions occurred between July 11, 2001 and August 14, 2001; and (3) all of these transactions occurred in Sun's 2002 Fiscal Year.

Sun classifies sales as "direct" or "indirect"; Sun has submitted evidence that the thirteen transactions were "direct." With regard to employee "separations" (or terminations), Section 26 of Sun's 2001 Sales Compensation Plan ("the Plan"), which controlled Kelley's employment relationship with Sun, reads as follows: "For direct transactions, an employee separated from Sun

---

[7]Kelley also alleges that she was not credited with "many, many more sales" than these specific thirteen transactions. Absent any evidence establishing their existence, however, the court cannot credit Kelley's assertions with regard to these "many, many more sales."

either voluntarily or involuntarily . . . shall be paid salary
and **earned** commissions (as defined in Section 17 . . . ) up to
his or her termination date." (Dkt. # 85, Ex. 11 at SUN00317
(emphasis in original).) Section 17 of the Plan defines "earned
commissions" as follows:

> Commission is earned on direct business and considered
> due and payable to any participant in the commission
> plan upon revenue recognition and receipt by Sun of
> full payment for all commissionable products. Direct
> purchase commissions are advanced 50% of net value to
> Sun at time of shipment and the remaining 50% of
> commissions is paid upon receipt by Sun of payment for
> all authorized products.

(Id. at SUN00288.)

All of the thirteen transactions at issue were shipped prior
to Kelley's official termination in November 2001. Nevertheless,
the court is forced to conclude that Sun did not fail to pay
Kelley "wages" under Connecticut law because Sun's Plan dictated
that Kelley was not entitled to receive any commission payments
for these transactions. The "General Provisions" portion of
Section 1 of the Plan reads as follows:

> No incentive compensation payments will be made to
> anyone covered by this Plan until a fully executed copy
> of the [employee's] Goal Sheet is signed by the
> participant, two levels of management and the Area
> controller.
>
> Incentive compensation calculations for all
> participants will be based upon fiscal weeks, months or
> quarters as appropriate and as defined by Sun's
> applicable fiscal year calendar . . . .

(Dkt. # 77, Ex. A.) The thirteen transactions occurred in Sun's

-32-

2002 Fiscal Year, and Kelley did not have a Goal Sheet for that
fiscal year.  Therefore, even though the shipping dates for these
transactions occurred before Kelley's official termination date,
the Plan directed that Sun was not obligated to make the
commission payments to her.  Thus, Kelley was not owed "wages" as
defined under Connecticut law.  Consequently, with regard to
Kelley's claim brought pursuant to Connecticut's wage collection
statute, Conn. Gen. Stat. § 31-72, Sun's motion for summary
judgment **(dkt. # 74)** is **GRANTED.**

### F. UNJUST ENRICHMENT

Kelley's unjust enrichment claim, however, survives summary
judgement.  "Unjust enrichment applies whenever 'justice requires
compensation to be given for property or services rendered under
a contract, and no remedy is available by an action on the
contract . . . .'"  Gagne v. Vaccaro, 255 Conn. 390, 401 (2001)
(quoting 12 S. Williston, Contracts (3d Ed.1970) § 1479, p. 272);
see Moran v. Morneau, 100 Conn. App. 169, 171 n.1 (2007)
("[U]njust enrichment is a legal doctrine to be applied when no
remedy is available pursuant to a contract."); United Coastal
Indus., Inc. v. Clearheart Constr. Co., Inc., 71 Conn. App. 506,
512 (2002).  Even though, under Sun's Plan, Kelley was not
entitled to a commission (i.e., "wages") for the thirteen
transactions, thus precluding her from prevailing under
Connecticut's wage statute, the court is not bound by the Plan's

terms when considering an unjust enrichment claim. "Indeed, lack of a remedy under the contract is a precondition for recovery based upon unjust enrichment. Not unlike quantum meruit, it is a doctrine based on the postulate that it is contrary to equity and fairness for a defendant to retain a benefit at the expense of the plaintiff." Gagne, 255 Conn. at 401.

"Plaintiffs seeking recovery for unjust enrichment must prove (1) that the defendants were benefited, (2) that the defendants unjustly did not pay the plaintiffs for the benefits, and (3) that the failure of payment was to the plaintiffs' detriment." Hartford Whalers Hockey Club v. Uniroyal Goodrich Tire Co., 231 Conn. 276, 283 (1994) (internal quotation marks omitted). "Unjust enrichment is, consistent with the principles of equity, a broad and flexible remedy." Id. (internal quotation marks omitted).

Based on the parties submissions, the court finds that there are issues of fact with regard to Kelley's unjust enrichment claim. There is evidence that Kelley conducted the thirteen transactions (and that some of these transactions were conducted before the July 23, 2001 notification). There is evidence that the shipping for those transactions took place before Kelley's official termination date. There is evidence that Kelley did not receive any payments for those thirteen transactions. Thus, apparently Kelley performed some acts, from which Sun benefitted,

-34-

yet for which Kelley, to her detriment, did not receive
compensation.  Under the Plan, a Goal Sheet for the 2002 Fiscal
Year was required to receive commission payments for the thirteen
transactions in question.  Kelley has claimed that Sun did not
provide her with such a Goal Sheet, presumably to prevent her
from complying with the Plan and receiving her commission
payments.  The court cannot grant summary judgment with these
facts at issue.  It is for a jury to decide whether Sun unjustly
withheld payment from Kelley.  Consequently, with regard to
Kelley's unjust enrichment claim, Sun's motion for summary
judgment **(dkt. # 74)** is **DENIED.**

### III. CONCLUSION

For the foregoing reasons, Sun Microsystems, Inc.'s motion
for summary judgment **(dkt. # 74)** is:  **GRANTED only with respect
to Margaret Mary Kelley's claim brought pursuant to Connecticut's
wage collection statute, Conn. Gen. Stat. § 31-72.  Judgment in
favor of Sun Microsystems, Inc. shall enter on the Seventh Count
of the Second Amended Complaint; and (2) DENIED in all other
respects.**

SO ORDERED this 8th  day of November, 2007.

                                /s/DJS
                        DOMINIC J. SQUATRITO
                        UNITED STATES DISTRICT JUDGE

-35-